**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC. ) | Case No.: |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | **COMPLAINT FOR** |
| ) | **DECLARATORY** |
| UNITED STATES ARMY CORPS ) | **JUDGMENT AND** |
| OF ENGINEERS; ) | **INJUNCTIVE RELIEF** |
| and ) | |
| ) | |
| Lieutenant General Todd T. Semonite, ) | |
| in his official capacity as Commanding General ) | |
| of the United States Army Corps of Engineers; ) | |
| and ) | |
| ) | |
| Col. William M. Conde, in his official ) | |
| capacity as District Engineer ) | |
| of the United States Army Corps of Engineers; ) | |
| and ) | |
| ) | |
| Frank J. Del Giudice,  in his official ) | |
| Capacity as Acting Deputy Chief of the ) | |
| Regulatory Division, New England District; ) | |
| of the United States Army Corps of Engineers; ) | |
| and ) | |
| ) | |
| PUBLIC SERVICE OF NEW HAMPSHIRE ) | |
| D/B/A EVERSOURCE ENERGY ) | |
| ) | |
| Defendants ) | |
| ) | |

## I.  INTRODUCTION

1.      This is an action to prevent the United States Army Corps of Engineers and Lt.

General Semonite, Col. Conde and Mr. Del Giudice, in their official capacities, (collectively, the

"Corps") and Public Service of New Hampshire d/b/a Eversource Energy (the "Applicant" or

"Eversource,") (together with the Corps, "Defendants") from irreparably and unnecessarily damaging Little Bay, part of the Great Bay estuary, in violation of the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), the Rivers and Harbors Act ("RHA"), and the regulations implementing those statutes.

2.      Specifically, this action challenges the Department of the Army Environmental Assessment and Statement of Findings for Permit Application NAE 215-00665 ("EA/SOF"), Exhibit 1, and Department of Army permit NAE-2015-00665 (the "Permit"), Exhibit 2, issued by the New England District of the Corps on July 2, 2019.

3.      Approval of the Permit will allow for direct and indirect adverse impacts to wetlands and estuarine habitat, including the release of more than 1,500 tons of sediment into Little Bay and the installation of up to 8,681 square feet of concrete mattresses in the bay. Conservation Law Foundation, Inc. ("CLF" or "Plaintiff") files this suit to challenge the Corps' failure to comply with federal law and to prevent unnecessary adverse impacts to an estuary of national significance.

4.      The project being challenged through this action is a 12.9 mile long 115 kV electric transmission line between existing substations in Madbury, New Hampshire and Portsmouth, New Hampshire, known as the Seacoast Reliability Project ("SRP" or the "Project"). The Project includes a nearly one-mile crossing of Little Bay between Durham and Newington, which Eversource proposes to bury using a jet plow, hand-jetting, and trenching, and will result in the permanent impact of up to 8,681 square feet in Little Bay due to the installation of concrete mattresses.

5.      Congress, through the passage of various environmental laws, has emphasized repeatedly that all federal agencies must give careful consideration to decisions that impact the

environment. When an agency's action will significantly affect the environment, NEPA requires the agency to prepare an Environmental Impact Statement to evaluate all of the reasonably foreseeable environmental impacts of its decision, and carefully consider alternatives with lesser impacts. Similarly, the CWA prohibits the Corps from issuing permits to dredge and fill wetlands unless it has determined that the activity would not have an unacceptable adverse impact on the ecosystem, that there are no practical alternatives that would have lesser adverse impact on the aquatic ecosystem, that there will be no significant degradation of waters of the United States, that the Permit is in the public interest, and that there will be no net loss of wetland functions.

6.      In authorizing the Project, the Corps violated NEPA by (i) failing to require the Applicant to demonstrate a need for the Project; (ii) failing to prepare a required Environmental Impact Statement ("EIS") before authorizing activities that will have a significant impact on the environment; and (iii) failing to consider feasible alternatives to the Project, including alternatives that would avoid and minimize the Project's impacts on special aquatic sites.

7.      The Corps also violated the CWA, the RHA, and its own regulations implementing those two statutes by (i) approving the Project despite the availability of less-damaging practicable alternatives; and (ii) arbitrarily and capriciously determining that the Project is in the public interest.

## II.  JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. § 1331 because this action presents a federal question under the laws of the United States, including the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*; the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.*; the Clean Water Act (CWA), 33 U.S.C. § 1344 *et seq.*; and the Rivers and Harbors Act (RHA), 33 U.S.C. § 403 *et seq.* Plaintiff has exhausted all administrative remedies

available to it as required by the APA. Plaintiff's request for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201(a) and 2202 and 5 U.S.C. § 706(2)(A).

9.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) as the Corps is an agency of the United States, Lt. General Semonite, Col. Conde, and Mr. Del Giudice are officers and employees of the United States acting in their official capacities, Eversource is a New Hampshire corporation, and the location of the proposed Project is in New Hampshire.

### III.  PARTIES

10.     Plaintiff Conservation Law Foundation ("CLF") is a not-for-profit corporation incorporated under the laws of the Commonwealth of Massachusetts and with offices at 27 North Main Street, Concord, New Hampshire, where it has maintained an advocacy center since 1998. CLF is dedicated to solving environmental problems that threaten the people, communities and natural resources of New Hampshire and other New England states.   Its advocacy includes, among other issues, the restoration and protection of water resources.  As part of these advocacy efforts, CLF has worked actively for years to restore and protect the Great Bay estuary, including through its Great Bay - Piscataqua Waterkeeper program, and has actively engaged in the environmental review processes for the Seacoast Reliability Project. CLF is a member-supported organization, with more than 600 members in New Hampshire, and nearly 5000 members throughout New England.  CLF's members include individuals who reside in communities that will be affected by the proposed Project that is the subject of this action, and who will themselves be adversely affected.  Such members include individuals who reside in Durham on property adjacent to Little Bay, in close proximity to the Project, and who use and enjoy Little Bay for recreational and aesthetic purposes; individuals who are deeply concerned about the impacts of the proposed transmission line burial and associated use of concrete mattresses in

4

Little Bay; and an individual who owns and operates a commercial shellfishing company that raises in oysters in Little Bay, who is greatly concerned about the Project's impacts to Little Bay and his company's aquaculture business.  CLF and members of CLF have participated in aspects of the environmental review process for the proposed project. CLF and its members will suffer harm if Eversource is allowed to proceed with the Project as planned based on the legally deficient planning and review process that led to its approval.

11.     Defendant United States Army Corps of Engineers is an agency of the federal government within the United States Department of the Army, with a mailing address of 441 G Street NW, Washington, DC 20314-1000. The Corps is responsible for issuing permits to dredge and fill waters of the United States pursuant to Section 404 of the CWA and Section 10 of the RHA.

12.     Lieutenant General Todd T. Semonite is named in his official capacity as Commanding General of the U.S. Army Corps of Engineers and as an officer and employee of the United States and its agency, the Department of the Army, with a mailing address of 441 G Street NW, Washington, DC 20314-1000.

13.     Colonel William M. Conde is named in his official capacity as District Engineer of the New England District, U.S. Army Corps of Engineers and as an officer and employee of the United States and its agency, the Department of the Army, with a mailing address of 696 Virginia Road, Concord, MA 01742.

14.     Frank J. Del Giudice is named in his official capacity as Acting Deputy Chief of the Regulatory Division of the New England District, U.S. Army Corps of Engineers and as an officer and employee of the United States and its agency, the Department of the Army, with a mailing address of 696 Virginia Road, Concord, MA 01742.

15.     Defendant Public Service Company of New Hampshire d/b/a Eversource Energy is incorporated under the laws of the State of New Hampshire with a mailing address of 780 N. Commercial Street, Manchester, New Hampshire 03101. It applied to the Corps for a Department of the Army Permit to construct the Project.

## IV.  STATUTORY AND REGULATORY FRAMEWORK

A.     Administrative Procedure Act

16.     The APA governs the scope of review of Plaintiff's claims against the Corps. Because NEPA, the CWA, and the RHA contain no internal standards of review, section 706 of the APA, 5 U.S.C. § 706, provides the standard of review for the agency actions at issue. *Adams v. United States EPA*, 38 F.3d 43, 49 (1st Cir.1994).

17.     The APA states, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

18.     The APA further explains "the reviewing court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or which have been taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

B.     National Environmental Policy Act

19.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). The Council on Environmental Quality (CEQ) promulgated regulations that govern an agency's implementation of NEPA. 40 C.F.R. § 1500 *et seq.* Additionally, many federal agencies, including the Corps, have promulgated their own regulations or guidance documents that govern the NEPA process. The Corps' NEPA regulations are set forth at 33 C.F.R. Part 230.

20.     NEPA's purpose is to "insure that environmental information is available to
public officials and citizens before decisions are made and before actions are taken," and "to help
public officials make decisions that are based on understanding of environmental consequences
...." 40 C.F.R. § 1500.1(b)-(c). Hence, NEPA requires federal agencies to take a "hard look" at
the potential direct and indirect impacts of proposed actions, as well as the cumulative impacts of
those actions. *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir. 1996). "The
hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright
acknowledgement of potential environmental harms." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422
F.3d 174, 187 (4th Cir. 2005) (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S.
332, 350 (1989)). Strict adherence to NEPA's procedural requirements ensures that the agencies
and the public are properly informed about the full scope of environmental consequences of a
proposed action before construction begins.

21.     NEPA requires all federal agencies to prepare a "detailed statement"—known as
an Environmental Impact Statement—for all "major federal actions significantly affecting the
quality of the human environment ...." 42 U.S.C. § 4332(C). This duty extends to any federal
actions that "*will or may*" have a significant effect on the environment. 40 C.F.R. § 1508.3
(emphasis added). The agency's recommendation must include a detailed statement of the
environmental impacts, any adverse environmental effects that cannot be avoided, alternatives to
the proposed action, including a no action alternative, the relationship between local short-term
uses of man's environment and the maintenance and enhancement of long-term productivity, and
any irreversible and irretrievable commitments of resources which would be involved in the
proposed action should it be implemented. *See* 42 U.S.C. § 4332. This requirement is designed to
ensure that NEPA's environmental protection policies are integrated into environmental

decision-making and provide a means by which decision-makers and the public can evaluate the environmental impacts. 40 C.F.R. §§ 1501.1(a), 1502.1.

22.     NEPA establishes several criteria for determining whether an impact is significant. Whether the impacts of an action may be "significant" within the meaning of NEPA depends on both context and intensity. *Id*. § 1508.27. "Context" "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). "Both short- and long-term effects are relevant." *Id.* "Intensity" refers to the severity of impact and requires the agency to evaluate a number of factors. *Id.* § 1508.27(b). Among these are the "degree to which the proposed action affects public health or safety," the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands [and] ecologically critical areas," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environmental are highly uncertain or involve unique or unknown risks," "[t]he degree to which the action may establish a precedent for future actions with significant effects," "whether the action is related to other actions with … cumulatively significant impacts," and "the degree to which the action may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b). "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." *Id.*

23.     In reviewing the effect an action may have on the environment, and in considering the effects of possible alternatives, the agency must consider the direct, indirect and cumulative impacts on the environment. 40 C.F.R. § 1508.8 ("[e]ffects and impacts … are synonymous … [and include] direct, indirect, or cumulative" effects). "Direct effects … are caused by the action

and occur at the same time and place." *Id.* "Indirect effects … are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.* "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

24.     When an agency is uncertain whether an activity will have a significant effect on the environment, and thus, whether it has a duty to prepare an Environmental Impact Statement (EIS), the agency may prepare an Environmental Assessment (EA) to assist it in determining whether the action may have a significant environmental effect. 40 C.F.R. §§ 1508.9, 1501.4. The EA must include "discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). The agency must "provide sufficient evidence and analysis" of the direct, indirect and cumulative environmental impacts of the proposed action and the alternatives considered to support its "determination whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(l). As the CEQ regulations make clear, "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. 1508.27(b)(1).

25.     If, after preparing an EA, the agency determines that there will be no significant impact, it must prepare a "finding of no significant impact," or "FONSI," and make the finding available to the public. 40 C.F.R. §§ 1501.4, 1508.13. Even if the agency properly decides that an EIS is unnecessary, its EA must be sufficiently detailed to adequately address potential impacts and reasonable alternatives. 40 C.F.R. §§ 1508.9.

26.     If the EA, on the other hand, cannot support a FONSI determination, then the agency must prepare an EIS. *Sierra Club v. Marsh*, 769 F.2d 868, 882 (1st Cir. 1985) ("[T]he record in this case cannot support a FONSI, and therefore an EIS must be prepared.").

27.     The Corps has developed specific regulations to provide guidance on how to determine if an EA—combined with the FONSI, 404(b)(1) Guidelines, and a statement of findings—is sufficient to make a final determination, or whether an EIS is necessary. One factor in those regulations is that "[t]he combined document normally should not exceed 15 pages and shall conclude with a FONSI (*See* 40 CFR 1508.13) or a determination that an EIS is required." 33 C.F.R. § Pt. 325, App. B ¶ 7(a).

28.     33 C.F.R. § Pt. 325, App. B also explains under which circumstances the Corps should consider the impacts of the proposed project on resources outside the Corps' regulatory boundary. The regulations explain that in those instances when "the Corps permit bears upon the origin and destination as well as the route of the project outside the Corps regulatory boundaries, the scope of analysis should include those portions of the project outside the boundaries of the Corps section 10/404 regulatory jurisdiction." *Id.* at 7(b)(3). "In all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal." *Id.*

10

29.     NEPA also provides that agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This requirement applies "whether an agency is preparing an [EIS] or an [EA]." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir.2008) (per curiam) (citations omitted).

30.     In analyzing alternatives, NEPA requires an "intense consideration of other more ecologically sound courses of action." *Envtl. Def. Fund, Inc. v. U.S. Army Corps of Eng'rs*, 492 F.2d 1123, 1135 (5th Cir. 1974); *see also* 40 C.F.R. § 1502.16. The First Circuit has further elaborated that an agency has an independent duty to identify and evaluate reasonable alternatives, particularly those that are raised by other agencies or during the public comment period.  *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1291 (1st Cir. 1996) ("In respect to alternatives, an agency must on its own initiative study all alternatives that appear reasonable and appropriate for study at the time, and must also look into other significant alternatives that are called to its attention by other agencies, or by the public during the comment period afforded for that purpose."). "The existence of a viable but unexamined alternative renders an EA inadequate." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013)(citations omitted).

31.     Moreover, the Corps' regulations explain that during the preparation of NEPA documents, it must "exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective" and that "[t]he Corps is neither an opponent nor a proponent of the applicant's proposal[.]" 33 C.F.R. § Pt. 325, App. B.

C.     Rivers and Harbors Act and Clean Water Act

32.     The Rivers and Harbors Act of 1899 is the nation's oldest environmental law. The statute prohibits a number of activities that impair ports, channels and other navigable waters. The RHA applies only in "navigable" waters, defined as waters subject to the ebb and flow of the tides, or waters that are "presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4.

33.     Section 10 of the RHA, 33 U.S.C. § 403, among other things, makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of" any navigable water without a permit from the Corps. *Id.* and 33 C.F.R. § 320.2(b).

34.     In 1972, Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Unlike the RHA, which only applies to *navigable* waters, the CWA applies to *all* waters of the United States.

35.     The CWA prohibits the discharge of any pollutant into the waters of the United States, including wetlands, without a permit. 33 U.S.C. § 1311(a). The term "pollutant" includes "dredge spoil," "solid waste," "rock, sand, cellar dirt and industrial … waste discharged into water." 33 U.S.C. § 1362(6).

36.     Section 404 of the CWA authorizes the Corps to issue permits for the discharge of "dredged or fill materials" into waters of the United States. 33 C.F.R. § 320.2(f). In reviewing applications for CWA 404 permits, the Corps must follow its own regulations at 33 C.F.R. § 320-330 and EPA regulations – EPA's so-called Section 404(b) Guidelines – at 40 C.F.R. § 230.1-230.80. *See* 33 C.F.R. § 320.2(f).

37.     The EPA's Section 404(b) Guidelines explain that "the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts," and "[t]he guiding principle should be that degradation or

destruction of special [wetland] sites may represent an irreversible loss of valuable aquatic

resources." 40 C.F.R. § 230.1. As a result, "[d]redged or fill material should not be discharged

into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an

unacceptable adverse impact either individually or in combination with known and/or probable

impacts of other activities affecting the ecosystems of concern." 40 C.F.R. § 230.1(c).

38.     EPA's Section 404(b) Guidelines establish several prohibitions to discharges to

waters. First, "no discharge of dredged or fill material shall be permitted if there is a practicable

alternative to the proposed discharge which would have less adverse impact on the aquatic

ecosystem ...." 40 C.F.R. § 230.10(a). The inquiry into practicability goes to both on-site and off-

site - that is "internal" and "external" - alternatives. *Id.*.

39.     An alternative is deemed practicable "if it is available and capable of being done

after taking into consideration cost, existing technology, and logistics in light of overall project

purposes." 40 C.F.R. § 230.10(a)(2). The inquiry into "cost" involves whether the alternatives to

be considered are "reasonable in terms of the overall scope/cost of the proposed project"; under

such an analysis, an alternative is not practicable if it is "unreasonably expensive." 45 Fed. Reg.

at 85339, 43.

40.     Moreover, the EPA's Section 404(b) Guidelines establish a strong presumption

that there are practicable alternatives to the discharge of fill to jurisdictional waters if the activity

to be permitted is not "water dependent," that is, if it "does not require access or proximity to or

siting within" a wetland "to fulfill its basic purpose," such as a marina. It is the burden of the

applicant to rebut the presumption by "clearly demonstrat[ing]" that there is no other practicable

alternative that would avoid or minimize the wetlands losses. 40 C.F.R. § 230.10(a)(3). "In

addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to

the proposed discharge which do not involve a discharge into a special aquatic site are presumed
to have less adverse impact on the aquatic ecosystem, *unless clearly demonstrated otherwise*."
*Id.* (emphasis added).

41.     The Corps is prohibited from issuing a Section 404 permit unless there is
"sufficient information to make a reasonable judgment as to whether the proposed discharge will
comply with [the] Guidelines." 40 C.F.R. § 230.12(a)(3)(iv). "[A]ll requirements in § 230.10
must be met" before a permit may issue. 40 C.F.R. § 230.10.

42.     A second prohibition to issuing a permit under the EPA's Section 404(b)
Guidelines is that "no discharge of dredged or fill material shall be permitted which will cause or
contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c).
"[E]ffects contributing to significant degradation considered individually or collectively, include:
[s]ignificantly adverse effects of the discharge of pollutants on human health or welfare,
including but not limited to effects on municipal water supplies, plankton, fish, shellfish,
wildlife, and special aquatic sites." *Id.; see also id.* at 40 C.F.R. § 230(c)(2),(3), (4). "Such
effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity
of a wetland to assimilate nutrients [or] purify water." 40 C.F.R. § 230.10(c)(3). "Significant" in
this context means anything that is "more than trivial." 45 Fed. Reg. at 85343. The Corps must
base its "significant degradation" determination on the potential short-term or long-term effects,
including cumulative and secondary effects, of the proposed discharge on the physical, chemical,
and biological components of the aquatic environment. 40 C.F.R. §§ 230.10(c); 230.11 (g), (h).
"Secondary effects are effects on an aquatic ecosystem that are associated with a discharge of
dredged or fill materials, but do not result from the actual placement of the dredged or fill
material." 40 C.F.R. § 230.11(h).

43.     A third prohibition under the Section 404(b) Guidelines is that – even if the Corps

finds that there are no practicable alternatives for a proposed project – "no discharge of dredged

or fill material shall be permitted unless appropriate and practicable steps have been taken which

will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. §

230.10(d). "[A]ll reasonable reduction in impacts [must] be obtained." 45 Fed. Reg. at 85344.

44.     The Corps' regulations provide that "[n]o permit will be granted which involves

the alteration of wetlands identified as important" unless the Corps finds, after its "public interest

review," that "the benefits of the proposed alteration outweigh the damage to the wetlands

resource," and that the proposed alteration is necessary to realize those benefits. 33 C.F.R. §

320.4(a), (b). In its review, the Corps must consider "[a]ll factors which may be relevant to the

proposal" including "the cumulative effects" of the project. 33 C.F.R. § 320.4(a)(1).

Additionally, the Corps must also consider "[t]he relative extent of the public and private need

for the proposed structure or work" and "the practicability of using reasonable alternative

locations and methods to accomplish the objective of the proposed structure or work[.]" *Id.* §

320.4(a)(2).

45.     The Corps' regulations provide eight criteria for determining whether any given

waters "perform functions important to the public interest," including: whether the waters "serve

significant natural biological functions, including food chain production, general habitat and

nesting, spawning, rearing and resting sites for aquatic and land species;" whether they have

been "set aside for study of the aquatic environment or as sanctuaries or refuges;" whether the

waters are of such character that the "destruction or alteration of which would affect

detrimentally … other environmental characteristics;" whether they "serve as valuable storage

areas for storm and flood waters;" whether they "serve significant water purification functions";

and whether they are "unique in nature or scarce in quantity to the region or local area." 33 C.F.R. § 320.4(b)(2).

## V. <u>SUMMARY OF ALLEGATIONS</u>

46.     This action alleges that the Corps violated the NEPA process and unlawfully issued a permit that violates the provisions of the CWA and the RHA.

47.     This suit challenges the Corps' findings under NEPA as set forth in the Department of the Army Environmental Assessment and Statement of Findings for Permit Application NAE 2015-00665 dated July 2, 2019 (the "EA/SOF") and the Corps' decision to grant the Department of the Army Permit (Permit No: NAE-2015-00665) on July 2, 2019 (the "Permit").

48.     Although the Corps and Eversource proceeded for years under the premise that the Project would qualify under the New Hampshire Programmatic General Permit issued by the Corps, the Corps determined in April 2019 — after receiving correspondence from CLF stating that the Project could not proceed under the Programmatic General Permit (Exhibit 3)— that it would require an Individual Permit. Despite this late reversal, the Corps still granted Eversource the Permit on July 2, 2019—less than three months after first deciding that an Individual Permit was even needed.

49.     The perfunctory and abbreviated NEPA process was deficient for a variety of reasons. First, the Corps failed to adequately (including independently) assess the underlying purpose and need for the Project in the EA. Then, the Corps did not take a "hard look" at the impacts of the project and erroneously concluded that the project would not "significantly" impact the environment. Related to its lack of a hard look was a failure to adequately evaluate the alternatives to Eversource's preferred alternative. The Corps did not independently identify

16

feasible alternatives that would have lesser impacts, nor did it evaluate viable alternatives identified during the public comments. Last, the Corps failed to include a convincing statement of reasons to support its FONSI.  Overall, the Corps' NEPA analysis relied heavily on Eversource's analysis and characterizations rather than the independent agency review required by NEPA.

50.    Moreover, this action challenges the Corps' unlawful issuance of a permit under Section 404 of the CWA and Section 10 of the RHA, for direct impacts to approximately 14 acres of jurisdictional waters. Since this Project is not "water dependent," the Corps was required to select the least environmentally damaging, practicable alternative. The Project is not. It includes permanent impacts to special aquatic sites ("SAS"). Relatedly, the Corps did not require Eversource to avoid and minimize adverse impacts to waters of the United States, as required in the 404(b)(1) Guidelines. Finally, the Permit will result in significant degradation of waters of the United States.

51.    CLF seeks remand of the Corps' permit so the Corps can conduct a comprehensive EIS; can accurately and thoroughly evaluate the environmental impact of the Project on jurisdictional waters; and can fully and independently assess the viability, costs, and impacts of all practicable alternatives.

## VI.  RELEVANT FACTS TO SUPPORT THE ALLEGATIONS

A.    Little Bay

52.    Little Bay is a public water with tidally submerged land that is held in trust by the State of New Hampshire for the benefit of the public. It is part of the larger Great Bay estuary, which has been designated an estuary of national significance under Section 320 of the Clean Water Act and which contains special aquatic sites. Little Bay and Great Bay are extremely valuable natural resources deserving of protection but are officially listed as water quality impaired under Section 303(d) of the CWA.

53.    The Great Bay estuary, including Little Bay, provides a diversity of essential habitats. Eelgrass habitat is a cornerstone of the ecosystem and provides numerous critical functions, such as stabilizing sediments, providing food sources for higher-trophic level estuarine organisms, providing structure and habitat for other organisms, and removing nutrients from the estuary.

54.    The estuary is also home to a wide variety of organisms, including fish, birds, invertebrates, and mammals. Of particular note, the estuary supports bald eagles and provides habitat for threatened Atlantic sturgeon.

55.    The estuary also provides habitat for oysters, including commercial oyster aquaculture, which provide important ecosystem functions and local economic benefits. Oysters are filter-feeders, which provide significant benefits to the ecosytem by removing excess nutrients, pathogens, and other contaminants. However, they are also susceptible to pollution from sedimentation and pathogens. Oyster populations were declining for many years, but have recently been on the rebound due to restoration efforts in Great Bay. This recovery is supporting a commercial oyster aquaculture industry, with 15 different companies or individuals operating in the bay.

56.     The estuary, including Little Bay, also provides important recreational opportunities for the public, including boating, fishing, swimming and aesthetic enjoyment.

57.     However, the Great Bay estuary is impaired and faces numerous challenges. According to the Piscataqua Region Estuaries Partnership's science- and data-driven 2018 *State of Our Estuaries* report, of sixteen indicators in the Great Bay estuary, twelve demonstrate negative or cautionary trends. Indicators exhibiting negative trends include eelgrass and oysters; indicators exhibiting cautionary trends include total suspended solids, nutrient concentration, nutrient loading from non-point sources, and other water quality challenges.

58.     Many of these indicators are interrelated. The high nutrient loading, particularly nitrogen, is causing eutrophication. The eutrophication in Little Bay can lead to algal blooms, which block light penetration to the seafloor and can kill eelgrass beds. Similarly, the eutrophication also promotes seaweed growth, which competes with eelgrass for the habitat on the seafloor. But eelgrass beds are a fundamental component of the bay's ecosystem and serve numerous important ecosystem functions: providing essential habitat, acting as a nursery, serving as a vital food resource, increasing dissolved oxygen concentrations, trapping suspended sediments, stabilizing loose substrate, and reducing wave energy. For these reasons and more, the National Oceanic and Atmospheric Administration has designated eelgrass as an essential fish habitat (EFH).

59.     The Piscataqua Region Estuaries Partnership, including the many scientists and stakeholders who have informed its analysis, has identified key management objectives for the estuary, including increasing eelgrass distribution and restoring connectivity of eelgrass beds; increasing the abundance of adult oysters at the estuary's six documented beds (to 10 million

oysters); improving water quality and mitigating pollution sources; stabilizing total suspended

solid concentrations; and managing nutrient loads to the estuary.

60.     To restore the health of the Great Bay estuary, and in particular to address the

adverse impacts of nitrogen pollution on eelgrass habitat and water quality, numerous

municipalities have made – and are making – significant public investments (well in excess of

$150 million, collectively) to upgrade sewage treatment facilities and stormwater management

infrastructure.

B.     Project Overview

61.     The Project is a new 12.9 mile long 115 kilovolt (kV) electric transmission line

that will consist of a combination of aboveground, buried, and underwater segments connecting

existing substations in Madbury, New Hampshire and Portsmouth, New Hampshire. The Project

would also upgrade the existing substations.

62.     The Project is split into nine different sections. Segments 1 (0.5 miles), 2 (0.9

miles), 4 (0.7 miles), 5 (5.1) miles, 7 (2.9 miles), 8 (0.3 miles), and 9 (0.8 miles) are all proposed

to be aboveground lines (total of 11.2 miles). Eversource would bury Segment 3 (0.4 miles).

Segment 6 includes the crossing of Little Bay, which Eversource proposes to bury under the bay

(1.1 miles) and adjacent land (0.3 miles). The Little Bay crossing is primarily at issue in this suit.

63.     For the Little Bay crossing, Eversource proposes to use a combination of jet

plowing, hand-jetting, and trenching to bury three cables in the estuary's sediments. Eversource

described the process to the New Hampshire Site Evaluation Committee ("NHSEC"), in its

NHSEC application ("NHSEC Application"):

>          The jet plow utilizes high-volume water pressure to temporarily liquefy
> the soft sediments immediately ahead of the plow blade. The water is sprayed out
> in specially designed nozzles located along the leading edge of the jet plow's
> blade. The submarine cable will feed from the barge, pass through the back of the

blade, and into the liquefied sediments. The majority of the sediment will settle into the trench leaving the cable installed at the desired depth.

The jet plow will reach within approximately 600 feet of the east shore, at which time the water depth will not allow further advancement of the barge towards the shoreline. At this point, the submarine cable will be unloaded from the plow, and the bitter end of the cable will be floated to the manhole using a winch from shore. The section of temporarily unburied cable between the end of jet plow position offshore and the excavated cable landing trench will be buried by divers utilizing water jet hoses and an excavator in the nearshore intertidal area. The intertidal areas that will be subject to diver burial and excavation will be enclosed within silt curtains.

NHSEC Application at 33-34.

64.    Before Eversource can install the three cables using the jet plow, however, it must remove some portions of existing, abandoned cable. This cable is buried within Little Bay up to two feet deep and will need to be physically removed. Then, Eversource will need to use a grapnel run to clear the route of any leftover debris. Some of the existing cable may contain lead.

65.    The proposed jet plow operation is projected to release approximately 1,000 cubic yards of sediment, equivalent to 1,500 tons of sediment, into the water column. Beyond just increasing the suspended solids concentration within the water column, this will also release pathogens, nutrients, and other contaminants. Sediment in Little Bay harbors bacteria, viruses, and other pathogens that are harmful to humans and other organisms within the bay, and are of particular concern with respect to oysters and people who consume oysters.

66.    As a comparison, the 1,000 cubic yards of sediment that would be released from the jet plowing is more than 150 times the annual total sediment yield to the bay, based on average estimates from 2006 to 2008. Similarly, the jet plowing would release more than 300 times the amount of nitrogen that the Durham wastewater treatment plant releases in an entire day.

67.     The scale of disturbance to the benthic zone of the estuary and to the sediments will also persist after the short term impacts of the project. Natural or anthropogenic disturbances to the floor of the bay would more easily re-suspend those disturbed sediments than non-disturbed sediments. Additionally, the nutrients, particularly nitrogen, trapped in pore water in sediments buried up to five feet deep would become more available, exacerbating eutrophic conditions in Little Bay and the Great Bay estuary.

68.     The removal of existing, abandoned cables in the Project location will also raise some of the same concerns, in that it will involve substantial disruption of sediments.

69.     Despite Eversource's proposed use of highly kinetic and disruptive jet plow technology, there are still areas within the estuary where the proposed methods would not bury the cables at sufficient depth. As a result, the Project includes the installation of up to 8,681 square feet of concrete mattresses in Little Bay to cover the shallow cables. These concrete mattresses, some of which will be exposed during low tide and highly visible, will cause the permanent loss of habitat and adverse impacts on recreational uses, including boating, within Little Bay.

C.     ISO-NE Reliability Needs Assessment

70.     In May 2010, ISO-New England ("ISO-NE") initiated the NH/VT Reliability Needs Assessment to evaluate the reliability of the New England regional transmission system over the 10-year period from 2010 through 2020. Similar assessments are initiated at the request of one or more stakeholders, or triggered by an event that would indicate an assessment is warranted.

71.     To complete an assessment, ISO-NE models the transmission system taking into account known or expected changes in transmission topology, capacity resources, load forecasts,

and other relevant system conditions as projected to occur or exist during the study planning

horizon. ISO-NE models various scenarios to determine whether reliability criteria violations are

identified under these stressed system conditions.

72.    The Reliability Needs Assessment used to justify SRP is titled "Vermont/New

Hampshire Transmission System 2011 Needs Assessment" ("NH/VT 2020 Needs Assessment")

dated September 2011 as revised pursuant to a "Follow-Up Analysis to the 2011 New

Hampshire/Vermont Needs Assessment" dated April 2012 ("NH/VT 2020 Follow Up Needs

Assessment"). The results of the NH/VT 2020 Needs Assessment determined that absent the

addition of new resources or transmission capacity, the New Hampshire Seacoast Area was

shown to have both thermal overloads and voltage criteria violations under certain contingencies.

73.    At the conclusion of a Reliability Needs Assessment, ISO-NE and the study team

members identify possible solutions ("Solution Study"). The NH/VT 2020 Solutions Study

identified multiple solutions for each sub-area, including four alternative transmission solutions

for the New Hampshire Seacoast sub-area. One of these alternatives was the current SRP, which

was chosen as the preferred alternative. Two of the other alternatives were only eliminated due to

higher costs estimates, and not concerns about impacts or performance. One of the alternatives

was eliminated due to poor electrical performance.

74.    The results of the NH/VT 2020 Needs Assessment and Solutions Study have been

updated periodically since being released to account for changes in load forecasting capabilities,

technological improvements, and changes in the timing and magnitude of electricity demand.

D.    State Permitting of the Seacoast Reliability Project

75.    On April 12, 2016, Eversource submitted an application to the NHSEC for a

Certificate of Site and Facility ("Certificate") under New Hampshire Revised Statutes Annotated

("RSA") 162-H (SEC Docket No. 2015-04). The NHSEC is tasked with balancing the impacts

and benefits of proposed energy facilities, including large transmission line projects, on local

communities and the state. The NHSEC preempts local regulations and serves as a "one-stop

shop" for energy facility permitting.

76.     In order to grant a Certificate, the NHSEC must determine four things:

      i.The applicant has adequate financial, technical, and managerial
capability to assure construction and operation of the facility in continuing
compliance with the terms and conditions of the certificate;
      ii.The site and facility will not unduly interfere with the orderly
development of the region with due consideration having been given to the views
of municipal and regional planning commissions and municipal governing bodies;
      iii.The site and facility will not have an unreasonable adverse effect on
aesthetics, historic sites, air and water quality, the natural environment, and public
health and safety; and
      iv.Issuance of a certificate will serve the public interest.

*See* RSA 162-H:16.

77.     The NHSEC granted a Certificate on January 31, 2019.

78.     CLF has appealed the NHSEC decision to the New Hampshire Supreme Court to

address the question of whether Eversource is required to obtain a grant of right from the

Governor and Executive Council to install concrete mattresses in Little Bay. *See* New Hampshire

Supreme Court Docket No. 2019-0277.

E.     New Hampshire Department of Environmental Services Project Review

79.     The New Hampshire Department of Environmental Services ("NHDES") has

been involved in the review of the Project through the NHSEC process as well as through the

CWA Section 401 water quality certification process.

80.     As part of the application for a Certificate through the NHSEC, the Applicant

submitted various applications that required approval recommendations from NHDES. These

include an alteration of terrain permit, a wetland permit, a shoreland permit, and a 401 Water

Quality Certificate.

81.    NHDES issued its findings based on a technical review of the Project for the

NHSEC process on February 28, 2018 ("Final Recommendations"). In those Final

Recommendations, NHDES raised concerns about the Applicant's use of a jet plow and

suggested that the NHSEC have the applicant provide additional information before approving

the Project. Specifically, NHDES concluded i) that Eversource had failed to provide sufficient

justification for why horizontal directional drilling ("HDD") was discarded as a viable alternative

to its preferred jet-plow method, and ii) that the environmental impacts of the jet plow in Little

Bay were unknown.

82.    NHDES wrote that HDD "may be feasible and have less impact on surface water

quality than the proposed jet plow method." Final Recommendations at 1.

83.    To better evaluate Eversource's conclusion that the HDD method would cost

more than the jet plow, NHDES recommended that the NHSEC require Eversource to provide

detailed cost estimates "from at least two companies experienced with jet plowing and two

companies experienced with HDD." Final Recommendations at 2.

84.    Aside from cost, NHDES also requested a more detailed evaluation of the

proposed jet plow along with detailed evaluations of two specific alternatives: the use of HDD to

cross all of Little Bay and the use of HDD in those sections where Eversource proposed hand-

jetting. For the HDD installation, NHDES sought additional information on some specific

factors—such as the size of the bore hole, the timing of the work, and the potential impacts of the

work. Moreover, NHDES instructed Eversource to contact the New Hampshire Department of

Transportation ("NHDOT") for additional insight, as the NHDOT had just completed the installation of a pipe via HDD across Little Bay in the near vicinity of the Project.

85.     Last, NHDES recommended that the NHSEC "consider having the Applicant conduct a trial jet plow run (without cable) across a portion of Little Bay" to provide useful information about the Applicant's assumptions regarding the jet plow. NHDES explained that the jet plow had never been used in New Hampshire, so the assumptions provided by Eversource could not be verified—independently or by Eversource. NHDES had specific concerns about the use of the jet plow on surface water quality: the size of the sediment plume, the effectiveness of the water quality monitoring plan, the water quality at various points, whether the project would meet NH surface water quality standards, and whether additional measures were needed. NHDES anticipated that the results from the trial run would be used to update their recommendations and conditions.

86.     After submitting the Final Recommendations, NHDES coordinated with the Applicant to revise some of the conditions. These are outlined in NHDES's October 29, 2018 Revised Final Decision. While NHDES allowed a shorter time between the jet plow trial run and the actual jet plow installation based on scheduling concerns raised by the Applicant, NHDES never received a complete analysis of the costs and impacts of HDD compared to jet plow that it requested in its Final Recommendations.

87.     In addition to recommendations to the NHSEC, NHDES also issued a 401 Water Quality Certification ("WQC") in accordance with Section 404 of the CWA on February 28, 2018. The 401 WQC was explicitly premised on the applicability of the Section 404 general permit ("GP") and the associated Water Quality Certification for the GPs (WQC #2017-404P-

001). The 401 WQC included condition E-1, which stated that "Construction and operation of all projects covered by the GPs shall comply with this Certification."

88.     On May 6, 2019, NHDES submitted a new 401 WQC, which reiterated that the conditions from the Section 404 GP WQC, which were included in the NHSEC Certificate, provided reasonable assurance that the Project would not violate surface water quality standards.

F.     The Corps' Determination That The Project Would Require An Individual Permit

89.     Eversource met with the Corps numerous times prior to the filing of an Application for a Certificate. On January 12, 2015, Eversource met with the Corps, at a meeting with various agencies, and the Corps had not determined whether the Project would require an Individual Permit or if it would fall under a Programmatic General Permit. At some point in 2015, the Corps determined that the Project would only require a General Permit, as the Corps explained at a January 12, 2016 SRP Interagency Meeting.

90.     The Corps' position, throughout the entirety of the NHSEC proceedings in 2016, 2017, and 2018, was that the Project complied with the New Hampshire Programmatic General Permit.

91.     This continued through the time the NHSEC issued the Certificate. In fact, the Certificate explicitly conditions the Project on "compliance with the Section 404 General Permit[.]"

92.     On March 11, 2019, however, CLF sent a comment letter to Ms. Lindsey Lefebvre at the New England District Office of the Corps pointing out that the Project was not, actually, in compliance with the requirements of General Permit 6 for "Utility Line Activities." *See* Exhibit 3. GP 6 cannot be used for new utility line construction requiring a permanent or temporary loss to tidal SAS and areas containing shellfish.

93.     After receiving that letter, the Corps determined that the Project would require an Individual Permit.

94.     Upon information and belief, the Corps notified Eversource that it would need an Individual Permit.

95.     On April 23, 2019, the Corps issued a Public Notice that the public comment period would open that day and end on May 8, 2019. *See* Exhibit 4. On May 7, 2019, the Corps issued a 15-day time extension, extending the comment period deadline to May 23, 2019.

G.      Corps' Permit Review

96.     Upon information and belief, the Corps only initiated the assessment of environmental impacts via the EA, to determine the necessity of preparing an EIS, after CLF sent its March 11, 2019 letter.

97.     During the public comment period, the Corps received 199 public comments. All 199 comments opposed the Project. Of the 199 comments, 128 of the comments included a request for a public hearing. *See* Public Hearing Needs Determination (the "Determination") at 1. CLF submitted extensive written comments regarding the Project, urging, *inter alia*, an assessment of the *need* for the Project, the preparation of an Environmental Impact Statement, and a rigorous analysis of alternatives. *See* Exhibit 5.

98.     Despite the requests for a public hearing, the Corps issued the Determination that concluded a public hearing was not necessary for the Project. The Determination explained that "Requests for Public Hearing shall be granted, pursuant to 33 CFR 327.4(b), 'unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing.'"

99.     As justification for not holding a public hearing, the Corps relied in large part on public hearings that were held as part of the NHSEC process. The Corps did not explain whether the district engineer had determined whether the issues raised in the comments were insubstantial or if the district engineer had determined that no valid interest would be served by a hearing.

100.    The Corps completed the EA/SOF on July 2, 2019 and granted the Permit that same day.  It did not notify commenters of the Permit issuance until July 9, 2019.  In providing such notice, the Corps did not provide commenters the Permit or the EA/SOF.

101.    Although CLF included substantive comments during the Corps' public notice period showing that the purported purpose and need for the project were outdated—i.e., ISO-NE methodology has changed such that it might not predict that the NH Seacoast region needs a new 115 kV transmission line to improve grid reliability—the Corps failed to properly assess the need for the project.

102.    The EA/SOF included a purpose and need for the project, which was directly repeated from the Applicant: "Purpose and need for the project as provided by the applicant and reviewed by the Corps: Eversource Energy's stated purpose for this project is to provide a parallel path to enhance the existing 115 kV loop. . . ." EA/SOF at 5.

103.    The EA/SOF also included seven (7) pages summarizing the substantive comments the Corps received on the Project. The Corps grouped these into 17 different topics, and included short responses to each topic. *Id.* at 6-12.

104.    The EA/SOF also included a statement that the Corps would not consult with ISO-NE in response to CLF's request in its May 23 Letter, but that it would assume that "appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the marketplace."  *Id.* at 12.

105.     The EA/SOF also included approximately six (6) pages of discussion about the different proposed alternatives to the project. The Corps broke these alternatives into on-site and off-site alternatives and concluded that Eversource's preferred alternative was the least environmentally damaging practical alternative. *Id.* at 12-18.

106.     The EA/SOF included as one of the final sections (Section 12.3) a "Findings of No Significant Impact" which simply stated: "Having reviewed the information provided by the applicant and all interested parties and an assessment of the environmental impacts, I find that this permit action will not have a significant impact on the quality of the human environment. Therefore, an environmental impact statement will not be required."

107.     The EA/SOF did not include any discussion of the direct or indirect impacts of its permitting decision on any upland areas. The Permit will directly lead to impacts in upland areas—both in the immediate vicinity of the jurisdictional waters and further away. Possible impacts that the Corps should have considered include the impact of the Project on terrestrial species, the visual impact of additional transmission lines on abutting landowners, or how much the cost of the Project might affect customer's utility bills. There is no discussion in the EA/SOF of those impacts for the Project or any of the alternatives.

H.     <u>Inadequate Alternatives Analysis</u>

108.     NEPA requires federal agencies to rigorously explore and objectively evaluate all reasonable alternatives that would accomplish the purpose and needs of the action. The Corps failed to study, develop, and describe appropriate alternatives to the alternative preferred by the Applicant.

109.    The Corps included six different alternatives: the No-Action alternative, a

Northern Route, a Southern Route, a Middle Route (the Project), Full HDD across Little Bay,

and Shore Landing HDD Installation.

110.    The Corps dismissed the No-Action Alternative immediately, merely stating that

it did not meet the project purpose. The Corps did not actually consider the impact of the No-

Action alternative on the electricity grid. The Corps' full evaluation of of the No-Action

Alternative was: "Does not meet project purpose therefore is not a practicable alternative."

EA/SOF at 17.

111.    The Northern Route Alternative was a 12.5 mile route that would be constructed

within existing transmission corridors from Madbury, NH to Eliot, ME, to Kittery, ME, and then

to Portsmouth, NH. The Corps considered this route unavailable, because the Applicant would

need to relocate two existing transmission lines, would need to acquire 11.8 miles of additional

right-of-way ("ROW"), would increase cost, and "could potentially jeopardize the stability of the

electric system in the region."  EA/SOF at 14.

112.    The EA/SOF language explaining the Northern Route Alternative was nearly

word-for-word the same as the language as what the Applicant included in its application to the

NHSEC in April 2016. *Compare* NHSEC Application, Appendix 13 at 6-28 ("The relocation and

rebuild for a significant portion of the new line would increase cost, add one or more years to the

overall project schedule, and could potentially jeopardize the stability of the electric system in

the region during construction because the existing transmission lines would have been removed

from service for extended periods of time."); *with* EA/SOF at 14 ("The relocation and rebuild for

a significant portion of the new line would increase cost, add one or more years to the overall

project schedule, and could potentially jeopardize the stability of the electric system in the region

during construction because the existing transmission lines would have been removed from service for extended periods of time.").

113.    Based on that, the Corps concluded that the Northern Route alternative "would impose the greatest potential environmental impacts as compared to the other alternatives[,]" due to the relocation of 11.5 miles of existing transmission line. EA/SOF at 17. The Corps further concluded that the alternative "could potentially result in the greatest permanent and temporary construction impact and impacts to [waters of the U.S]." *Id.* The Corps did not explain the specific environmental impacts of the transmission line or the details or extent of the permanent and temporary impacts to waters of the U.S.

114.    The Southern Route would run from Madbury, NH to Stratham, NH, to Greenland, NH, to Portsmouth, NH. This alternative would use existing railroad corridor and the Eversource utility corridor being used in the Project. The Corps explained that the total length of this Alternative was "almost twice the length of the Northern Route and Middle Route, approximately seven (7) miles longer[.]" EA/SOF at 14. The Corps declared the Southern Route unavailable because the greater length would lead to greater "line-loss" and inefficiency[1], the costs would be higher, and an additional capacitor bank would be required. *Id.* The Corps also explained that the Southern Route "presented other technical issues associated with constructing the project through the Portsmouth traffic circle, the need to secure additional land rights to construct the project, and greater environmental impacts to wetlands and State-designated prime wetlands in the southern sections of the State." *Id.* at 14-15.

---

[1] Note, however, that the Corps does not include the actual length of the Northern or Southern Routes in the EA/SOF. The language about the impact of greater length is exactly the same as what is in the NHSEC Application. It is not clear from the EA/SOF whether the Corps even knew how long the alternatives were, let alone the impact of the longer project on feasibility. *See* NHSEC Application at 6-29.

115.    Again, the Corps evaluation of the alternative was exactly the same as the language Eversource used in its NHSEC Application. *See, e.g.*, NHSEC Application, Appendix 13 at 6-28 ("The Southern Route also presented other technical issues associated with constructing the project through the Portsmouth traffic circle, the need to secure additional land rights to construct the project, and greater environmental impacts to wetlands and State-designated prime wetlands in the southern sections of the State").

116.    The Corps did not include a total cost estimate for the Southern Route, which could be used to compare to the $86.7 million cost for the Project. Nor did the Corps include any metrics to document the amount of "line-loss" and inefficiency that would be expected by a transmission line that is seven miles longer.

117.    Finally, the analysis of the Southern Route did not identify which wetlands would be impacted or how the wetlands would be impacted. Nor did the Corps explain how the Southern Route would lead to "*greater* environmental impacts." (Emphasis added). The Southern Route includes overhead transmission lines along an existing railroad corridor and an existing utility line corridor—no explanation was given about what the impacts to State-designated prime wetlands would be or why those impacts could not be avoided.

118.    The first on-site alternative is the Full HDD across Little Bay. The Corps determined that this alternative would avoid permanent impacts to SAS, because concrete mattresses would not be required. But the Corps also concluded that the alternative was impractical because the staging areas on either side of Little Bay would be too large; there was a risk of the release of drilling fluid, known as Inadvertent Return ("IR"); the distance for HDD is long and the geometry is challenging; and the cost would be $216 million. EA/SOF at 16.

33

119.    The Corps did not require Eversource to provide additional information about the estimated cost of the HDD, such as what was requested by NHDES. Nor did the Corps provide any detailed analysis about the IR—either the likelihood of a release, the impact of the release, or how an IR compares to the suspension of sediments within the water column that is a guaranteed byproduct of jet plowing. The Corps also did not coordinate with the NHDOT, which had just completed HDD in Little Bay, to gather additional information about their concerns stemming from the abrasiveness of the bedrock in Little Bay and the impact on tool wear. Last, the Corps did not describe in detail what the "substantial" impacts to land use would be.

120.    CLF provided substantive comments to the Corps regarding the HDD alternative. It included analysis about how Eversource was inflating the environmental impact of HDD and how Eversource had failed to compare the costs of HDD and jet plowing, which had been recommended by NHDES. The Corps did not address this analysis by CLF when it evaluated the Full HDD alternative, or any other alternative.

121.    The final alternative considered by the Corps was the Shore Landing HDD Installation, which would involve two HDDs that extend from either shore to a point in Little Bay where jet plowing could start. The Corps explains that this would allow Eversource to reduce the total amount of hand jetting, and would possibly eliminate the need for concrete mattresses. The Corps states the cost for this alternative would be $184 million, that the project would need large staging areas, that there was a risk of IR, and that the impacts to land use would be substantial.

122.    The Corps provided no additional analysis about this alternative, and relied on its analysis of the Full HDD alternative.

123.    The Corps did not consider a number of practicable alternatives that were raised in public comments. ISO-NE initially presented four alternatives to meet the identified need of addressing reliability concerns for the NH Seacoast region. Of those four, only one alternative was eliminated due to concerns about performance. The other two alternatives were eliminated due to cost concerns. However, the cost estimates underlying the Project, which was initially the lowest cost alternative, have increased substantially. The initial ISO-NE cost estimate for the suite of projects that included the current SRP was $110.7 million. The cost estimate for the SRP was initially estimated to be $30.6 million of that $110.7 million.

124.    While Eversource has not provided an updated cost estimate to compare to ISO-NE's initial number, the cost estimate for SRP alone is now $86.9 million—an increase of $57.3 million. A $57.3 million increase on its own would make the project more expensive than the $134 million New Gosling Road Substation w/Autotransformers alternative that ISO-NE had identified. That alternative, which was prepared by ISO-NE to meet the exact need justifying the SRP, was a practicable alternative that would cost less and avoid impacts to Little Bay. But the Corps did not consider that alternative in its analysis.

125.    Nor did the Corps consider any alternative locations within Little Bay that would reduce or eliminate the need for concrete mattresses. CLF pointed out to the Corps that Eversource determined the route across Little Bay without even considering if there was an alternative that would eliminate the need for concrete mattresses and permanent impacts to the estuary. Instead, Eversource considered how to avoid existing abandoned cables to the maximum extent possible, how to use as little cable as possible, and how to use an existing easement.

I.    Failure to Prepare an EIS

126.    The Corps failed to prepare an EIS in order to fully understand the impacts of the Project, despite evidence of the need to do so.

127.    An EA is a preliminary document that is primarily used to determine if an EIS is required or not. The Corps regulations expressly recognize the preliminary nature of the document and recommend that an EA/SOF "should not exceed 15 pages[.]" 33 C.F.R. § Pt. 325, App. B ¶ 7(a).

128.    The EA/SOF in this instance is 44 pages long, three times as long as the Corps regulations recommend. Not included in the 44 pages is the reference to Eversource's 47-page response to the comments. *See* Exhibit 6. The Corps' response to CLF's 30-page comment letter was less than a page long and did not include any detailed discussion of CLF's comments. In lieu of a detailed response, the Corps referenced and copied from Eversource's 37-page response to CLF's comments.

129.    The complexity of the Project, the nature and sensitivity of Little Bay and the Great Bay estuary, the extent of the impacts, the scope of the alternatives, and the public concern with the Project are all reasons why the EA greatly exceeded the 15-page length recommended by the Corps' regulations. These are also the reasons why the Corps should have prepared an EIS.

130.    Although the EA/SOF was nearly 30 pages longer than the Corps regulations recommend, it was still inadequate. The Corps omitted any analysis on impacts to the upland resources, wholly failed to consider alternatives to avoid or reduce impacts in Little Bay, and failed to objectively and rigorously analyze and evaluate the alternatives it did consider.

131.    The Corps should have prepared an EIS for this Project.

J.      CWA 404(b)(1) Guidelines

132.    The Corps' determination that there were no practicable alternatives to avoid

and/or minimize environmental impacts was contrary to the evidence in the record, and thus

violated the requirements of Section 404(b)(1), which is more demanding than NEPA.

133.    Because the Corps determined that the Project is not "water dependent," the

Corps applied the wrong burden of proof during its analysis. 40 C.F.R. § 230.10(a)(3).

Eversource bears the burden of clearly demonstrating that there is no other practicable alternative

that would avoid or minimize the wetlands losses. *Id.* And, since the Project will involve

discharge into a SAS, the practicable alternatives that do not impact a SAS "are presumed to

have less adverse impact on the aquatic ecosystem, *unless clearly demonstrated otherwise.*" *Id.*

134.    Notwithstanding that the Corps failed to apply the correct standard when

evaluating the alternatives, the Corps failed to adequately assess and evaluate the alternatives.

During its consideration of the permit, the Corps was presented information demonstrating that

there were practicable alternatives that would result in fewer environmental impacts. In reaching

its determination to issue the permit, the Corps ignored this contradictory factual information

concerning alternatives and failed to independently analyze practicable alternatives. The Corps

also failed to perform any new, independent analysis on the practicability of the Applicant's

identified alternatives or any alternatives raised in the public comments.

135.    The Corps blindly accepted Eversource's assertions that alternatives that avoid

crossing Little Bay were not practicable due to difficulties with relocating existing transmission

lines, impacts to waters of the United States that would exceed those resulting from the Project,

logistical infeasibility, and higher costs.

136.    Specifically, the Corps concluded that the Northern Route alternative "would

impose the "greatest potential environmental impacts as compared to the other alternatives[.]"

Neither the Corps nor Eversource explained what the permanent and temporary impacts to waters of the United States would be from that transmission line, or how those impacts would be greater than the impacts from jet plowing across Little Bay and installing concrete mattresses.

137.    Similarly, the Corps concluded the Southern Route was not practicable because it was 7 miles longer than the preferred route and would result in greater line-loss and inefficiency. Again, however, neither the Corps nor Eversource established the extent of the line-loss or inefficiency. Eversource has constructed transmission lines that are 20 miles long. The Corps did not evaluate why Eversource could not construct a 20-mile line to satisfy the purpose and need identified in the EA/SOF.

138.    Nor did the Corps require Eversource to demonstrate in any way the "greater environmental impacts to wetlands and State-designated prime wetlands in the southern sections of the State." Such a broad assertion falls short of the regulatory standard to clearly demonstrate that these alternatives are not practicable.

139.    The Corps also failed to properly investigate Eversource's claims that there were no practicable on-site alternatives that would minimize or avoid impacts. The Corps did not objectively analyze Eversource's conclusions about the feasibility of HDD in Little Bay, but merely concluded that it was not feasible. This was particularly unreasonable, because NHDES raised specific concerns about Eversource's assumptions relating to the risks associated with IR from HDD and Eversource's estimates regarding costs for the jet plow and HDD options.

140.    The 404(b)(1) Guidelines also prohibit a discharge that will "cause or contribute to significant degradation of [U.S.] waters." In deciding whether to permit this Project, the Corps must evaluate—and make careful factual findings regarding—the extent to which the Project will individually or cumulatively contribute to significant degradation of the environment including,

but not limited to, adverse effects to human health or welfare, wetlands and other special aquatic

sites, fish and wildlife habitat and populations, and aquatic ecosystem diversity, productivity, and

stability.

141.    The jet plow operations will suspend 1,500 tons of sediment into the water

column causing extremely high total suspended solid concentrations in the vicinity of the Project.

The severe sediment disturbance will also release pathogens, contaminants, and nutrients in the

estuary. Yet, the Corps ignored this requirement, and ignored the potentially harmful impact of

this result on natural and commercial oyster beds near the Project. The Corps' determination that

there would be no significant degradation of waters of the United States was unsupported by the

evidence in the record.

142.    CLF expressly notified Eversource of its concerns about Eversource proceeding

with its Project construction during the Corps' permitting process and during the pendency of its

appeal of the NHSEC decision to the New Hampshire Supreme Court, advising Eversource that

its election to proceed with construction activities would be at its own risk.  *See* Exhibit 7.

143.    On August 21, 2019, the NHSEC docket supervisor circulated an updated

construction schedule dated August 19, 2019, which Eversource filed with the NHSEC. *See*

Exhibit 8. That construction schedule shows that Eversource intends to conduct the jet plow trial

run in "Early September" and begin removing the existing cable in "Early – Mid September." *Id*

at 2.

## COUNT I
## VIOLATIONS OF NEPA

144.    Plaintiff repeats and realleges all previous paragraphs as though fully set forth

herein.

145.    The Corps violated NEPA and its implementing regulations, and acted arbitrarily, capriciously, and otherwise not in accordance with the law in violation of the APA in a variety of ways.

146.    The Corps' decision not to prepare an EIS was in violation of 42 U.S.C. § 4332(C), because the evidence in the record shows that the Project will or may have a significant effect on the environment. There is no reasonable basis to support the Corps' finding of no significant impact.

147.    The Corps violated 33 C.F.R. § Pt. 325, App. B., because it only considered the impacts of the Project on the water resources and aquatic habitats. The Corps did not consider any impact to areas outside its regulatory boundaries.

148.    The Corps' actions further violated 42 U.S.C. § 4332(C), because it approved the Project without taking a "hard look" at the environmental impacts of the permit. *See also*, *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir. 1996). The Corps failed to include sufficient discussion of the relevant issues and opposing viewpoints, and the decision was not fully informed or well-considered. Therefore, the Corps acted arbitrarily and capriciously.

149.    The Corps' failure to adequately evaluate alternatives was a violation of 42 U.S.C. § 4332(2)(E) and 40 C.F.R. § 1502.16. The Corps not only failed to fully and independently evaluate the alternatives identified in the EA/SOF, including but not limited to the No-Action Alternative, but the Corps also failed to evaluate additional practicable alternatives that were identified by CLF in its comments to the Corps. It was arbitrary, capricious, and otherwise not in accordance with the law for the Corps to fail to evaluate those alternatives.

150.    Last, the Corps violated its own regulations when it relied on an unreasonably narrow and unsupported purpose and need statement that was prepared by and in the self-serving

interest of the Applicant. 33 C.F.R. § Pt. 325, App. B.  Whatever the accuracy of the statement of

need submitted by the Applicant, the Corps' permit decision very clearly was drawn directly

from the application and the response of the Applicant to public comment, rather than from an

independent analysis of the need for the project as required by law.  *Id.*

151.    In addition, on the merits of the question of need, CLF provided substantial

evidence that the alleged need for the project was outdated and unsupported. Yet the Corps failed

to require Eversource to provide any additional support or justification for the project, or to

exercise independent judgment in defining the purpose and need. That failure was arbitrary and

capricious, and CLF is entitled to a declaratory judgment that the Corps violated the

requirements of NEPA.

**COUNT II**
**VIOLATIONS OF THE CWA AND THE RHA**

152.    Plaintiff repeats and realleges all previous paragraphs as though fully set forth

herein.

153.    The Corps violated Section 404 of the CWA and Section 10 of the RHA and their

implementing regulations, and acted arbitrarily, capriciously, and otherwise not in accordance

with the law in violation of the APA in a variety of ways.

154.    The Corps violated 40 C.F.R. § 230.10(a) by issuing a permit that authorizes

dredge and fill material in a special aquatic site for a project that is not the least environmentally

damaging, practicable alternative. The Corps decision was particularly arbitrary and capricious

because, as determined by the Corps, the Project is not water dependent, requiring the Applicant

to clearly demonstrate that alternatives that do not impact special aquatic sites are not available.

There was no reasonable basis to support a decision that Eversource "clearly demonstrated" that

no practicable alternative exists, which would not impact a special aquatic site.

41

155.    The Corps violated Section 404 of the CWA and 40 C.F.R. § 230.10(d) by failing to require the applicant to avoid and minimize impacts to waters of the United States. CLF and other commenters raised specific, pragmatic opportunities for Eversource to avoid and minimize impacts to Little Bay. Yet the Corps, arbitrarily and capriciously, did not require Eversource to implement any of those opportunities.

156.    Last, the Corps failed to undertake an adequate public interest review, as required under both the CWA and the RHA,  and to properly weigh the benefits of the Project against its reasonably foreseeable detriments including secondary and cumulative impacts in violation of 33 C.F.R. § 320.4. This failure was arbitrary, capricious, and otherwise not in accordance with the law, and CLF is entitled to a declaratory judgment that the Corps violated the requirements of the CWA and the RHA.

## DEMAND FOR RELIEF

Plaintiff respectfully requests that the Court:

A.    Declare that the Corps has violated NEPA, the CWA, and the RHA, and their implementing regulations, and the APA;

B.    Preliminarily and permanently set aside the Clean Water Act Section 404 permit and the Corps EA/SOF;

C.    Enjoin all Defendants from proceeding with the Project's construction, including but not limited to any activity in jurisdictional waters until, such time as the Corps has fully complied with NEPA, the CWA, and the RHA, and their implementing regulations, and the APA;

D.    Order the Corps to conduct an Environmental Impact Statement to cure all violations of NEPA and the APA;

E.      Award Plaintiff its attorney fees and costs pursuant to 28 U.S.C § 2412 and 5 U.S.C. § 552(a)(4)(E).

F.      Grant such other relief as it deems necessary.

Respectfully submitted,

CONSERVATION LAW FOUNDATION

By Its Attorneys

ORR & RENO, P.A.

Dated:  August 21, 2019          By:        /s/ *Jeremy D. Eggleton*
                                            Jeremy D. Eggleton, Esq. (NH Bar # 18170)
                                            Nathaniel B. Morse, Esq. (NH Bar #266188)
                                            45 South Main Street
                                            PO Box 3550
                                            Concord, NH 03302-3550
                                            Phone:  (603) 224-2381
                                            Fax:  (603) 224-2318
                                            jeggleton@orr-reno.com
                                            nmorse@orr-reno.com