**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC. | ) | |
|  | ) | Case No.: |
| v. | ) | |
|  | ) | |
| UNITED STATES ARMY CORPS | ) | |
| OF ENGINEERS, ET AL. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**I.      Background**

This memorandum is filed in support of Plaintiff Conservation Law Foundation, Inc.'s

("CLF" or "Plaintiff") Motion for Temporary Restraining Order and Preliminary Injunction with

Request for Expedited Hearing ("Plaintiff's Motion"), filed contemporaneously herewith.

A.   Facts and Need for Preliminary Relief

The permitting process that led to the Corps' approval in this case was abnormally and

improperly truncated due to the Corps' late decision to conduct an individual permit review and

its cursory pursuit of that process.  The hasty effort to approve Eversource's permit to conduct

"jet plow" activities in Little Bay was inadequate to meet the requirements of federal law or to

protect the sensitive environment of the bay and the larger Great Bay estuary of which it is part.

On January 12, 2015, Eversource met with the Corps to discuss their proposed power line

crossing portions of Little Bay in Durham and Newington, N.H.  *See* New Hampshire Site

Evaluation Committee ("NHSEC") Application (hereinafter "NHSEC Application"), Docket No.

2015-04, Appendix 13 at PDF page 21, available at https://www.nhsec.nh.gov/projects/2015-

1

04/2015-04_application.htm.  In brief, Eversource planned to deracinate parts of an existing

underwater cable, dredge a channel beneath the waters of Little Bay, run a new cable through the

sensitive seabed, and then cover portions of the line with large concrete "mattresses" that would

protect the power line from disruption or contact with users of the bay.  *See* NHSEC Docket No.

2015-04 (the "Seacoast Reliability Project" or "SRP").

Consultation with the Corps was an important component of Eversource's application to

the NHSEC for this project.  *See* NHSEC Docket No. 2015-04; and RSA 162-H:16 (allowing the

NHSEC to condition approval upon federal agency study periods that exceed the NHSEC

application period). Later in 2015, the Corps determined that Eversource could proceed under a

general permit pursuant to General Permit No: NAE-R-2012-00339.[1]  NHSEC Application,

Appendix 13 at PDF page 38.  A General Permit allows a user to complete a project with

specific, minimal impacts without the need to apply separately for an individual permit from the

Corps.  *See, e.g.*, General Permit No: NAE-2016-02415 (effective August 18, 2017).[2]  However,

this project was not eligible for a general permit. After the SEC approved Eversource's project

on January 31, 2019, CLF wrote the Corps on March 11, 2019 to point out that the Project did

not meet the requirements under the general permit, because it would result in the permanent loss

to tidal special aquatic sites containing shellfish.  *See* Complaint ¶ 92; Complaint Exhibit 3.

When confronted with this oversight, the Corps agreed it had made an error.  Complaint,

Exhibit 4.  The Corps required Eversource to submit application materials for an Individual

Permit.  *Id.*  On April 23, 2019, the Corps opened its record for public comment, which it kept

---

[1] Available at
https://www.nae.usace.army.mil/Portals/74/docs/regulatory/StateGeneralPermits/NHPGPAug2013.pdf
[2] available at
https://www.nae.usace.army.mil/portals/74/docs/regulatory/StateGeneralPermits/NH/NH%20General%20Permit%2018August2017.pdf.

open for one month. *Id.* Just six weeks later, on July 2, 2019, the Corps completed its

environmental assessment and statement of findings ("EA/SOF"), and issued the Permit to

Eversource on the same day.  Complaint ¶ 100, Complaint Exhibits 1 (hereinafter "EA/SOF")

and 2 (hereinafter "Permit").

　　　　This was not just remarkable speed for a federal environmental approval, it was

unprecedented—particularly for an $80M+ project passing through sensitive estuarine and

aquatic resources.  *See*, *e.g.*, *Friends of Magurrewock, Inc. v. U.S. Army Corps of Engineers*, 498

F. Supp. 2d 365, 368 (D. Me. 2007) (application for agency action in January 1999, draft EA

prepared in January 2001, FONSI issued on July 31, 2002)); *Sierra Club v. Marsh*, 769 F.2d 868,

874 (1st Cir. 1985) (Corps initial EA in December 1983 and Corps' supplement to statement of

findings in August 1984);  *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 260 (D.N.H. 2008),

aff'd, 555 F.3d 21 (1st Cir. 2009) (public comment sought in January 2006, EA issued in May

2006, revised EA sent for public comment in November 2006); *All. To Protect Nantucket Sound,*

*Inc. v. U.S. Dep't of Army*, 288 F. Supp. 2d 64, 69 (D. Mass. 2003), aff'd, 398 F.3d 105 (1st Cir.

2005) ("On August 19, 2002, *after nine months of review*, the Corps issued a section 10 permit to

Cape Wind. . .") (emphasis added); *City of Waltham v. U.S. Postal Serv.*, 786 F. Supp. 105, 111

(D. Mass. 1992), aff'd, 11 F.3d 235 (1st Cir. 1993) (May 15, 1990 initial assessment, updated

assessment in September 1990, November 1990 FONSI issued); *Touret v. Nat'l Aeronautics &*

*Space Admin.*, 485 F. Supp. 2d 38, 40 (D.R.I. 2007) (NASA initiated NEPA review in September

2002, issued draft EA on June 2, 2003, and FONSI on August 8, 2003).  *See also, e.g.*, *Airport*

*Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 200 (1st Cir. 1999) (Final EIS in 1985, Final

Supplemental EIS in 1991, FHWA approval in July 1998); *Conservation Law Found. v. Fed.*

*Highway Admin.*, 827 F. Supp. 871, 873 (D.R.I. 1993), aff'd, 24 F.3d 1465 (1st Cir. 1994)

(November 1975 EIS started, April 1979 Draft EIS, 1984 Final EIS); *Conservation Law Found., Inc. v. Busey*, 79 F.3d 1250, 1255 (1st Cir. 1996) (February 1990 began complying with environmental requirements, February 1991 draft EIS issued; June 1991 final EIS, February 1992 FAA approved plan); *Conservation Law Found. of New England v. U.S. Dep't of Air Force*, No. CIV.A. 87-1871-K, 1987 WL 46370, at *1 (D. Mass. Nov. 23, 1987) ( EA issued in April 1985, FONSI issued on September 5, 1985, EIS preparation began in September 1986, EIS finished on September 25, 1987); *Advocates For Transportation Alternatives, Inc. v. U.S. Army Corps of Engineers*, 453 F. Supp. 2d 289, 295 (D. Mass. 2006) (draft EIS issued on May 7, 1990, Corps issued 404 permit on January 3, 2005).

The shortest time between a permit application and a FONSI that appears in the law of the First Circuit—after a diligent but necessarily limited search in light of the expedited nature of this request—is the approval for a permit application that the Marine Biological Laboratory ("MBL") submitted, which would temporarily impact 50 square feet within Buzzard's Bay. *Food & Water Watch, Inc. v. U.S. Army Corps of Engineers*, 570 F. Supp. 2d 177, 182 (D. Mass. 2008).  MBL proposed placing a 50 square foot aquadome on the floor of the bay, to conduct a scientific experiment where black sea-bass would be confined to the aquadome for a one month period. *Id.*  For that experiment, the individual permit application was submitted on February 5, 2008 and the Corps issued a FONSI on May 30, 2008.  *Id.*  The 115 days for that permit is actually longer than the amount of time between the March 11, 2019 letter that CLF sent to the Corps and the July 2, 2019 FONSI issuance date (113 days), even though the temporary disruption for this project is orders of magnitude larger, and its permanent impacts—of which there were none in the MBL case—include disturbing and releasing into the water column significant volumes of sediment, and placing concrete mattresses permanently into jurisdictional

4

waters.  To approve such a disruptive project with so little independent fact-finding, discovery, deliberation or examination of the evidence was a startling abdication of the Corps' responsibility under NEPA and the Clean Water Act, and it must be reversed before irreparable harm is done.

The Corps erred in 2015 when it failed to give Eversource's Seacoast Reliability Project the scrutiny it should have with an individual permit.  The Corps had a chance to correct that error this spring, when CLF pointed out that an individual permit—and the accompanying "hard look" it requires—was necessary.  But the Corps proceeded to implement a brief, cursory, seemingly outcome-driven review that utterly failed to fulfill its obligations under federal law. The Court must intervene to prevent the jet plowing and hand-jetting of Little Bay from proceeding without due and proper review by the Corps under NEPA and the CWA.

For these reasons, the Petitioner requests that the Court issue a temporary restraining order and preliminary injunctive relief to prevent the jet plow dredging from proceeding absent complete review.  It is imperative that this relief issue immediately, as Eversource has a stated objective of commencing the work in August or September 2019.  Once done, this work cannot be undone.  The harm to the Little Bay, the communities and people who rely on them, including the Petitioner and its members, is irreparable.

Plaintiff's Motion seeks a temporary restraining order and a preliminary injunction that would order the defendants, United States Army Corps of Engineers and Lt. General Semonite, Col. Conde and Mr. Del Giudice, in their official capacities, (collectively, the "Corps"), to officially suspend and/or revoke, pursuant to 33 C.F.R. § 325.7, Department of Army permit number NAE-2015-00665 issued by the New England District of the Corps on July 2, 2019 (the "Permit") until such time as the Corps can demonstrate compliance with the National

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, Clean Water Act ("CWA"), 33 U.S.C. § 1344 *et seq.*, the Rivers and Harbors Act (RHA), 33 U.S.C. § 403 *et seq.,* and the Administrative Procedures Act (APA), 5 U.S.C. §§ 701 *et seq.*, and implementing regulations. Plaintiff's Motion also seeks a temporary restraining order and a preliminary injunction to suspend and prevent all construction activities associated with the Project, including but not limited to activities in areas subject to the Corps' regulatory jurisdiction, until such time as the Corps can demonstrate compliance with NEPA, the CWA and RHA, and the APA, and implementing regulations.

## II.        Injunctive Relief Standards

"Before it grants a preliminary injunction, a district court is required to consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Shurtleff v. City of Bos.*, 928 F.3d 166, 171 (1st Cir. 2019).

For challenges under the APA for cases alleging environmental harms, "Plaintiffs must show that Defendants have violated the applicable statutory and/or regulatory authority, that there will be a continuing irreparable injury to the Plaintiffs in the absence of an injunction, and the lack of an adequate remedy at law." *Florida Keys Coalition v. Army Corps of Engineers*, 374 F. Supp.2d 1116, 1128 (S.D.Fla. 2005) (citation omitted).

Although there is demonstrated potential for concrete environmental harm in this case, the First Circuit has emphasized that for purposes of preliminary injunctive relief in an environmental case brought for violations of NEPA, plaintiffs need *not* show "irreparable environmental injury," i.e., "physical harm to the environment that one could not repair at a later

date (if a plaintiff should later win on the merits)." *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st

Cir. 1989) (Sierra Club II).  Rather:

> the harm at stake in a NEPA violation is a harm to the environment, not merely to
> a legalistic "procedure," nor, for that matter, merely to psychological wellbeing.
> ... The way that harm arises may well have to do with the psychology of
> decisionmakers, and perhaps a more deeply rooted human psychological instinct
> not to tear down projects once they are built. But the risk implied by a violation of
> NEPA is that real environmental harm will occur through inadequate foresight
> and deliberation. The difficulty of stopping a bureaucratic steam roller, once
> started, still seems to us ... a perfectly proper factor for a district court to take into
> account in assessing that risk, on a motion for a preliminary injunction.

*Id.*, at 504 (citation omitted). "Thus, when a decision to which NEPA obligations attach is made

without the informed environmental consideration that NEPA requires, the harm that NEPA

intends to prevent has been suffered." *Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983).

### III.        Preliminary Injunction Factors

A. <u>Allowing Defendant Eversource to Proceed With The Project Will Cause
    Irreparable Harm</u>

The court's consideration of irreparable harm in a NEPA case includes not only the direct

harm from an agency action, but also the failure to adhere to NEPA procedures. The *Sierra Club*

*v. Marsh* series of cases is controlling. In 1984, the Corps and the Federal Highway

Administration authorized the construction of a port facility on undeveloped island in Penobscot

Bay after reviewing the potential impacts of the project and issuing EAs (and revised and

supplemented EAs) that concluded with FONSIs. The Sierra Club sued both agencies on the

basis that they had failed to follow NEPA. In *Sierra Club v. Marsh*, (Sierra Club I), the First

Circuit held that the Corps erred in finding that the Maine Department of Transportation's

project would have no significant environmental impacts necessitating the preparation of an EIS.

769 F.2d 868, 877–78 (1st Cir.1985). The Court enjoined the project so that the agencies and the

public could gather additional information about the full impacts of the project. *Id.* In response,

the Corps and FHA conducted an EIS and then reauthorized the project. But Sierra Club sued the agencies again to stop the project. This time, however, Sierra Club sued because the EIS showed the project would have a significant impact on the environment, which the agencies had ignored, and that there was a practicable alternative with lesser environmental impacts. After the First Circuit reiterated the proper standard to consider NEPA violations, *Sierra Club II*, 872 F.2d at 500, the project was stopped once again, when the District of Maine issued a preliminary injunction requiring the agencies to adequately evaluate the project. *Sierra Club v. Marsh*, 714 F. Supp. 539, 593 (D. Me.), *amended*, 744 F. Supp. 352 (D. Me. 1989), *aff'd*, 976 F.2d 763 (1st Cir. 1992) (Sierra Club III) ("The public interest is better served by a preliminary injunction that ensures maintenance of the status quo pending agency recourse to the NEPA process established by Congress to assure that decision makers are fully informed of the significant environmental effects of the proposed Sears Island project.").

Without court intervention, Eversource and the Corps will cause irreparable harm to Little Bay and the NEPA process. Eversource will cause irreparable harm to the physical substrate and benthos of the estuary floor with its jet plow. The Corps, through its inadequate permitting process, will be a cause of the actual, environmental harm to Little Bay but also the sole cause of the harm from uninformed decision-making the First Circuit has explicitly recognized as an environmental harm that injunctive relief can protect against. *See, e.g., Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008); *Sierra Club II*, 872 F.2d at 500; and *Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983).

i.   *Irreparable Physical Harm to the Environment*

"Irreparable injury in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full

adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Moreover, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir.2004).

In this case, CLF has demonstrated that the Project will cause irreparable harm to Little Bay by harming oysters, impacting eelgrass communities, and polluting the water. According to Eversource's own filings, the use of the jet plow will cause the resuspension of substantial amounts of sediment, with suspended sediment concentrations reaching up to 235 mg/L. EA/SOF at 9. This equates to 1,000 cubic yards of sediment, which is estimated to be more than 150 times the total annual sediment yield to the bay. Complaint ¶ 66. The disturbance  of the sediment will also release massive amounts of nitrogen (more than 300 times the daily output from Durham's wastewater treatment plant), pathogens (such as bacteria and viruses), and other contaminants. Complaint ¶¶ 65-67. The release of nutrients will exacerbate eutrophication, where excessive nutrient loads fuel the growth of algae and threaten the health of important eelgrass habitat (at a time when municipalities are making significant investments to *reduce* nitrogen loads in the estuary), and the pathogens will threaten the health of oysters and the people who consume them. Complaint, Exhibit 5 (hereinafter "May CLF Letter") at 12-17.

Beyond the direct impacts to water quality, the sediments and associated contaminants will also impact oyster beds in the area and the recovering eelgrass communities. Complaint ¶¶ 54-59, 65-67, May CLF Letter at 12-17. Both eelgrass and oyster beds would be impacted by the settlement of sediments. The impact of sediments on these communities has already been identified by the Piscataqua Region Estuaries Partnership's 2018 *State of Our Estuaries* report as

a threat. May CLF Letter at 15. Additional sediments will only exacerbate the problem. *Id.* Moreover, since oysters are filter-feeders, these organisms are particularly susceptible to water quality changes. *Id.* at 13. Paired with the commercial oyster beds that would be impacted by the Project, this creates a direct risk to human health and to the New Hampshire's developing oyster aquaculture industry. *Id.* at 15-16.

In addition to the changes to water quality, the Project also proposes to install permanent concrete mattresses within Little Bay in the areas where Eversource will not bury the line deep enough. These mattresses will cause a permanent change in the benthic habitat. May CLF Letter at 23. This would permanently prevent these areas from providing eelgrass habitats. *Id.* It would also eliminate potential feeding habitat for threatened Atlantic sturgeon that feed on "soft bottom" habitat. *Id.* Finally, concrete mattresses would likely be visible from land and water at and near low tide and would negatively impact the aesthetics of Little Bay as well as boating. May CLF Letter at 22.

In summary, there is ample evidence documenting the threat of substantiated, irreparable harm to Little Bay if Eversource moves forward with its plans to install three cables in Little Bay by means of jet plowing and hand-jetting and to install concrete mattresses.

ii.    *Irreparable Harm to the Environment from Uninformed Decision Making*

In NEPA cases, while the concrete irreparable harm to the environment is one important consideration, failing to assess the environmental risks of a project is an independent irreparable harm. *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) ("the harm at stake in a NEPA violation is a harm to the environment, not merely to a legalistic 'procedure[.]'").  The rationale is that if the standard for a preliminary injunction in a NEPA case were *solely* a showing of concrete irreparable environmental harm, then an agency would actually be rewarded for not

following the NEPA procedures. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures."). For that reason, courts consider the failure to follow NEPA procedures—and the willful or reckless indifference to potential environmental impacts—to be an irreparable harm to the environment in a preliminary injunction analysis. *Puerto Rico Conservation Found. v. Larson*, 797 F. Supp. 1066, 1070 (D.P.R. 1992) ("Although the need to prevent irreparable injury to a party is an important factor when considering a petition for preliminary injunction, the most compelling reason to grant this request is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act.") (citations omitted). Moreover, courts recognize that a NEPA project cannot always be compared to other situations, where a preliminary injunction is less important: the transfer can be unwound, the money can be returned, or the other party can be adequately compensated. In contrast, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987). In NEPA, the bell cannot be unrung. The absurdity of pulling down an already-built project to protect the environmental harms of that project must be acknowledged and considered before the shovels (or jet plows) break ground. For that reason, "a violation of NEPA can itself be considered irreparable injury." *Puerto Rico Conservation Found. v. Larson*, 797 F. Supp. 1066, 1072 (D.P.R. 1992).

  In *Sierra Club I*, the First Circuit held that the Corps erred in finding that the Maine Department of Transportation's project would have no significant environmental impacts necessitating the preparation of an EIS. 769 F.2d at 877–78. The Court ultimately reasoned that

the record did not support a FONSI and, therefore, violated the purpose of NEPA. As evidence of why an EIS was required, the Court pointed to the length of the EA, the complexity of the issues caused by the proposed project, and the fact that the information in the record did not support the Corps' ultimate conclusions. Moreover, the Court clarified that although the District Court found Sierra Club failed to show it would suffer irreparable harm, the Corps' failure to follow the NEPA requirements was, in and of itself, an irreparable harm. The situation here is analogous, except that instead of an environmental review process that lasted more than two years for the Maine project, this process lasted approximately three months (the time period between when the Corps determined an individual permit was required and when it issued the Environmental Assessment and Statement of Findings ("EA/SOF"))—very possibly the shortest evaluation on record for a project disturbing one of New Hampshire's most sensitive marine sites. Despite the shortened time period, the Corps issued a FONSI for this Project that has many of the same inadequacies. The Corps' EA is far longer than the regulations' 15-page suggestion, the Corps failed to fully consider all the Project's impacts, and the Corps' FONSI is not supported by the information in the record. For the same reasons the First Circuit in Sierra Club I stopped the project and required the Corps to prepare an EIS, the Plaintiff is entitled to injunctive relief here both with respect to activities affecting resources under the Corps' jurisdiction, including but not limited to Little Bay, and activities elsewhere in the Project corridor.[3]

---

[3] Allowing the Project's construction activities to proceed in locations outside of the Corps' jurisdictional areas would greatly undermine the purpose and intent of NEPA.  Specifically, it could lead to a result in which the Project is constructed in all areas except those where wetlands and waters of the United States are present, establishing the Project as a *fait accompli* and rendering meaningless – and a purely academic exercise – any assessment of impacts (e.g., an EIS) and alternatives the court may require.

**B.** <u>CLF is likely to succeed in showing that the Corps' NEPA violations will cause irreparable harm if the jet plow dredging is allowed to proceed</u>

The Corps failed to comply with NEPA, because it decided not to prepare an Environmental Impact Statement ("EIS"); it relied on a purpose and need statement that was unreasonably narrow and driven by Eversource; it failed to consider the impacts from the project as a whole, and only considered the impacts to jurisdictional waters; it failed to take a "hard look" at the environmental impacts of the Project; and, it failed to adequately identify and evaluate the alternatives.

i. *"Arbitrary and Capricious" Standard*

The proper standard of review for NEPA claims is the APA's "arbitrary and capricious" standard. The APA explains "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the standard, a court must "determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). Overall, while the arbitrary and capricious standard is highly deferential, "it is not a rubber stamp." *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st Cir.1995). "The court must undertake a 'thorough, probing, indepth review' and a 'searching and careful' inquiry into the record." *Dubois*, 102 F.3d at 1285 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)).

In applying the arbitrary and capricious standard, the Court must "determine whether the agency has . . . 'articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Penobscot Air Services Ltd. v. FAA*,

164 F.3d 713, 719 (1st Cir. 1999) (citations omitted). The Court must further determine that the

agency's reasoning is supported by "substantial evidence." *Dickinson v. Zurko*, 527 U.S. 150,

164 (1999) *see also FPC v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637 (1972)

(agency's conclusions must have a "substantial basis in fact"). Relying on misinformation, or

relying heavily on an applicant's submission without verifying that information, does not satisfy

the standard. *Van Abbema v. Fornell*, 807 F.2d 633, 639 (7th Cir. 1986) ("If the Corps bases its

conclusions on entirely false premises or information, even when its attention is specifically

directed to possible defects in its information, we would have difficulty describing its

conclusions as reasoned; we would have to call them arbitrary and capricious.").

For a NEPA review, an agency must "try on its own to develop alternatives that will

mitigate the adverse environmental consequences of a proposed project." *Dubois*, 102 F.3d at

1291. Although project opponents cannot simply raise a particular alternative if they are not

serious about pursuing it, "[t]he agency bears the primary responsibility to investigate serious

alternatives[.]" *Seacoast Anti-Pollution League v. Nuclear Regulatory Comm'n*, 598 F.2d 1221,

1231 (1st Cir. 1979).

ii.    *Chronology of Corps involvement*

This was not a typical permitting process, where an applicant applied for a Corps permit,

the Corps completed a thorough review of the project benefits and impacts, and based on that

assessment, issued or denied a permit. This was a case where the Corps made a mistake and then

compounded that mistake by hastily issuing an Individual Permit.

On January 12, 2015, Eversource met with the Corps about the Project. NHSEC

Application, Appendix 13 at PDF page 21.  The notes from that meeting show that it was unclear

if the Project was eligible under the Programmatic General Permit, or if Eversource would need

14

to apply for an Individual Permit. *Id.* At some point in 2015, the Corps determined that the Project satisfied the requirements for a general permit and all parties proceeded under that assumption until after the NHSEC granted a Certificate for Site and Facility ("Certificate") in January 2019. *Id.* at PDF page 38; Complaint ¶¶ 89-91; Certificate at 1. Only after CLF sent a letter on March 11, 2019 did the Corps conclude that Eversource was not eligible under the general permit conditions. Complaint ¶¶ 92-93.  CLF pointed out that the Project would permanently impact up to 8,681 square feet of Special Aquatic Sites containing shellfish. Complaint Exhibit 3 at 2. Eversource needed to apply for an individual permit. *Id.* At some point after March 11, 2019, the Corps informed Eversource of this reversal and Eversource submitted the application. *Id.* On April 23, 2019, the Corps sought public comment on the permit application and then extended the comment period to May 23, 2019. Complaint ¶ 95. The Corps completed the EA/SOF on July 2, 2019 and granted the Permit that same day. Complaint ¶ 100; Complaint Exhibits 1 and 2.

iii.   *The Corps failed to assess the need for the Project*

One vital component of an EA is "discussions of the need for the proposal[.]" 40 C.F.R. § 1508.9(b). The Corps' regulations further explain that during the preparation of NEPA documents, it must "exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective" and that "[t]he Corps is neither an opponent nor a proponent of the applicant's proposal[.]"  33 C.F.R. § Pt. 325, App. B.

The Corps failed to exercise independent judgment about the need for the Project. Even after CLF provided substantial evidence regarding the changes in circumstances that showed Eversource's justification for the Project was based on outdated analyses and that ISO New England's methodology for determining need had substantially changed since the assessment

relied upon by Eversource was published, the EA/SOF included a purpose and need statement

that was exactly the same as the purpose included in the NHSEC application. Complaint ¶¶ 101-

102; EA/SOF at 5.  Eversource's application should have provided—and the Corps should have

required—a statement of need current in 2019, when it submitted its Individual Permit

application, rather than a needs assessment that was nearly a decade old.  33 C.F.R. § Pt. 325,

App. B; *Envtl. Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n*, 470 F.3d 676, 683 (7th

Cir. 2006) ("NEPA requires an agency to 'exercise a degree of skepticism in dealing with self-

serving statements from a prime beneficiary of the project' and to look at the general goal of the

project rather than only those alternatives by which a particular applicant can reach its own

specific goals.").  Moreover, the Corps did not include any independent analysis that documented

it had even considered the public comments that the Project was no longer necessary due to other

grid upgrades, changes in load analyses, and changes in generation and demand capacity. *Id.*

Without a discussion about the need for the Project, the EA/SOF is fatally flawed, and the Corps

reliance on it for a FONSI was arbitrary and capricious.

iv.    *The Corps failed to consider all the impacts from the Project*

As a preliminary matter, Corps regulations establish that when "the Corps permit bears

upon the origin and destination as well as the route of the project outside the Corps regulatory

boundaries, the scope of analysis should include those portions of the project outside the

boundaries of the Corps section 10/404 regulatory jurisdiction." 33 C.F.R. § Pt. 325, App. B at

7(b)(3).  The Corps cannot limit its review only to the impacts to waters of the United States.

Moreover, the Corps must use the same scope of analysis for analyzing the benefits and the

impacts of the project. *Id.*

Here, the Corps only considered the impacts of the Project on the water resources and aquatic habitats. EA/SOF at 4 ("The scope or analysis is limited to the proposed areas of fill and work within waters of the U.S."). The Corps completely failed to consider any impact to upland areas. *Id.* The EA/SOF does not include any discussion about the impact of the Project on terrestrial species, the visual impact of additional transmission lines on abutting landowners, or how much the cost of the Project might affect customer's utility bills. *Id.* Yet the only benefits from the project considered in the EA/SOF are that the Project would address reliability concerns. *Id.* at 5. Therefore, the Corps did not follow regulations by considering *all* the impacts of the Project.

v.   *The Corps failed to take a "hard look" at the environmental impacts*

The underlying premise of NEPA is to ensure that an agency is making informed decisions that fully consider the environmental consequences of the decision. NEPA requires federal agencies to take a "hard look" at the impacts of a proposed action. *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 187 (4th Cir. 2005).  "The hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright acknowledgement of potential environmental harms." *Id.* (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989)). Tightly connected with the "hard look" requirement is that the consideration of environmental consequences of an action should be considered throughout the evaluation of the project. *Kleppe v. Sierra Club*, 427 U.S. 390, 417 (1976) ("Early consideration of environmental consequences through production of an environmental impact statement is the whole point of NEPA[.]"). When an agency fails to fully consider those consequences, or only considers those impacts after-the-fact, then the agency has failed to comply with the procedural requirements of NEPA.

Here, the Corps failed to take a hard look at the Project. The underlying benefit of NEPA is not in having completed an EA but, rather, in having considered the need for the project, conducted a thorough review of the project's impacts and benefits, and evaluated the alternatives. In this case, the Corps hardly gave a look, let alone a hard look. Complaint ¶¶ 96-125. This is, at least partially, driven by the fact that the Corps did not determine until too late in the process that the Project did not comply with the general permit requirements. Complaint ¶¶ 89-95. Yet, even after failing to fully consider the Project impacts and realizing that the Project would impact special aquatic sites—which made the Project ineligible for a general permit—the Corps rubber-stamped the Project by going through the motions. *Id.* The Corps failed to assess the need for the project, copied substantial portions of the Applicant's own words in dismissing possibly viable alternatives, and failed to consider all potential impacts (see above). Complaint ¶¶ 96-125. This was not a hard look as required by NEPA.

   vi.   *The Corps failed to identify and evaluate alternatives*

The assessment of feasible alternatives is a fundamental component of NEPA process. An agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This requirement applies "whether an agency is preparing an [EIS] or an [EA]." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir.2008) (per curiam) (citations omitted). And although the alternatives analysis for an EA is less rigorous than for an EIS, "an agency must still give full and meaningful consideration to all reasonable alternatives in an environmental assessment." *Id.* Moreover, "[t]he existence of a viable but unexamined alternative renders an EA inadequate." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013)(citations omitted). The First

Circuit has further elaborated that an agency has an independent duty to identify and evaluate reasonable alternatives, particularly those that are raised by other agencies or during the public comment period. *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1291 (1st Cir. 1996) ("In respect to alternatives, an agency must on its own initiative study all alternatives that appear reasonable and appropriate for study at the time, and must also look into other significant alternatives that are called to its attention by other agencies, or by the public during the comment period afforded for that purpose.").

The Corps failed to adequately evaluate the alternatives that were considered in the EA/SOF, and failed even to consider other feasible alternatives that were raised during the public comment period. Complaint ¶¶ 108-125.

First, the Corps' evaluation of the alternatives included nearly identical wording to that used by the Applicant to describe the drawbacks or concerns regarding the discarded alternatives. Complaint ¶¶ 111-115.[4] There was no indication that the Corps conducted any independent analysis regarding these alternatives. *Id.* More specifically, the Corps parroted Eversource's conclusory and self-serving comments about the alternatives that it had already dismissed. *Id.* For example, Eversource said—and the Corps repeated in the EA/SOF—that the Northern Alternative would increase cost, take 1 to 2 years longer to construct, and could "potentially jeopardize the stability of the electric system[.]" Complaint ¶ 111. But the Corps did not include any analysis about what the Northern Alternative would actually cost or whether Eversource's

---

[4] *Compare* NHSEC Application, Appendix 13 at 6-28 ("The relocation and rebuild for a significant portion of the new line would increase cost, add one or more years to the overall project schedule, and could potentially jeopardize the stability of the electric system in the region during construction because the existing transmission lines would have been removed from service for extended periods of time."); *with* EA/SOF at 14 ("The relocation and rebuild for a significant portion of the new line would increase cost, add one or more years to the overall project schedule, and could potentially jeopardize the stability of the electric system in the region during construction because the existing transmission lines would have been removed from service for extended periods of time."). This is but one of numerous examples in this case in which the Corps appears to simply have cut-and-pasted from Eversource's application—the antithesis of a "hard look."

assertion that Eversource—perhaps New Hampshire's largest and oldest electric utility—somehow did not have the technical capability to construct a new transmission line adjacent to a current line without destabilizing the grid had merit. Similarly, the Southern Route alternative included a claim that it would lead to impacts to "State-designated prime wetlands." Complaint ¶ 114-115. But neither the Corps nor Eversource identified which prime wetlands would be impacted, or whether those impacts were avoidable or not.

Second, the Corps failed to consider the No-Action alternative. The Corps dismissed the No-Action Alternative without assessing the actual impact and merely concluded: "Under the No Action Alternative, the proposed reliability project would not be constructed and the potential impacts from the project would not occur. This alternative does not meet the project purpose and therefore is not practicable." EA/SOF at 13. But the Corps does not have a statutory obligation to approve any reliability project, let alone this specific project. *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 836 (E.D. Mich. 2008) (granting a preliminary injunction in part on the basis that the agency failed to adequately consider the No Action Alternative). The Corps needed to assess the actual impact of the project on the electricity grid after public comment raised substantive concerns, including a detailed and substantive comment from CLF. CLF May 23 Letter, Attachment A. This failure was arbitrary and capricious.

Third, the Corps failed to independently analyze the potential viability of horizontal directional drilling (HDD) for the submarine crossing of Little Bay. Complaint ¶ 118-122. Eversource claimed that there were cost and technical impediments to that option, which would have substantially fewer environmental impacts than the jet-plow method. *Id.* But NHDES raised credible questions about Eversource's conclusions and requested additional information. *Id.* Eversource did not provide that information to NHDES, but the Corps had an opportunity and a

duty to reevaluate those conclusions independently. *Id.* The Corps did not. Instead it repeated

Eversource's conclusions and ruled out HDD as a viable option.

Fourth, ISO-NE initially identified viable alternatives that were only discarded due to

cost. Complaint ¶ 73, 123-124. With the cost of the SRP having increased nearly $50 million

over initial estimates, the Corps failed to consider whether any of these projects would now be

viable and have lesser environmental impacts. *Id.*

Fifth, CLF raised the option of using alternative routes within Little Bay. Complaint ¶

125. CLF explained that Eversource selected the route across Little Bay to avoid, to the

maximum extent possible, the existing cables and the costs to remove those cables. May CLF

Letter at 12. However, as a result, Eversource will have to install disruptive concrete mattresses

in those areas where it cannot bury the cable deeper. *Id.* CLF requested that the Corps require

Eversource to analyze whether there is a way to route the cable across Little Bay to minimize the

use of concrete mattresses, thereby minimizing the permanent impacts to Little Bay. *Id.*

Any one of these five examples is independently sufficient to remand the Permit. That the

Corps committed all five is egregious, and requires a preliminary injunction before the jet plow

work is permitted to go forward.

vii.   *The Corps should have prepared an EIS*

NEPA requires all federal agencies to prepare a "detailed statement"—an EIS—regarding

all "major federal actions significantly affecting the quality of the human environment ...." 42

U.S.C. § 4332(C). This duty extends to any federal actions that "*will or may*" have a significant

effect on the environment. 40 C.F.R. § 1508.3 (emphasis added). Federal regulations provide

additional guidance that an agency can determine whether an effect is significant or not by

looking at the context and intensity of the impacts. 40 C.F.R. § 1508.27. If the need for an EIS is

21

not clear, then the Corps can perform a more abbreviated review known as an Environmental

Assessment ("EA"). 40 C.F.R. §§ 1508.9, 1501.4. The Corps regulations explain that an EA

should not exceed 15 pages. 33 C.F.R. § Pt. 325, App. B ¶ 7(a). At the same time, however, the

EA must still be sufficiently detailed to address potential impacts and consider reasonable

alternatives. 40 C.F.R. §§ 1508.9. After completing the EA, if the agency finds that the project

will not have a significant impact on the environment, then it can issue a "finding of no

significant impact" or "FONSI." 40 C.F.R. §§ 1501.4, 1508.13. But if the EA shows that the

project would have a significant impact or is not conclusive as to not having a significant impact,

then the agency must prepare an EIS. *Sierra Club v. Marsh (Sierra Club 1)*, 769 F.2d 868, 882

(1st Cir. 1985) ("[T]he record in this case cannot support a FONSI, and therefore an EIS must be

prepared."). Similarly, if an agency issues a FONSI that either fails to consider the relevant data

or is based on bad data, then the FONSI is unsupported and the agency should have required an

EIS. *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1284 (S.D. Ala. 1998) ("Because the agency

failed to consider important aspects of the problem and relied on insufficient, inadequate, and,

out of date data, it was arbitrary and capricious for the FWS to issue findings of no significant

impact, and thus, in their action violated NEPA.")

     Here, the Corps' EA/SOF cannot support a FONSI—i.e., that the Project definitively will

not have a significant effect on the environment. Complaint ¶ 126-131. Many of the public

comments, and the specific comments from CLF, included detailed concerns about the Project's

impact on water quality, shellfish, and the aquatic biota in Little Bay. EA/SOF at 9; May CLF

Letter at 12-20. Little Bay – on its own and as part of the Great Bay estuary – is an important and

sensitive ecosystem, which provides numerous ecosystem services to the entire region.

Complaint ¶¶ 52-60. The Project will involve a severe, and significant, disruption to this

ecosystem via the disturbance of 1,500 tons of sediment and associated release of nutrients, pathogens, and other contaminants, and as a result of the installation of concrete mattresses that will permanently consume natural habitat.  It will adversely affect the bay's recreational and aesthetic uses and threatens to harm commercial aquaculture

The Corps, in their response to public comments about water quality concerns in the EA/SOF, relied on the NHDES water quality monitoring plan as assurance that the Project would not have an adverse impact on water quality. EA/SOF at 9-10. But NHDES expressed substantial concerns about the use of jet plowing, how the technology will impact Little Bay, and whether it would comply with the water quality standards. Moreover, the Corps relied almost exclusively on the data and reports provided by Eversource, even after CLF, intervenors in the NHSEC proceedings, and the public raised substantive and valid criticisms about the comprehensiveness and accuracy of Eversource's data, reports, and conclusions. Similarly, there are also substantiated concerns that the jet plow will release pathogens and other contaminants that could harm shellfish populations in Little Bay, including oyster beds. May CLF Letter at 13-15. CLF raised these concerns in its public comment to the Corps. *Id.*  Because of these errors, the Corps' EA/SOF cannot support a FONSI.

Last, the Corps' EA/SOF was 44 pages long and incorporated Eversource's 47-page response. "A lengthy EA indicates that an EIS is needed." *Sierra Club v. Marsh (Sierra Club 1)*, 769 F.2d 868, 874 (1st Cir. 1985) (citing 40 Fed.Reg. at 18037).  The Corps' 44-page document, alone, is nearly three times the 15-page length recommended by the Corps' regulations. A detailed EA is not a substitute for an EIS—the documents have different purposes. The purpose of an EA is to determine if an EIS is necessary.  In this case, the length of the EA is an additional factor showing an EIS was necessary and should have been ordered.

The combination of these factors—the importance and sensitivity of Little Bay and the Great Bay estuary, the Project's substantial environmental disturbance, the significant and detailed concerns about the Project's impacts on water quality and habitat, the Project's proposed installation of permanent concrete structures, the Corps reliance on inadequate data, and the extensive length of the EA—show that the Corps' FONSI determination and decision not to prepare an EIS was arbitrary and capricious.

C. <u>Reasonable Likelihood of Success on the Merits of the CWA and RHA Claims</u>

CLF is likely to succeed on the merits of its claims. The chronology of the Corps' process clearly demonstrates that the Corps failed to follow proper procedures, only did a cursory review of the Project, and granted the Permit without any independent, substantive oversight or review of the Applicant's claims. In doing so, the Corps violated the procedural requirements of NEPA, an irreparable harm, as well as the substantive requirements of the CWA and RHA.  The Corps violated the RHA and CWA because it: approved a permit that authorizes dredge and fill material in a special aquatic site, when there are practicable alternatives with lesser impacts; failed to require the Applicant to avoid and minimize impacts; and failed to undertake an adequate public interest review.

i. *The Permit is unlawful because there are practicable alternatives that avoid dredge and fill material in a special aquatic site*

While NEPA violations are procedural, violations of the CWA are substantive. The EPA's Section 404(b) Guidelines explain that "the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be *among the most severe environmental impacts*." 40 C.F.R. § 230.1 (emphasis added).  For that reason, the Section 404(b) Guidelines explain "no discharge of dredged or fill material shall be permitted *if there is a practicable alternative* to the proposed discharge which would have less adverse impact on the

aquatic ecosystem ...." 40 C.F.R. § 230.10(a) (emphasis added).  This is a categorical preference. Moreover, the EPA's guidelines establish a strong presumption that there are practicable alternatives to the discharge of fill to jurisdictional waters if the activity to be permitted is not "water dependent," that is, if it "does not require access or proximity to or siting within" a wetland "to fulfill its basic purpose," such as a marina. 40 C.F.R. § 230.10(a)(3). "[W]here a discharge is proposed for a special aquatic site, *all practicable alternatives* to the proposed discharge which do not involve a discharge into a special aquatic site *are presumed to have less adverse impact on the aquatic ecosystem*, unless clearly demonstrated otherwise." *Id.* (emphasis added).

The Corps in this case did not require Eversource to "clearly demonstrate" that there are no practicable alternatives to the proposed discharge in a special aquatic site. In fact, as explained above, there were practicable alternatives that would avoid that discharge and that should have been rigorously considered. *See supra* Section III.B.vi. But the Corps failed to evaluate those alternatives, let alone require that Eversource meet its burden to demonstrate that there are no alternatives that avoid impacts to special aquatic sites.

ii.   *The Corps did not require the Applicant to minimize impacts*

The CWA regulations also provide that "no discharge of dredged or fill material *shall be permitted* unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d) (emphasis added). The use of concrete mattresses in Little Bay will have adverse impacts by eliminating potential habitat, such as for eelgrass or oysters. May CLF Letter at 23. Yet, the Corps did not require Eversource to avoid these permanent impacts to Little Bay. CLF commented in its letter that Eversource did not investigate alternative routes that might prevent the need for concrete

mattresses. May CLF Letter at 12. The Corps did not require Eversource to show that there were

no alternative routes or otherwise evaluate the practicable steps that could be taken. The failure

to require such a step was arbitrary and capricious.

   iii.    *The Corps' public interest review was inadequate*

Last, the Corps' regulations provide that "[n]o permit will be granted which involves the

alteration of wetlands identified as important" unless the Corps finds, after its "public interest

review," that "the benefits of the proposed alteration outweigh the damage to the wetlands

resource," and that the proposed alteration is necessary to realize those benefits. 33 C.F.R. §

320.4(a), (b). In its review, the Corps must consider "[a]ll factors which may be relevant to the

proposal" including "the cumulative effects" of the project. 33 C.F.R. § 320.4(a)(1).

Additionally, the Corps must also consider "[t]he relative extent of the public and private need

for the proposed structure or work" and "the practicability of using reasonable alternative

locations and methods to accomplish the objective of the proposed structure or work[.]" *Id.* §

320.4(a)(2).

Here, the Corps concluded that the Project is in the public interest based primarily on the

delivery of a "low-cost, reliable source of power." EA/SOF at 31. But this benefit was not

properly evaluated by the Corps. The Corps did not analyze the purpose and need for the Project

in the NEPA analysis. Complaint ¶ 101-104. Instead it simply accepted the Applicant's

justification and stated benefits. *Id.*

At the same time, the Corps also downplayed the legitimate, adverse impacts of the

Project. Specifically, the Project, particularly from the jet plowing, will have a significant impact

on the water quality of the bay due to the release of sediments, nutrients, pathogens, and other

contaminants. May CLF Letter at 12-20. The use of concrete mattresses will also affect the habitat in Little Bay. *Id.* at 23.

### D.  The Balance of Equities

The third factor in the preliminary injunction analysis is the balance of equities. The Supreme Court has explained that if a plaintiff satisfies the likelihood of irreparable environmental harm prong of the analysis, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).

While a court may consider the monetary harm that might be realized by a defendant, the court also must recognize that "environmental harm, by its nature, is long-lasting and seldom adequately remedied by monetary damages." *Sierra Club III*, 714 F. Supp. at 592. Although the court has enumerated specific exceptions, such as "imminent harm to national defense, the impending bankruptcy of an entire industry, or the bankruptcy of innocent third parties," the balance of harms is usually in favor of an injunction to protect the environment. *Id.* (citations removed).

Here, CLF has raised specific environmental harms that would occur without an injunction.  Eversource has imminent plans to begin disruptive Project-related activities in Little Bay. *See* Complaint, Exhibit 8. While Eversource will undoubtedly argue that it will suffer significant economic impacts from delay, Eversource has been well aware of concerns raised by CLF and other members of the public and, in particular, of CLF's advocacy related to the project which, in addition to advocacy before the Corps, includes: CLF's intervention in the NHSEC proceedings; the filing of a motion for rehearing of the NHSEC's approval decision; the filing of a motion to stay the effectiveness of the NHSEC's approval until such approval was final and

unappealable (which the NHSEC denied); the initiation of an appeal of the NHSEC's approval

decision to the New Hampshire Supreme Court (which the Court has accepted); and the filing of

a motion to stay the NHSEC's approval decision until the pending appeal has been resolved.

Moreover, CLF sent Eversource a letter on May 30, 2019 specifically informing Eversource that

any activity was premature and at their own risk. *See* Exhibit 7. Eversource has deliberately

chosen to undertake any economic risks that it now faces.

On the other side, the environmental harms – both direct and from uninformed decision

making – substantially outweigh any economic risks. Moreover, the First Circuit has recognized

"[t]he difficulty in stopping a bureaucratic steamroller. . .[is] a perfectly proper factor for a

district court to take into account in assessing that risk, on a motion for a preliminary injunction."

*Sierra Club II*, 872 F.2d at 504. For all these reasons, the balance of equities favors a preliminary

injunction in this case.

E.   The injunction is in the public interest

The final factor in a preliminary injunction analysis is whether the injunction is in the

public interest or not. "NEPA implements a legislative determination that the public interest is

served by ensuring that agency decisionmakers have before them an analysis (with prior public

comment) of the likely effects of their decision upon the environment[.]" *Sierra Club III*, 714 F.

Supp. at 592–93; *see also Conservation Law Foundation v. Watt*, 560 F.Supp. 561, 583

(D.Mass.) ("It is plain that the public interest calls upon the courts to require strict compliance

with environmental statutes"), *aff'd sub nom. Commonwealth of Massachusetts v. Watt*, 716 F.2d

946, 953 (1st Cir.1983) ("The district court's weighing of the public interest and its conclusions

thereon were ... well within its sound discretion."); *Manatee County v. Gorsuch*, 554 F.Supp.

778, 795–96 (M.D.Fla.1982) ("The public has an interest in seeing that Government officials

28

carry out their [environmental] responsibilities"). Moreover, the Section 404(b) Guidelines specifically identify eight different wetland functions and characteristics that the Corps has determined are in the public interest.[5] *See* 33 C.F.R. § 320.4(b)(2). Many of these functions and characteristics exist in Little Bay.

In contrast, the sole rationale for the Project is to improve the reliability of the grid—the sufficiency of which is directly challenged in this action. *Cf. American Motorcyclist Association v. Watt*, 714 F.2d 962, 966–67 (9th Cir.1983) (likelihood of environmental harm if injunction is issued); *or Piedmont Heights Civil Club, Inc. v. Moreland*, 637 F.2d 430, 443 (5th Cir.1981) (serious traffic and safety hazards from overcrowded highway).

## IV.      Conclusion and Request for Relief

As set forth herein, preliminary injunctive relief is warranted and necessary.  CLF has demonstrated that allowing the Project to proceed would cause irreparable harm; that there is a substantial likelihood of success on the merits; that the balance of equities favor not allowing the Project to proceed; and that the public interest weighs in favor of an injunction. It is imperative that the SRP be enjoined from proceeding until the issues required to be considered by the Corps, including off-site issues as an alternative to the route through Little Bay, are addressed.  This will require the Corps to review all aspects of the project.  The Court must enjoin the entire project

---

[5] 33 C.F.R. § 320.4(b)(2): Wetlands considered to perform functions important to the public interest include:
  (i) Wetlands which serve significant natural biological functions, including food chain production, general habitat and nesting, spawning, rearing and resting sites for aquatic or land species;
  (ii) Wetlands set aside for study of the aquatic environment or as sanctuaries or refuges;
  (iii) Wetlands the destruction or alteration of which would affect detrimentally natural drainage characteristics, sedimentation patterns, salinity distribution, flushing characteristics, current patterns, or other environmental characteristics;
  (iv) Wetlands which are significant in shielding other areas from wave action, erosion, or storm damage. Such wetlands are often associated with barrier beaches, islands, reefs and bars;
  (v) Wetlands which serve as valuable storage areas for storm and flood waters;
  (vi) Wetlands which are ground water discharge areas that maintain minimum baseflows important to aquatic resources and those which are prime natural recharge areas;
  (vii) Wetlands which serve significant water purification functions; and
  (viii) Wetlands which are unique in nature or scarce in quantity to the region or local area.

lest Eversource proceed in constructing all but the portion crossing Little Bay and place the

Court in the position of trying to stop a "bureaucratic steam roller" after it has already gathered

momentum as well as render meaningless further review required under NEPA, the CWA and

RHA. *Sierra Club II* at 504. At a minimum, however, the Court must enjoin the Defendants from

proceeding with the jet plow and other construction activities in Little Bay until this matter is

resolved on the merits.

Because Defendant Public Service of New Hampshire d/b/a Eversource Energy has

submitted plans to begin jet plow trial runs beginning within weeks, and to begin construction

activities in Little Bay in early September, *see* Complaint, Exhibit 8, the Plaintiff requests an

expedited hearing to stop the jet plow trial and the project before it starts, so that the Court may

hear this appeal on the merits.

Respectfully submitted,

CONSERVATION LAW FOUNDATION

By Its Attorneys,

ORR & RENO, P.A.

Dated:  August 21, 2019      By:        */s/ Jeremy D. Eggleton*
                                         Jeremy D. Eggleton, Esq. (NH Bar # 18170)
                                         Nathaniel B. Morse, Esq. (NH Bar #266188)
                                         45 South Main Street
                                         PO Box 3550
                                         Concord, NH 03302-3550
                                         Phone:  (603) 224-2381
                                         Fax:  (603) 224-2318
                                         jeggleton@orr-reno.com
                                         nmorse@orr-reno.com