UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No. 1:19-cv-00868-JL |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

**<u>Single Statement of Agreed Facts</u>**

Pursuant to the Court's Order of August 29, 2019, the parties[1] [2]file the following Single

Statement of Agreed Facts:

---

1.  [1] CLF stipulates without condition to numbers 3,4,5,6,10,13,16-22 and 61-64.  For all other numbers CLF  stipulates to any statement asserting that the Corps, the New Hampshire Site Evaluation Committee, the New Hampshire Department of Environmental Services made findings or rulings as asserted, subject to the global dispute that the findings or rulings were lawfully or reasonably arrived at, or correct on the substantive merits.

[2]  Counsel for the United States Army Corps of Engineers agrees to these facts subject to the following statement: Plaintiff's claims are brought pursuant to the Administrative Procedure Act ("APA").  Compl. ¶ 16.  Under the APA, this Court's review of the merits should generally be limited to a review of the administrative record underlying the decision at issue.  As such, the facts are contained in the administrative record and the Court may not "find" underlying facts. See 5 U.S.C. § 706; see also <u>Citizens to Preserve Overton Park v. Volpe,</u> 401 U.S. 402, 416 (1971). Therefore, on the merits issues, the Court should not base its decision on findings of undisputed material facts but rather determine as an issue of law whether the agency's decision, based on the record, was within its authority, considered the relevant factors, and involved no clear error in judgment.  See, e.g., <u>Lujan v. Nat'l Wildlife Fed'n,</u> 497 U.S. 871, 883 (1990);<u>Fla. Power & Light Co. v. Lorion,</u> 470 U.S. 729, 743-44 (1985); <u>Citizens to Preserve Overton Park,</u> 401 U.S. at 416.  The Corps does not object to the statement of undisputed facts, with the understanding that it is being submitted solely for the Court's use in resolving the motion for a temporary restraining order.

1. The SEC granted the following "Stipulated Facts and Requested Findings"

    a. The proposed Project is a reliability project selected by the Independent System Operator of New England ("ISO-NE") to address identified transmission capacity needs for the continued reliability of the electric transmission system in the New Hampshire Seacoast Region. Appl. E-1. ISO-NE concluded, based on a study commenced in 20l0, that additional transmission capacity is necessary in this area to support the reliable delivery of electric power. Appl. E-3.

    b. ISO-NE considered a range of alternatives to increase transmission system thermal capacity, to increase transformer thermal capacity, and to improve system voltage performance. ISO-NE chose the present project, in 2012, as the preferred solution "as it is much less costly than the other alternative and addresses the needs in the area." Appl. E-3; New Hampshire Vermont Transmission Solutions Study Report, published by ISO-NE in 2012.

    c. The ISO-NE selected the Seacoast Solution, including the Seacoast Reliability Project, as a reliability project in the region to support the reliable delivery of electric power. Appl. 59.

    d. The "New Hampshire Vermont Transmission Solutions Study Report," published by ISO-NE in 2012, found that the Seacoast Region faces significant violations of the transmission system criteria under certain system operating conditions and, if these criteria violations are not addressed, the Region will likely encounter system overloads that could lead to power outages for numerous customers. Appl. 59.

    e. ISO-NE determined in 2011 and 2012 that if no action is taken to address the needs of the Seacoast Region's electric system, there is the potential that the transmission lines there will exceed their emergency thermal ratings, which could result in degraded voltage. Appl. 59.

    f. ISO-NE considered a range of alternatives to increase transmission system thermal capacity, to increase transformer thermal capacity, and to improve system voltage performance. ISO-NE chose the present project as the preferred solution because its ability to solve identified needs and in part because of its cost. The project will provide an additional path to enhance the existing 115 kV transmission system between the Deerfield and Scobie Pond Substations, and will provide 115 kV transmission ties to Maine to better address reliability concerns in the New Hampshire Seacoast region. Appl. E-3.

    Order at 329; 334–35.

2. As of June 2018, the Project remained on the on the project list ISO-NE approved project list that it publishes three times per year.  ISO-NE's June 2019 ISO-New England Project

Listing Update (Draft) – ISO-NE Public, available at https://www.iso-ne.com/static-assets/documents/2019/06/final_project_list_june_2019.xls, shows that the Project remains planned and is expected to be in-service by December 2019.

3.  The Corps and the SEC both rejected requests that the ISO-NE needs assessment be revisited by ISO-NE.

**Environmental Issues**

4.  GeoInsight and Dr. Steven Jones, witnesses for the Town of Durham and the University of New Hampshire stated in their supplemental pre-filed testimony that: "[T]he Jet Plow Trial run is necessary to evaluate whether the conditions predicted by the sediment dispersion model are accurate, whether surface water quality standards will be exceeded, and whether additional sediment reduction measures are necessary during the actual cable installation. The Jet Plow Trial run will also provide useful information about the effectiveness of the water quality monitoring plan, the water quality within the mixing zone and at the boundary of the mixing zone, and how the jet plow operational parameters (including jet plow speed and pressure) affect water quality, including toxic chemical, pathogenic bacterial, and nitrogen release."

5.  Witnesses for the Town of Durham and University of New Hampshire also recommended other permit conditions to NHDES.   The SEC found that "The evidence demonstrates that NHDES reviewed and addressed each recommendation made by Durham" and "some were accepted and incorporated into the permit and others were rejected." Decision at 169.

6.  The SEC Order required that Eversource conduct a jet plow trial run to "address the level of uncertainty associated with modeling." Order at 169.

7.  The SEC Order states: "Having heard the expert testimony, knowing that a jet plow trial run will occur, and that monitoring will be undertaken by NHDES, the Subcommittee does not find that nitrogen released by the jet plow will have an unreasonable adverse effect on water quality." Order at 170.

8.  The SEC concluded that removal of the existing cable will not have an unreasonable effect on water quality. Order at 170.

9.  Experts for Counsel for the Public at the SEC confirmed that jet plow represents a reliable well-proven method for installing cables that was successfully utilized before. Order at 56.

10. Jet plow installation of the cables in Little Bay was approved by NHDES.  Order at 57.

11. The SEC Order states that "it is reasonable to require [Eversource] to conduct a jet plow trial run in order to confirm the accuracy of the modeling and to collect data that would

- 3 -

mitigation and minimization measures that may be implemented prior to the beginning of construction." Order at 58.

12. The SEC concluded that "Considering the expert testimony and the avoidance, mitigation, and minimization measures adopted by NHDES and agreed to by the Applicant, and the conditions imposed, the Subcommittee finds that the Project will not have an unreasonable adverse effect on water quality." Order at 172.

13. The SEC's Certificate Ordered the following conditions relative to the jet plow trial run:

    a. Further Ordered that at least ninety (90) days prior to the jet plow trial run, the Applicant shall submit a Jet Plow Trial Plan (JPTP) to NHDES for approval; and it is,

    b. Further Ordered that the JPTP shall describe in detail how and when the trial run and monitoring will be conducted and the results reported; and it is,

    c. Further Ordered that the Applicant shall conduct one jet plow trial run in accordance with the JPTP as approved by NHDES; and it is,

    d. Further Ordered that at least 14-days prior to the scheduled start of the submarine cable installation in Little Bay, the Applicant shall submit a jet plow trial run summary report to NHDES and the Administrator to be posted on the Committee's website; and it is,

    e. Further Ordered that the jet plow trial run summary report shall address the following: (i) how well the model predicts the sediment plume; (ii) how well the water quality monitoring plan works (including communication between the monitors and jet plow operators) and what if, any, modifications to the plan are necessary; (iii) water quality monitoring results within the mixing zone and at the boundary; (iv) how measures taken to reduce sediment suspension due to jet plowing (including, but not limited to jet plow speed and pressure reductions) impact water quality; (v) if results suggest that cable installation by jet plowing is likely to meet NH surface water quality standards; and (vi) if any additional sediment suspension reduction measures are needed to help ensure surface water quality standards will be met; and it is,

    f. Further Ordered that NHDES is authorized to permit installation of the Project by jet plow under Little Bay; and it is,

    g. Further Ordered that installation of the submarine cable in Little Bay shall not proceed until authorized by NHDES.

14. SEC found that "the record indicates that Durham presented its concerns to NHDES about the release of pathogens and their potential impacts to public health. While being

fully aware of concerns, NHDES decided not to require the Applicant to test oysters for pathogens." Decision at 207-08.

15. SEC found that: "Durham and CLF argue that the Project may prevent eelgrass from future recolonization of Little Bay. The degree of such impact, however, cannot be ascertained by the Subcommittee where it is speculative that eelgrass will be reestablished in Little Bay and it is unknown as to how much of it will be reestablished, if any." Decision at 207.

**Construction Facts**

16. On May 6, 2019, after notifying the Administrator of the SEC of its intent to do so, Eversource commenced construction of the Project in areas not subject to the jurisdiction of the Defendant Army Corps of Engineers ("Corps").

17. After issuance of the Corps' Permit in July 2019, Eversource commenced preparatory activities for construction activities in the Little Bay portion of the Project that required the Corps permit.

18. The two-day jet plow trial run is currently scheduled to commence September 9th.

19. The trial ordered by the SEC for the purpose of the jet plow trial is supposed to determine both the accuracy of the jet plow modeling evidence that Eversource presented to the NHSEC and whether there are additional measures that should be taken to reduce any potential adverse impacts of using the jet plow technique to install transmission cable in Little Bay.

20. The jet plow trials are supposed to evaluate: (i) how well the jet plow modeling that Eversource undertook predicts the sediment plume; (ii) how well the water quality monitoring plan works (including communication between the monitors and jet plow operators) and what if, any, modifications to the plan are necessary; (iii) water quality monitoring results within the mixing zone and at the boundary; (iv) how measures taken to reduce sediment suspension due to jet plowing (including, but not limited to jet plow speed and pressure reductions) impact water quality; (v) if results suggest that cable installation by jet plowing is likely to meet New Hampshire surface water quality standards; and (vi) if any additional sediment suspension reduction measures are needed to help ensure surface water quality standards will be met. SEC Order at 59–60.

21. The trial will run for a distance of 1,000 feet.

22. The SEC Order further directed that, at least 14-days prior to the scheduled start of the submarine cable installation in Little Bay, the Applicant must submit a jet plow trial run summary report to NHDES and the SEC Administrator to be posted on the SEC's website. SEC Order at 59–60.

**Alternatives Analysis Facts**

23. The Corps determined that the applicant has demonstrated there are no practicable alternatives that do not involve special aquatic sites. Environmental Assessment ("EA") at 18.

24. The Corps determined that there are no alternatives to the proposed discharge that would be less environmentally damaging. EA at 18.

25. The Corps determined that the proposed discharge is the practicable alternative with the least adverse impact on the aquatic ecosystem, and it does not have other significant environmental consequences. EA at 18.

26. The Corps determined that there is no practicable alternative to the proposed discharge that would be less damaging to the environment. EA at 29.

**Additional Corps Determinations**

27. As part of the Corps Public Hearing Need Determination made on July 3, 2019, the Corps stated and found that:

    Requests for a public hearing shall be granted, pursuant to 33 CFR 327.4 (b), "unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing". In support of this determination the Corps submits the following:

    a. Multiple public comment sessions were held by Eversource from April 2015 to May 2019 regarding this project in which the public was given opportunity to voice their concerns.

    b. Additionally, multiple public hearings were held over 24 days by the New Hampshire Site Evaluation Committee (SEC) from August 2018- March 2019.

    c. All testimony, hearing and, deliberation minutes from the NH SEC are publically available at https://www.SEC.nh.gov/projects/2015-04/2015-04.htm. The Corps continually reviews comments and transcripts produced from the SEC process.

    d. On June 12, 2019 and June 17, 2019, Normandeau Associates, an agent of the Applicant, responded to all comments sent to the Corps from April 23, 2019 to May 23, 2019. These responses were then analyzed and addressed in our review.

    The Corps' Public Notice combined with the multiple Eversource and SEC public hearings offered the public ample opportunity to comment. Issues raised in this case

were clearly stated and can be evaluated with the existing information. Holding a public hearing would not provide any new or substantive information nor would it aid in our understanding of the relevant facts and issues.

Public Hearing Need Determination at 2 – 3.

28. The Corps determined that potential impacts to substrate are minor and long term. EA at 19.

29. The Corps determined that potential impacts to suspended particle and turbidity are minor and short term. EA at 19.

30. The Corps determined that potential impacts to water are minor and short term. EA at 19.

31. The Corps determined that effects to the movement of water in the aquatic environment will be negligible. EA at 19.

32. The Corps determined that there will be no effect on normal water fluctuations. EA at 19.

33. The Corps determined that there will be no changes in salinity gradients as a result of this project. EA at 20.

34. The Corps determined that the plume generated by the jet plow will normally be limited to the immediate vicinity of the disturbance and should dissipate shortly after each phase of the construction activities. EA at 19-20.

35. The Corps determined that potential impacts to fish, crustaceans, mollusk, and other aquatic organisms are minor and short term. EA at 20.

36. The Corps determined that jet plow technology has been shown to minimize impacts to marine habitat caused by excessive dispersion of bottom sediments, but some increased turbidity and resuspension of sediments can be expects. EA at 21.

37. The Corps determined that the total suspended sediment levels expected for jet plowing are below those shown to have adverse effect on fish. EA at 21.

38. The Corps determined that any effects to the movement of listed species would be too small to meaningfully measured or detected, and are therefore, insignificant. EA at 21.

39. The Corps determined that major natural oyster beds or restored oyster beds will not be impacts by the Project because the sediment plume created by the jet plow will not reach them.  EA at 21.

40. The Corps determined that smaller, unmapped oyster beds may be exposed to the sediment plume but the ephemeral nature of the plume will result in there being negligible effects to these resources. EA at 21.

41. The Corps determined that the community of benthic organisms in Little Bay is resilient and indicates it is likely to repopulate disturbed sediments quickly. EA at 22.

42. The Corps determined that impacts to other wildlife such as transient mammals, birds, reptiles, and amphibians are expected to be minor and temporary and will be managed through best management practices during construction. EA at 22.

43. The Corps determined that potential impacts to sanctuaries and refuges will be negligible. EA at 23.

44. The Corps determined that potential impacts to wetlands will be minor and short term. EA at 23.

45. The Corps determined that potential impacts to mud flats will minor and long term EA at 23.

46. The Corps determined that there is not potential effect to vegetated shallows. EA at 23.

47. The Corps determined that no eelgrass will be directly impacts by the Project. EA at 23.

48. The Corps determined that there is no potential effect resulting from contaminants.  EA at 23.

49. The Corps determined that testing for possible contaminants in dredged or fill material is not required because the proposed material is not likely to be a carrier of contaminants because it is comprised of sand, gravel or other naturally occurring inert material. EA at 26.

50. The Corps determined that jet plowing operations did not require a full Marine Analysis Section (MAS) review as this material will be only briefly suspended into the lower part of the water column before re-depositing into the immediate vicinity of the jet plow. EA at 27.

51. The Corps determined that potential impacts to the physical substrate will be minor and long term. EA at 28.

52. The Corps determined that potential impacts to aquatic ecosystems and organisms are minor and short term. EA at 28.

53. The Corps determined that potential impacts relative to the proposed disposal site are minor and short term. EA at 28.

54. The Corps determined that potential cumulative effects on the aquatic ecosystem are minor and short term. EA at 28.

55. The Corps determined that secondary effects on the aquatic ecosystem are minor and long term.  EA at 28.

56. The Corps determined that the discharge will not cause or contribute to violations of any applicable water quality standards.  EA at 28.

57. The Corps determined that the discharge will not violate any toxic effluent standards.  EA at 29.

58. The Corps determined that the discharge will not violate standards set by the Department of Commerce to protect marine sanctuaries. EA at 29.

59. The Corps determined that the discharge will not cause or contribute to significant degradation of waters of the United States. EA at 29.

60. The Corps determined that all appropriate and practicable steps have been taken to minimize the potential adverse impacts of the discharge on the aquatic ecosystem. EA at 29.

**Additional Facts**

61. Little Bay is part of the Great Bay estuary, which has been designated an estuary of national significance under Section 320 of the Clean Water Act.

62. The Great Bay estuary, including Little Bay, provides a diversity of essential habitats, including eelgrass, salt marsh, mudflats, and oyster beds.

63. Little Bay includes several commercial oyster aquaculture sites.

64. Eversource has described the cable installation process in Little Bay, by means of jet

   plowing and hand-jetting, as follows:

   The jet plow operation will utilize high-volume water pressure to temporarily liquefy the soft sediments immediately ahead of the plow blade.  The water is sprayed out in specially designed nozzles located along the leading edge of the jet plow's blade.  The submarine cable will feed from the barge, pass through the back of the blade, and into the liquefied sediments.  The majority of the sediment will settle into the trench leaving the cable installed at the desired depth. The jet plow will reach within approximately 600 feet of the east shore, at which time the water depth will not allow further advancement of the barge towards the shoreline.  At this point, the submarine cable will be unloaded from the plow, and the bitter end of the cable will be floated to the manhole using a winch from shore.  The section of temporarily unburied cable between the end of the jet plow position offshore and the excavated cable landing trench will be buried by divers utilizing water jet hoses and an excavator in the nearshore intertidal area.  The intertidal areas that will be subject to diver burial and excavation will be enclosed with silt curtains.

                              Respectfully submitted,

- 9 -

PUBLIC SERVICE COMPANY OF NEW
HAMPSHIRE d/b/a EVERSOURCE
ENERGY

By its attorneys,

McLANE MIDDLETON,
PROFESSIONAL ASSOCIATION

Date:  September 4, 2019          By:     /s/ Wilbur A. Glahn, III
                                          Wilbur A. Glahn, III, NH Bar No. 937
                                          bill.glahn@mclane.com
                                          Barry Needleman, NH Bar No. 9446
                                          barry.needleman@mclane.com
                                          900 Elm Street, P.O. Box 326
                                          Manchester, New Hampshire 03105
                                          Telephone (603) 625-6464

                                          CONSERVATION LAW FOUNDATION

                                          By Its Attorneys

                                          ORR & RENO, P.A.

Dated:  September 4, 2019         By:     _/s/ Jeremy D. Eggleton_____
                                          Jeremy D. Eggleton, Esq. (NH Bar # 18170)
                                          Nathaniel B. Morse, Esq. (NH Bar #266188)
                                          45 South Main Street
                                          PO Box 3550
                                          Concord, NH 03302-3550
                                          Phone:  (603) 224-2381
                                          Fax:  (603) 224-2318
                                          jeggleton@orr-reno.com
                                          nmorse@orr-reno.com

## Certificate of Service

I hereby certify that on September 4, 2019, I served the foregoing Single Statement of Agreed Facts electronically through ECF upon all counsel of record.

/s/ Jeremy D. Eggleton
Jeremy D. Eggleton