UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>U.S. ARMY CORPS OF ENGINEERS, et al. )<br>)<br>Defendants. )<br>) | No. 1:19-cv-00868-JL |

**SUPPLEMENTAL MEMORANDUM OF LAW
OF PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE
D/B/A EVERSOURCE ENERGY
IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Public Service Company of New Hampshire d/b/a Eversource Energy ("Eversource")

submits this Supplemental Memorandum in opposition to Plaintiff Conservation Law

Foundation's ("CLF") Motion for Preliminary Injunction.  Dkt 3-1.  CLF is not entitled to the

relief it seeks.  It cannot succeed on the merits of its claims, and it has not demonstrated that

irreparable harm will occur in the absence of injunctive relief.  Preliminary injunctive relief may

be granted only if the plaintiff succeeds on all four prongs of the applicable standard.  Winter v.

Nat. Res. Def. Council, 555 U.S. 6, 21-22 (2008).  Because CLF cannot demonstrate either a

likelihood of the success on the merits or that irreparable harm will occur, its Motion should be

denied and this much-needed Project should be allowed to proceed without further delay to

ensure the reliability of the region's electricity grid.

The Corps considered a massive administrative record in this case, including material

developed in the course of extended proceedings before two State agencies.  As the applicant for

multiple State and federal permits, Eversource had the obligation to provide much of the studies and analyses for consideration by the agencies.  CLF offers no evidence that the Corps failed to take the requisite "hard look" at that information or issues raised by third parties, neglected to address questions presented by CLF and others, or failed to consider alternatives in the fashion authorized by applicable regulations.  CLF's main complaint seems to be that the Corps disagreed with its views.  The Corps examined CLF's issues, as well as the ample evidence in the record that was contrary to CLF's views, and based its decision on evidence that the Corps concluded was credible.

CLF's irreparable harm arguments are just as weak as its merits arguments.  The Corps and both State agencies considered technical and ecological information on all potential impacts, including modeling of predicted levels for water quality parameters that would result from jet plow operations in Little Bay.  The modeling forecasted acceptable levels of suspended sediments, nutrients, and various contaminants, all of which has now been corroborated by the jet plow trial run, which this Court allowed to proceed over CLF's objections just over a month ago, as shown in the Revised Report of the Jet Plow Trial run dated October 2, 2019.  That Report is attached to this memo as Exhibit 1.[1]  Furthermore, on October 4, 2019, NHDES approved construction using the jet plow without conditions.  See NHDES letter to the SEC dated October 4, 2019, attached hereto as Exhibit 2.

Eversource addressed most of CLF's claims and arguments in its Objection to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.  Dkt. 20-1.  Those

---

[1] Eversource filed the Report of the Jet Plow trial with NHDES on September 18, 2019 and NHDES provided comments seeking additional information on September 26, 2019.  The Revised Report reached the same conclusions as the earlier report.  Accordingly, here, Eversource cites to the "Revised Report."

arguments are incorporated in this Supplemental Memorandum, which focuses primarily on

CLF's Supplemental Memorandum ("CLF Supp. Memo"), Dkt. 44.[2]

## I.  STANDARD OF REVIEW

This Court's review of the Corps' action is limited to the question of whether the Corps'

decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  5 U.S.C. S 706(2)(A).  Judicial review under this standard "affords great deference to

agency decisionmaking and…the [agency's] action is presumed valid…."  Assoc. Fisheries of

Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).  Deference to an agency's judgment is

heightened where the issues require the application of "substantial agency expertise."  Marsh v.

Or. Natural Res. Council, 490 U.S. 360, 376-77 (1989).

The Court may not substitute its judgment for that of the Corps.  Citizens to Preserve

Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  Rather, the Corps' action must be upheld

if the Corps "considered the relevant factors and articulated a rational connection between the

facts found and the choice made."  Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 105

(1983).  An agency must "examine the relevant data and articulate a satisfactory explanation for

its action."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43

(1983).

Similarly, a reviewing court will find that an agency has taken the "hard look" required

under NEPA when it is apparent that the agency applied its own expertise, obtained the expert

views of others outside the agency, examined the issues with the appropriate application of

scientific scrutiny, and responded to legitimate concerns raised by others.  Hughes River

Watershed Conservancy v. Johnson, 165 F.3d 283, 288 (4th Cir. 1999).  The Court therefore is

---

[2] Eversource does not reargue a number of points raised earlier by CLF, such as whether the Corps needed to re-evaluate ISO-NE's determination of the need for the Seacoast Reliability Project, or whether the Corps should have assessed upland impacts.

required to ascertain whether the Corps met this standard by reference solely to "the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973).

## II. ARGUMENT

### A.  Likelihood of Success on the Merits.

CLF cannot demonstrate a likelihood of success on the merits of its claim that the Corps erred in issuing its EA and the permit authorizing Eversource to proceed with the work required to install the cable beneath Little Bay.  CLF's Preliminary Injunction Motion sets the bar much higher, by requesting an injunction that would require the Corps to revoke the Eversource permit. Dkt. 3-1 at 5.  That is not preliminary relief; it is the ultimate relief authorized by the APA when a plaintiff ultimately succeeds on the merits.  5 U.S.C. § 706(2)(A).  As Eversource has emphasized in its prior filings, following this briefing and the hearing scheduled for October 9, 2019, nothing will remain to be decided on the merits in this action to position the Court to issue a final judgment.  Dkt. 38-1.  Accordingly, Eversource urges the Court to not only deny CLF's Motion, but to issue final judgment in favor of the Corps and dismiss the Complaint.

### 1.  CLF's Contention That the Corps Failed to Take a "Hard Look" and Should Have Prepared an EIS Cannot Withstand Scrutiny.

CLF offers a variety of assertions, each devoid of meaningful or persuasive content, to support its claim that the Corps "rubber stamped" Eversource's permit application and "went through the motions" rather than undertake the requisite level of analysis to evaluate potential environmental impacts.  Eversource previously addressed CLF's remarkable assertions that this Court should reach legal conclusions based on the page count of the Corps' EA and the number of days taken to prepare it.  Dkt. 21 at 15.  CLF raises two additional claims.  First, it asserts that the Corps' reliance on Eversource's data and analyses, as well as the Corps' occasional use of

the text Eversource provided to convey its conclusions to the Corps, demonstrates a lack of searching analysis by the Corps in preparing its EA and permit determinations.  CLF Supp. Memo, Dkt. 44 at 10.  In fact, the record demonstrates the opposite – that the Corps consulted a wealth of technical information and articulated its findings clearly and in detail.  Second, CLF contends that the Corps violated its obligation to prepare an Environmental Impact Statement ("EIS") thereby leaving significant issues unresolved by the EA.  CLF is wrong on both counts. Id. at 19.

### a. The Corps Did Not Fail to Take a "Hard Look."

There is no merit to CLF's argument that the Corps' reliance on materials and textual explanations provided by Eversource evinces a failure to take the requisite "hard look" required by NEPA in preparing its EA.  It is commonplace for agencies to primarily review materials submitted by permit applicants and, if those materials are deemed to be thorough and competently prepared, to rely upon them in preparing an Environmental Assessment.  In fact, the President's Council on Environmental Quality ("CEQ"), which oversees NEPA implementation by all federal agencies, has issued regulations authorizing agencies to allow applicants to prepare the EA themselves.  40 C.F.R. § 1506(b).  In such circumstances, the agency's job is to examine the issues and take responsibility for the scope and content of the EA.  Id.  Even where the agency prepares the more detailed EIS, it may rely on information provided by the applicant so long as it evaluates the information and verifies its accuracy.  Id. § 1506(a).  CEQ emphasized that the intent underlying this regulation is "that acceptable work not be redone…"  Id.

The courts have indicated approval of the approach authorized by CEQ's regulation.  See City of Oxford, Ga. v. F.A.A., 428 F.3d 1346, 1356 (11th Cir. 2005); San Francisco Baykeeper v. U.S. Army Corps of Engineers, 219 F. Supp.2d 1001, 1013 (N.D. Cal. 2002).  This Court has

made clear that the need to discuss the relevant issues does not burden the agency to rely solely on its own independent research.  In Northwest Bypass Grp. v. Army Corps of Engineers, for example, the Court held that the Corps took a hard look at the issues when preparing its EA because it relied on and included in the record the conclusions of a study prepared for a city by a third party for another purpose eight years earlier.  470 F. Supp.2d 30, 61 (D.N.H. 2007).

In reviewing this Project, the Corps considered extensive technical materials from a variety of sources.  Eversource provided to the Corps a 538-page permit application prepared by an expert environmental consulting firm.  The application included, among other things, detailed discussions or descriptions of the project purpose, the environmental setting, construction methods, potential project impacts, project alternatives, impact analysis and project mitigation. Army Corps Record ("AR" at 23052).  The Eversource application also included, as appendices:

- Modeling Sediment Dispersion from Cable Burial, prepared by RPS ASA, dated December 14, 2015 (54 pages) (AR at 22412);

- Natural Resource Existing Conditions Report, prepared by Normandeau Associates, Inc., dated March, 2016 (102 pages), AR at 22542;

- Natural Resource Impact Assessment, prepared by Normandeau Associates, Inc., dated March, 2016 (76 pages), AR at 22644;

- Rare, Threatened, and Endangered Species and Exemplary Natural Community Report, prepared by Normandeau Associates, Inc., dated March, 2016 (64 pages), AR at 22720; and

- Revised Modeling Sediment Dispersion from Cable Burial, prepared by RPS ASA, dated June 27, 2017 (98 pages), AR at 6221.

In addition, Eversource provided the following studies and plans to the Corps:

- Horizontal Direction Drilling and Jet Plow:  A Comparison of Cable Burial Installation Options, prepared by Eversource, dated July 1, 2018 (79 pages), AR at 7085; and

- Seacoast Reliability Project Existing Cable Removal Plan, prepared by Eversource (52 pages), AR at 5969.

As the administrative record demonstrates, the Corps also considered:

- Phase I-A Preliminary Archeological Survey, prepared by Archeological and Historical Services, Inc., dated February 13, 2015 (32 pages), AR at 1;

- Seacoast Reliability Project Historic Resources Assessment, prepared by Preservation Company, dated February, 2016 (265 pages), AR at 699;

- Essential Fish Habitat Assessment, prepared by Normandeau Associates, Inc., dated March, 2016 (23 pages), AR at 22784;

- Eversource NH Department of Transportation Application, prepared by Eversource, dated April 4, 2016 (74 pages), AR at 22974;

- Eversource Application for Certificate of Site and Facility, prepared by Eversource, dated April 12, 2016 (154 pages), AR at 24164;

- NHDES Shoreland Permit Application, prepared by Normandeau Associates, Inc., dated April 12, 2016 (96 pages), AR at 23856;

- NHDES Alteration of Terrain Permit Application, prepared by Normandeau Associates, Inc., dated April 12, 2016 (207 pages), AR at 23952;

- Visual Assessment for the Seacoast Reliability Project, prepared by LandWorks, dated April, 2016 (167 pages), AR at 22807;

- Characterization of Sediment Quality Along Little Bay Crossing, prepared by Normandeau Associates, Inc., dated December 1, 2016 (335 pages), AR at 22644; and

- Soil, Groundwater and Surface Water Investigation, prepared by GEI Consultants, dated December 15, 2016 (178 pages), AR at 5666.

Finally, the administrative record also demonstrates that the Corps' analysis went far beyond technical studies and reports provided by Eversource. The Corps' record includes the following materials developed during the New Hampshire Site Evaluation Committee ("SEC") review process: Transcripts of SEC deliberation hearings held November 29-30, 2018 (451 pages) (AR at 14444), as well as other SEC deliberation hearing transcripts (1,000 plus pages);

transcripts of all SEC public hearings held in 2018 (1,500 plus pages); transcripts of public comments and responses by Eversource before the SEC (60 pages) (AR0021682); and the Order of the SEC dated January 31, 2019 ("Order") (342 pages), AR at 15560.  Clearly, the Corps deemed this mountain of technical and analytical material to be acceptable work that need not be redone.  By including this material in the administrative record, the Corps has represented that it considered all of it.  Wilderness Soc., Center for Native Ecosystems v. Wisely, 524 F. Supp.2d 1285 (D. Colo. 2007).

The Corps also considered views expressed by CLF and others, and took those views into account in reaching its decisions.  An agency's decision-making is entitled to a presumption of regularity.  Assoc. Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).  It is therefore presumed that the Corps considered all of CLF's submissions and other record materials that raise the "detailed concerns" CLF now claims have been neglected.  Likewise, the Corps' explicit written findings that specific environmental impacts will be insignificant and/or temporary are presumed to be valid.  See AR at 21335-46.  Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971); Sierra Club v. Marsh, 976 F.2d 763, 769 (1st. Cir. 1992); Conservation Law Foundation of New England v. Sec'y of Interior, 864 F.2d 954, 957-58 (1st. Cir. 1989).  Those findings also are presumed to be based on the Corps' consideration of the mammoth record underlying its decision, including record material supplied by CLF.  Id.

To overcome the presumption, CLF must show something credible.  Merely pointing out that the Corps, in describing its own conclusions, utilized language offered by Eversource falls far short of meeting CLF's burden of demonstrating a failure to take a hard look.  City of Oxford, Ga., 428 F.3d at 1356; San Francisco Baykeeper, 219 F. Supp.2d at 1013.  The Corps' utilization of Eversource's language implies that the Corps thought that language accurately reflected the

Corps' findings, not that the Corps failed to independently evaluate the issues based on the record.

### b.  The Corps Correctly Determined That an EIS is Not Required.

The Corps determined that Project activities authorized by the permit "will not have a significant impact on the quality of the human environment."  AR at 21328.  For that reason, the Corps found that an EIS will not be required.  Id.  CLF asserts that "the Project will involve a severe, and significant, disruption to this ecosystem," and thus contends that the EA is insufficient to support the Corps' "finding of no significant impact" ("FONSI").  CLF Memo, Dkt.15 at 22-23.  It also maintains that, because significant issues remain unresolved following the Corps' issuance of its EA, an EIS was required.  CLF Supp. Memo, Dkt. 44 at 19.

CLF's contentions are just not true.  The Corps addressed each of the issues raised by CLF and others, leaving no material issue unresolved, and the administrative record contains ample evidence to support the Corps' judgment that the Project will not have a significant environmental impact.  Under the APA standard of review, this Court should sustain the Corps' action.

### i.  Disturbance of Sediments.  First, CLF contends that ecosystem

disruption will result from the disturbance of 1500 tons of sediment due to cable installation via the jet plow technique.  Id. at 23.  As this Court heard at the September 6, 2019 hearing, all parties agree that cable installation will only suspend about one quarter of that amount of sediment into the water column, or about 375 tons of sediment; three quarters of this amount of sediment will return immediately to the trench to bury the cable.  Hearing Transcript of TRO Hearing, Morning Session at 136-37; Hearing Transcript of TRO Hearing, Afternoon Session at

31-33.  Although CLF voiced its "concerns," it provided no analysis to show the extent to which dispersion of sediment would disrupt the ecosystem.  But the Corps did provide that analysis.

In its EA, the Corps addressed the comments provided in CLF's letter dated May 23, 2019.  AR at 21327-28.  The Corps concluded that:  (i) "[a]ll impacts have been avoided and minimized to the greatest extent practicable;" (ii) compensatory mitigation required by the permit will address the remaining impacts that are unavoidable; (iii) "detrimental effects are expected to be minimal and temporary;" (iv) "Eversource has conducted multiple studies to demonstrate the impacts of SRP will be ephemeral and minor;" and (v) the reader should consult Section 7.0 of the EA for further explanation.  AR at 21327-28.  Thus, the Corps' judgment was that the record demonstrates that impacts will be minor.[3]

The Eversource studies included sediment characterization analysis and sediment dispersion modeling, as noted above.  The modeling projected that, as a result of jet plow installation and diver burial of the cable, limited areas of Little Bay would experience excess suspended solids for relatively short periods of time, as well as a very thin layer of sediment deposition.  AR at 6224-25.  For example, the study found that the sediment plume from jet plowing would largely dissipate within an hour, and a total area of only 0.2 acres would experience a suspended solids concentration of 10 milligrams per liter after two hours, with no area experiencing that concentration after three hours.  Id.  The study concluded that an area of only 68 acres would experience sediment deposition greater than 0.1 millimeter, a little more than the thickness of a human hair.  Id.

The SEC also had noted these findings from the Eversource analysis, and had considered the criticisms of the sediment modeling offered by experts for the Town of Durham, two of

---

[3] As discussed below, the Jet Plow Trial confirmed the SEC findings and the Corps conclusions on those findings for all environmental impacts.

whom (Stephen H. Jones and Michael F. Dacey) have appeared in this matter. AR at 15711-22. CLF made various claims about the modeling in a post-hearing brief, but notably, "did not sponsor any witness or testimony to affirmatively support its claims." AR at 15726. The SEC rejected Durham's and other parties' criticisms because they did not provide evidence to demonstrate the Project's anticipated impacts, and because the NHDES has the experience and expertise to address any modeling uncertainty, in part through the jet plow trial run. Id. at 15727-28.

The Corps considered the Eversource analysis and the detailed SEC deliberations, and articulated its own conclusion in Section 7.0 of the EA: "[a]ny changes in water quality from suspended sediment will be brief in duration and limited in scope." AR at 21350. As to sediment deposition, the Corps found that there would be minor impacts on the physical substrate of Little Bay, and that "no long-term impacts are expected to fish and wildlife values." Id. at 21345-49.

The Corps also consulted the scientific literature to inform its judgment as to specific issues, including analysis by the U.S. EPA, which is tasked with issuing water quality criteria pursuant to the Clean Water Act ("CWA") that establish ambient concentrations of various pollutants, including total suspended solids ("TSS"), above which adverse impacts will be experienced by aquatic organisms. The Corps found that TSS concentrations from jet plowing would be far below levels found to have any adverse effects on even the most sensitive species of fish or on benthic (bottom dwelling) aquatic life. Id. at 21338. As for oysters, the Corps found that major oyster beds would be unaffected and smaller, unmapped beds would experience negligible effects. Id. While several oyster farms could be exposed to the sediment plume, "exposure of aquaculture stock at these operations to sediment plumes will be extremely limited

in both concentration and duration."  AR at 21338.  The Corps said:  "Research has shown that elevated suspended sediments do not cause detrimental effects in oysters at the exposure levels (concentration times and duration) predicted to occur during jet plowing in the vicinity of the aquaculture farm."  Id. at 21338-39.

The record includes other scientific studies supporting the Corps' conclusion; for example, one study demonstrated that the eastern oyster exhibited no discernible response to a three-week exposure to TSS concentrations as high as 710 mg/l.  Eversource Response to CLF Comments to Corps, CLF Ex. 14, at 15.  The jet plow operation is likely to produce short-term TSS levels much lower than that concentration.  AR at 21326.

In sum, the Corps took a hard look by thoroughly and carefully considering the issue of sediment suspension and deposition.  It considered CLF's comments, reviewed sediment modeling results, considered expert opinion and sworn testimony from the SEC proceedings, consulted the scientific literature, and noted the informed judgment of the expert environmental agency, the NHDES.  This demonstrably was not "going through the motions."

**ii. Release of Nutrients.**  Second, although CLF offered no expert testimony at the SEC, it argues that the Corps was obliged to prepare an EIS due to significant impacts that will be caused by the release of "massive amounts" of nutrients into Little Bay from jet plow operations.  CLF Memo, Dkt. 15 at 9, 23.  CLF bases this assertion on testimony presented to the SEC by witnesses representing Durham and the University of New Hampshire.  Those witnesses testified that jet plowing would release nitrogen into Little Bay in an amount 300 times greater than the Town of Durham's nitrogen discharge on a daily basis.  CLF Letter to the Corps dated May 23, 2019, Dkt. 1-5 at 16.

Eversource submitted to the Corps a detailed response to this CLF comment demonstrating that other witnesses before the SEC pointed out fundamental errors in the "300 times" calculation, and demonstrated that the nutrients released by construction of the Project will be miniscule and short lived.  CLF Ex. 14.  The errors included (i) a gross overstatement of the sediment expected to leave the burial trench under reasonably foreseeable circumstances, as discussed above, (ii) the very low amount of nitrogen available for release to the water column, and (iii) the fact that the very short duration of nitrogen release from jet plow operations will have no meaningful impact on attainment of nutrient water quality criteria, which are based on long-term exposures.  AR at 21079-80.  The NHDES certified that the Project construction would not violate water quality standards for Little Bay, AR at 12258, and the Corps considered the certification, as it must under the CWA.  AR at 21346, 21350.

   iii.  **Contaminants.**  The record contains no evidence to suggest that the Corps failed to evaluate the potential for environmental impacts due to the release of contaminants from disturbed sediments, or that there remain any significant unresolved issues concerning contaminants.  Eversource performed two sediment sampling events under the supervision of the NHDES and the Corps.  AR 2904-05; AR 6024-05.  As noted above, these studies are contained in the administrative record.  Analysis of sediment samples demonstrated that, except for arsenic, all organic and inorganic contaminants were present at low levels within the ranges observed elsewhere in Little Bay and below concentrations likely to cause ecological impairment.  AR at 21344.  Arsenic concentrations averaged slightly above levels shown to have a potential for ecological response, but were consistent with background levels in New Hampshire coastal groundwater and bedrock.  Id.  The SEC found as a fact that "all parameters tested are below

regulatory risk thresholds with the exception of Arsenic, which is a common naturally occurring element in NH bedrock." AR at 15891-92.

### 2. CLF's Analysis of the Corps' Alternatives Evaluation is Legally and Factually Flawed.

CLF asserts that the Corps failed to properly evaluate alternatives to the Project, as required by NEPA and the CWA. CLF Memo, Dkt. 15 at 13 and CLF Supp. Memo, Dkt. 44 at 10. But CLF neglects to recognize the applicable legal framework and conveniently ignores important facts set forth in the extensive administrative record.

### a. The Legal Standard Requires Detailed Evaluation Only For Practicable Alternatives.

CLF inaccurately represents the NEPA and CWA requirements for examination of alternatives, preferring terms and phrases such as "viable alternatives," "true alternative routes," and "significant alternatives." CLF Supp. Memo, Dkt. 44 at 3, 5 and 8-9. While CLF also uses the legally relevant term, i.e.,"reasonable alternatives," it never informs the Court of the significant, common sense limitations on the obligations of an agency that attach to that concept. In short, the structure of applicable legal requirements under both NEPA and the CWA permit agencies to eliminate from their detailed consideration of alternatives any option that, after even a brief evaluation, plainly is not practicable.

Under NEPA, agencies must follow the regulations and guidance issued by the President's Council on Environmental Quality ("CEQ"). Andrus v. Sierra Club, 442 U.S. 347, 357-58 (1979). Regulations promulgated by CEQ require rigorous exploration of "reasonable alternatives," but "for alternatives which were eliminated from detailed study, [agencies need only] briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). In other words, agencies must conduct a detailed evaluation of "reasonable" alternatives, but can and should eliminate from detailed evaluation those alternatives that are not reasonable. In

guidance, CEQ has explained that "reasonable alternatives include those that are <u>practical or feasible</u> from the technical and economic standpoint and using common sense…"  Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026-1 (March 23, 1981) (emphasis in original).

Under the CWA, consideration of alternatives must be performed consistent with the Section 404(b) guidelines.  33 U.S.C. § 1344(b), codified at  40 C.F.R. § 230, <u>et seq</u>.  CLF relies on two requirements under the guidelines:

- Section 230.10(a) provides that "no discharge of dredged or fill material shall be permitted if there is a <u>practicable</u> alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem…"

- Section 230.10(a)(3) provides that, for an activity that is not water dependent, "<u>practicable</u> alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all <u>practicable</u> alternatives …which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."

(Emphases added).  The guidelines define "practicable" to mean "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.3(l).

The First Circuit has recognized the limitations these provisions place on the range of alternatives an agency must consider under NEPA.  In <u>Lovgren v. Locke</u>, 701 F.3d 5 (1st Cir. 2012), the Court heard challenges to the fisheries management plan that federal agencies had developed to implement the Magnuson-Stevens Fishery Conservation and Management Act for multiple New England species of groundfish.  The Court rejected claims that the agencies should have considered several alternatives suggested by commenters, saying "the concept of alternatives must be bounded by some notion of feasibility."  <u>Id</u>. at 37 (quoting <u>Vermont Yankee</u>

Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 551 (1978). The

Court continued:

> Based on practical considerations and the "purpose and need" for the proposed
> action, the agency must first decide which alternatives are "reasonable," 43 C.F.R.
> § 46.420(b), and only "reasonable alternatives" are subject to rigorous and
> objective review, id. § 46.420(c).  See Theodore Roosevelt Conservation P'ship v.
> Salazar, 661 F.3d 66, 72 (D.C. Cir. 2011).  For all others, the agency need only
> "brief[ly] discuss[]…the reasons for eliminating them."  43 C.F.R. § 46.420(c).

Id.[4]  The First Circuit has also recognized that it is proper for an agency to substantially rely on

the evaluation of alternatives already undertaken by State and federal agencies that participated

in reviewing the proposal.  Town of Norfolk v. U.S. Army Corps of Engineers, 968 F.2d 1438,

1447-48 (1st Cir. 1992).

As these authorities indicate, the Corps was only obligated to give detailed consideration

to practicable alternatives, those that are feasible in light of the costs, technological requirements

and logistics involved, and with the application of common sense.  And the Corps was expressly

permitted to rely upon the analysis undertaken by the SEC and other state agencies in reaching

its conclusions.  The discussion below demonstrates that the Corps did precisely that.

> **b.  The Corps Properly Addressed Reasonable Alternatives for the Project's
> Connection of the Madbury and Portsmouth Substations.**

As discussed at the hearing on the temporary restraining order, ISO-NE identified a

geographic area of the system defined as the "New Hampshire Seacoast Region" that is in need

of additional generation resources or transmission capacity to serve the 115 kilovolt (kV) system

during certain operating conditions.  According to ISO-NE's *Vermont/New Hampshire*

*Transmission Solutions Study Report* (ISO-NE 2012), the primary concerns are:

- The New Hampshire Seacoast Area is shown to be in violation of both
  thermal rating and operating voltage transmission planning criteria; and

---

[4] These regulatory citations pertain to regulations governing the Department of the Interior's implementation of
NEPA, and provide a close corollary to the Corps' regulatory scheme discussed above.

- These violations are more significant when generation connected to the 115 kV transmission system is unavailable.

As a result of these needs, through a multi-year planning process, ISO-NE approved a transmission solution that includes the construction of a new 115 kV transmission line connecting the existing Madbury and Portsmouth Substations. Thus, ISO-NE defined the purpose and need for the Project, and the only remaining justification for evaluating alternatives was a determination of how best to connect those substations. For alternatives to be reasonable, they must meet that purpose and need.

The Corps considered five alternatives. These were (1) the no-action alternative, (2) the Northern Route, (3) the Southern Route, (4) the Middle Route installed via horizontal directional drilling under Little Bay, and (5) the Middle Route installed via jet-plow operations to bury the cable beneath Little Bay. AR at 21329-35. The Corps evaluated these alternatives in a straightforward fashion, and impracticability played a significant role in narrowing the range down to the preferred alternative.

The Corps considered the "no action" alternative, and concluded this alternative "[d]oes not meet project purpose [and] therefore it is not a practicable alternative." Id. at 17. No analysis is required to see that not constructing the Project would fail to meet the purpose for constructing the Project. As explained above, an alternative that does not meet the purpose of the proposal is not "practicable," and the "reasonable" range of alternatives that must be considered in detail includes only those that are "practicable." The Corps had no duty to further analyze the "no action" alternative before discarding it.

CLF also contends that the Corps failed to analyze the "potential viability" of horizontal directional drilling ("HDD") as an alternative to jet plow installation of the cable under Little Bay along the Middle Route. CLF Supp. Memo, Dkt. 44 at 20-21. At the request of the SEC

17

and the DES, Eversource conducted an assessment of the viability of HDD and provided a report documenting that this technique presented substantial technical and cost constraints.  AR  at 7164.  There is no evidence that the Corps neglected to examine cost, logistical and environmental considerations before finding that HDD would be impracticable.  The Corps explained that using HDD for the Project "would be approaching the limit of the recorded distance for such installations," and found that HDD was not a practicable alternative due to its length, characteristics of the bedrock, the large staging areas required, environmental risks, the 28-month period required, and the need to acquire additional land use rights.  AR at 21332-34.  As explained above, an alternative discarded as impracticable does not fall within the range of reasonable alternatives for which more in-depth analysis is required.

Finally, CLF devotes much of its Supplemental Memorandum to arguing that the Corps' consideration of the Northern and Southern Routes was deficient because the administrative record provides only narrative conclusions about these options and lacks the required "data, information, maps, cost estimates/comparisons or other substantiating references."  CLF Supp. Memo, Dkt. 44 at 5.  CLF thumps the "24,500 plus page record" and decries its lack of data and "figures" about environmental impacts, alleged complexities, hypothetical risks associated with these routes, and other factors that it asserts should have been provided to test the "veracity and importance of the issues raised by Eversource."  Id. at 10-13.  Yet CLF did not provide any such data to support its position.

Based on an extensive record developed before the NHSEC, which was continually reviewed as part of its consideration of the SRP application (AR at 21484), the Corps evaluated route alternatives at pages 12-18 of its EA.  AR at 21329-35.  It began by explaining the importance of evaluating each alternative in order to assess its practicability, then listed the

factors used in that evaluation and stated the route selection objectives utilized to select the alternatives.  Id. at 21329.  It then described each alternative and stated Eversource's conclusions as to each.  Id. at 21331-34.  The Corps evaluated the alternatives, finding the no-action alternative, the Northern Route, the HDD installation method, and the Southern Route to be impracticable.  Id. at 21334-35.

Boiled down to its essence, CLF's claims the administrative record lacks detailed information pertaining to the Corps' evaluation of the alternatives.  CLF would have the Court believe the facts relied upon by the Corps were mere assertions or opinions offered by Eversource.  CLF is wrong about that.  Eversource provided facts—not assertions or opinions— about the Northern and Southern routes in its application to the SEC and its joint application to the NHDES and the Corps.  AR at 24327-47; AR at 23136-39.  Each of these applications was certified as true and accurate.  The SEC application, for example, was sworn to as true and accurate by the President and Chief Operating Officer of Eversource.

That application was submitted as part of the exhaustive SEC proceedings in which all participants' points of view were subject to scrutiny and open to challenge by other participants.  Thus, the veracity of facts and conclusions sworn to in the application, unless successfully challenged by others, should have been regarded by the Corps as reliable inputs to its evaluation.  Indeed, the very testimony on which CLF relies in this action was provided by various witnesses in that same SEC proceeding.  And CLF offered no direct testimony to the contrary at the SEC.

The facts set forth in the SEC application, on their face, provided ample basis for the Corps to determine that the Northern and Southern routes were not practicable.  Contrary to CLF's assertions, no granular detail, such as exhaustive studies, backup information, calculations, spreadsheets and the like, were required for the Corps to draw clear conclusions.

**Northern Route Alternative.**  With respect to the Northern Route, the SEC application provided these facts:

- This route would require construction of the new 12.5 mile line and also the removal and reconstruction of 11.5 miles of existing line in the same transmission corridor, resulting in 24 miles of construction rather than the 12.9 miles of construction for the Middle route.  AR at 24239.  This would result in extending the schedule by at least a year and increase the costs.  No detailed analysis should be required for the Corps to understand that nearly doubling the length of the construction project will substantially increase costs and delay completion of the Project.

- Removal of the 11.5 miles of existing transmission line will disrupt service for an extended period of time, potentially jeopardizing the stability of the region's electric system.  Id.  Anyone could see, without further analysis, that this is a genuine, adverse impact of selecting the Northern route.

- Eversource would need to acquire an additional 11.8 miles of ROW in two states.  This would require significant landowner discussions and create a possibility that the Project could be blocked by unwilling landowners.  All of that would lead to delay, increased cost, and risk to successful completion of the Project.  Id.

- The Northern route would entail two significant river crossings, which would add complexity and cost to the Project.[5]

- Eversource would need to satisfy permitting and siting requirements in both New Hampshire and Maine, increasing the complexity and cost of the Project.  Id.

These facts should be obvious to the Corps and any other unbiased observer without further analysis.

While the Corps found that the Northern Route would have the greatest environmental impacts among the three routing alternatives, in the end it decided the Northern Route should be excluded from any further analysis because it is not practicable.  AR at 21334.  The Corps cited jeopardy to the stability of the electric system, increased costs, and logistical difficulties in

---

[5] CLF asserts that no maps of these routes exist in the record.  We direct CLF's attention to Appendix 23 to the application.  AR 24159.

support of its decision.  Id.  Each of these bases for the Corps' decision is obvious from the facts

presented by Eversource and included in the record.

      **Southern Route Alternative.**  For the Southern Route, the SEC application provided

these facts:

- The Southern Route would be approximately seven miles longer than the Northern and Middle Routes.  This would result in "line loss" and inefficiency.  AR at 24239.  Line loss, also called "transmission loss," is a commonly understood term referring to electrical energy lost when electricity flows across a transmission system.  See, e.g., Sithe v. FERC, 285 F.3d 1, 2 (D.C. Circ. 2002) ("In general, the current on a given transmission line remains constant, and the loss associated with a single transmission of electricity is primarily a function of the distance the electricity is transmitted.").

- The added length of the Southern Route would increase costs.  Id.

- The Southern Route would require the construction of an additional capacitor bank at one of the substations.  This would add costs to the Project.  Id.

- The Southern Route presents technical issues associated with constructing the Project through the Portsmouth traffic circle and the need to secure additional land rights.  Id. at 24240.

While the Corps mentioned greater environmental impacts to prime wetlands, in the end

the Corps deemed the Southern Route to be not practicable due to its greater length, which would

lead to increased costs, as well as the line loss and inefficiency issues.  AR at 21335.  For this

reason, the Corps excluded the Southern Route from detailed evaluation, as it is authorized to do

under the regulations.

      In evaluating the sufficiency of the Corps' alternatives analysis, based on its review of

the record before the SEC, it is important to remember that the SRP is not just a "nice to have"

addition to the New England grid.  The delays associated with the rejected alternatives are of

considerable moment.  The ISO-NE process, begun in 2010 with an eye toward electricity needs

for the region in 2020, resulted in a determination that there are already transmission system

criteria violations that create risks of equipment damage, line and power outages and threats to

public safety.  AR at 24344.  It was only rational for the Corps to conclude on the record before

it that longer, more costly routes that would require some combination of eminent domain

proceedings, dual state proceedings, additional facilities, and substantial disruptions to existing

power service were not practicable given the pressing need to correct already existing reliability

violations and upgrade the grid in the fastest growing part of New Hampshire.

In sum, the Corps considered the facts in the record and reached these decisions through

the exercise of its judgment.  The Court should not substitute its judgment for that of the Corps.

**B.  <u>CLF Has Failed to Demonstrate Any Harm to the Environment of Little Bay.</u>**

**1.  <u>CLF's Claims of Irreparable Environmental Harm</u>**[6]

CLF's Supplemental Memo devotes less than three pages to the issue of irreparable harm.

CLF Supp. Memo at 23-25.[7]  The reason for this is clear:  despite CLF's claims about harm to

the environment raised before the SEC and this Court, the jet plow trial results demonstrate that

there is no harm to the environment of Little Bay, irreparable or otherwise.  <u>See</u> Exhibit 1.  In

fact, the trial—argued for by CLF and its current counsel, and approved by DES and the SEC—

has demonstrated just what Eversource said it would; namely, that the jet plow will not result in

the exceedance of any standards imposed by NHDES.  As a result, on October 4, 2019, NHDES

approved the installation of the submarine cable by jet plow, without conditions.  <u>See</u> Exhibit 2.

---

[6] At the outset, it is worth remembering that the urgency with which this Court is required to decide this matter is the result of CLF's own failure to act for more than six weeks after the Corps' decision granting the permit.  <u>See</u> Eversource Memo, Dkt. 21 at 23-24.  Had CLF brought suit within a few weeks of the Permit issuance, this matter would have been addressed in early to mid-August.  Plainly, CLF's strategy was to delay in the hope of killing the Project by causing a delay in the start date.

[7] CLF's initial Memo, Dkt. 15, spent a mere page and a half on alleged harm to Little Bay.  Dkt. 21 at 8-10.  As discussed below, CLF's claims for environmental harm in this action rest on its assertions to the Corps in its May 23, 2019 Letter to the Corps.  Complaint, Dkt.1-5 at 9.  The Corps considered each of these matters and as shown below, the Jet Plow Trial Report addressed—and disproved—each of the claims in CLF's May 2019 Letter.

In this lawsuit, CLF's May 2019 Letter to the Corps serves as the basis for its assertions that the jet plow will cause harm to Little Bay.  The Letter made three claims.[8]  First, relying on the testimony of Dr. Stephen Jones (who testified not for CLF but for the Town of Durham at the SEC), CLF asserted that the jet plow would stir up sediment including "bacteria, viruses, parasitic pathogens of humans, and pathogens harmful to oysters," and those who consume them. Dkt.1-5 at 13-15.[9]  It also relied on the testimony of Jason Baker, the owner of the Fat Dog Oyster Farm, who claimed at the SEC that sediments stirred up by the jet plow would cause Little Bay to reach a "tipping point" that would kill his oysters.  Id. at 15.[10]  The SEC considered these arguments, and found as follows:  "While being fully aware of Durham's concerns, NHDES decided not to require [Eversource] to test oysters for pathogens…NHDES has extensive experience regulating the environmental impacts of development on oysters and other organisms in Little Bay.  The Subcommittee relies on the experience and expertise of NHDES with regard to the level of testing that should be required."  SEC Order at 207-208.

Second, CLF asserted (again relying on Dr. Jones) that a "great concern" that the jet plow would cause the release of a "significant load of nitrogen" into Little Bay.  Dkt. 1-5 at 16.  The principal concern raised by Dr. Jones at the SEC, and as reported to the Corps, was the impact of

---

[8] Eversource provided the Corps with detailed responses to each of these issues.  Eversource letter to the Corps dated June 17, 2019, CLF Exhibit 14 at the TRO hearing.

[9] At the hearing before the SEC, and again in this Court at the hearing on the temporary restraining order, Eversource showed that the claim by CLF that the jet plow would release 150 times the total annual sediment yield in Little Bay (Dkt. 15 at 9) was simply inaccurate, and that in fact, the release would be less than $1/6^{th}$ the annual yield.  Transcript of TRO Hearing (excerpt attached as Exhibit 3), Morning Session at 134-136.

[10] At the SEC, Mr. Baker also testified for the Town of Durham, and CLF did not question him, or even appear at the hearing during his testimony.  On cross, Mr. Baker conceded that he had not conducted any studies relating to the impact of the Project, and did no testing for bacteria in the sediment.  See attached excerpts from Baker's testimony, Exhibit 4 at 39-42.  In fact, Baker further conceded that due to sediment stirred up by the storms, rainfall events had closed his oyster beds 8-10 times in the past two years, and that he had not lost any oysters as a result. Id. at 42.  Baker's complaint was economic; namely, the loss of a week of sales during these closures.  Id. at 78-79. And Baker agreed that Eversource had offered to clean his oyster cages to address his concerns and if the Project was completed in October, that would allow Eversource time to do so.  In short, Baker's testimony at the SEC did not establish any irreparable harm to his oysters.  And while CLF appealed the SEC Order to the New Hampshire Supreme Court, it raised no issues concerning environmental harm to Little Bay.

the release of nitrogen on eelgrass.  Id. at 17.  Again, the SEC considered this testimony, noted that the dispersion model developed by Eversource demonstrated that the sediment would not reach eelgrass beds, and relied on NHDES to establish appropriate monitoring and testing to address this issue.  SEC Order at 207.

Third, CLF asserted that the installation of concrete mattresses would have an unreasonable effect on aesthetics and cause a "permanent change in benthic habitat," due to the loss of eelgrass and the potential feeding grounds for sturgeon.  Dkt. 1-5 at 23.  The SEC concluded that the concrete mattresses would not have an unreasonable adverse effect on aesthetics or the natural environment of Little Bay.  SEC Order at 117, 207-210.

Notably, despite its current claims of irreparable environmental harm, CLF did not retain, or call, a single expert witness at the SEC to address the alleged environmental harm to Little Bay.  And with the exception of the concrete mattresses (which were not a subject of the Report), the Revised Report addresses each of CLF's claims for irreparable harm and shows that there will be no harm to Little Bay from the jet plow.

### 2.   **The Results of the Jet Plow Trial**

The findings of the jet plow trial are reported in the Revised Report.[11]  The key findings of that Report (which do not differ from the Report of September 18th) are as follows:

**General conclusions:**

- "Overall, the results of the jet plow trial indicate that the sediment plume model predictions were conservative and that installation of the cables using the jet plow can be accomplished in a manner that will not compromise the water quality of Little Bay." Revised Report at Executive Summary, vi.
- Overall, most of the water quality parameters measured both in situ and through laboratory testing during the trial run did not change substantially between the pre-trial collections and those made during and after the jet plow started operating.  Id. at 30.

---

[11] Additional and more detailed findings from the Report are set out in Eversource's proposed findings of fact.

- In combination, water quality measurements, water chemistry and images from the drone survey collected during the jet plow trial generally confirm the predictions of the plume modeling. The model basically characterized the plume as narrow, elongated and ephemeral. The drone data confirmed those characteristics for much of the tide cycle. Id.

The Revised Report's findings on specific issues are as follows:

**Turbidity and Total Suspended Solids:**[12]

- There were no exceedances of State turbidity standards based upon the data taken at the mixing zone boundary stations. Id. at 13, 16 (Figure 3) and Appendix G, pp. 103–05.[13]

- Total suspended solids ("TSS") levels measured during the jet plow trial were well below the levels predicted by the plume model. Id. at 15; Table 5 at 16. Based upon the comparison of the results of the jet plow trial and the hydrodynamic model, the predictions generated by the model were generally very conservative or on target. Where observed TSS exceeded modeled TSS, the observed was only slightly higher than what was modeled and dissipated quickly. Id. at 15.

- Total suspended sediment (TSS) data also showed that the model predictions were generally conservative. Most of the TSS results were well below the concentrations predicted in the nearfield and, although the plume reached the mixing zone boundary (as evidenced in the drone videos), concentrations at the boundary stations were near or below the 20 mg/L above background level indicated by the model. Id.

- Water quality monitoring, as summarized in the Revised Report, demonstrated that (1) turbidity levels remained below the exceedance threshold, or BSAL, of 13 and 14 NTUs (10 NTUs above background on the tidal flats and channel, respectively) at all sampling field stations throughout the trial;[14] and (2) total suspended solids were low throughout the trial never exceeding 44 mg/L, and were largely at or below the levels predicted by the plume model. Id. at 30.

CLF's Supplemental Memo asserts that the turbidity reading at the Fat Dog oyster farm was 317 NTU, and that this violates the state water quality standards by two orders of magnitude.

---

[12] As shown in Figure 2 of the Revised Report (page 5), the red bordered area is the so-called "mixing zone," in which increased turbidity was expected to occur. That area establishes the boundary of that zone. So long as applicable standards for turbidity are not exceeded at, or outside of the boundary of the red area, there is no violation of NHDES standards. See footnote immediately below.

[13] Per NHDES guidance, Boundary Station Action Levels (BSAL) were calculated for establishing the exceedance values for turbidity. Revised Report at 8. BSAL were calculated for the tidal flat and the channel separately. A BSAL of 13 NTU was calculated for the tidal flat and 14 NTU for the channel. Report at 13.

[14] "'Nephelometric turbidity unit ("NTU")'means a standard used to measure the optical property that causes light to be scattered and absorbed rather than transmitted in straight lines through water, as measured by a nephelometer. N.H. Code Admin. R. Env-Wq 1702.29." According to NHDES rules, "Class B waters shall not exceed naturally occurring conditions by more than 10 NTUs." Env-Wq 1703.11.

Dkt. 44 at 23.  CLF is wrong.  First, the turbidity reading cited by CLF was measured at Fixed

Station SM 1/32 which, for purposes of identification, was called Fat Dog.  See Revised Report

at 13 and 45.  But as shown on Figure 2 in the Revised Report, that Fixed Station is in the mixing

zone, and higher levels of turbidity within the mixing zone are expected, and irrelevant.  Put

simply, higher levels of turbidity within that zone does not violate NHDES standards.  Second,

Station 23 (see Figure 2) is located at the Fat Dog oyster farm, and readings at that Station were

within NHDES parameters.  Third, as shown in the Revised Report (at 45), turbidity readings at

Fixed Station 1/32 were above 400 NTUs before the trial began on September 9th as well as after

the trial, yet returned to zero before and after the trial.  As a result, it is plain that factors other

than the jet plow trial resulted in the high readings (even if irrelevant).

CLF also asserts that Normandeau Associates (which prepared the Reports for

Eversource) used incorrect threshold levels for the calculation of both turbidity and fecal

coliform in the Report.  CLF is correct.  Normandeau corrected these threshold levels in the

Revised Report.  But the issue is irrelevant.  When applying the correct standards, there were no

exceedances of the standards for either turbidity or fecal coliform.

**Nitrogen:**

- Concentrations of nitrates were generally below the quantification limit of 0.05 mg/L. Revised Report at 17.
- Nitrite concentrations never exceeded the quantification limit of 0.05 mg/L.  Id. at 18.
- Ammonia concentrations never exceeded the quantification limit of 0.1 mg/L.  Id. at 18.
- During the jet plow trial activity, total nitrogen ranged from <0.5 to 0.873 mg/L and again the majority of the samples fell below the reporting limits.  Total nitrogen values fell within the range reported by Wood and Trowbridge (2014) for Great Bay estuary tributaries.  Based upon the jet plow trial run, the submarine installation will not significantly increase nitrogen levels in Little Bay.  Id. at 19.

**Dissolved Metals:**

- There were no exceedances of either acute or chronic water quality criteria for dissolved arsenic at any time during the survey.  Report at 16. None of the values exceeded the chronic toxicity threshold of 36 µg/L or the acute toxicity value of 69 µg/L.  Id. at 19–20.

- Of the 191 samples analyzed for dissolved copper, 92 were below the reporting limit and an additional 81 were <1.0 µ/L. Report at 20.  Of the remaining 18 samples, 17 were below the chronic toxicity threshold of 3.1 µg/L and the acute toxicity value of 4.8 µg/L. The highest value sample for copper (7.0 µg/L at a near-bottom sample), when averaged with the near-surface and mid-depth collections, was below both the acute and chronic toxicity level.  Id. at 20.

**Fecal Coliform:**

- Prior to the start-up of the jet plow, fecal coliforms generally fell below the reporting limit of 10 MPN/100 ml.  The median value for the pre-trial samples was below the reporting limit of 10 MPN per 100 ml.  Id. at 24.

- After the trial started, only six out of the 57 samples collected had fecal coliform levels above the quantification limit.  The median value for samples collected during jet plow activity was below the reporting limit of 10 MPN per 100 ml and no samples exceeded the most stringent threshold of 28 MPN per 100 ml.  Id. at 24–25.

- There is no indication, therefore, that use of the jet plow introduced fecal coliforms into the water column from the sediment.  Id. at 25.

**Concrete Mattresses:**

As noted above, the jet plow trial did not address—and was unrelated to—the concerns raised by CLF (and others) concerning the installation of concrete mattresses.  CLF's appeal to the New Hampshire Supreme Court did not raise any issues concerning the environmental impact of the mattresses or their aesthetics.  Instead, CLF argued only that installation of the mattresses requires approval of the Governor and Executive Council.

At the SEC, Eversource retained an aesthetics expert, Mr. David Raphael of LandWorks, to prepare a visual assessment of the Project.  LandWorks prepared and submitted a Visual Assessment for the Seacoast Reliability Project dated April 2016 (the "VA").  In July 2017, LandWorks prepared an Addendum to the VA, namely, a Visual Assessment of the Proposed

Concrete Mattresses for the Submarine Cable across Little Bay.  That Addendum concluded, in part, as follows:

> The concrete mattresses will not draw the eye to any great extent, and they will not be a substantive intrusion into the visual landscape.  Due to their limited size, their minimal visual presence and the fact that they will readily fade into and become part of the surrounding shoreline and waterscape, the concrete mattresses will be a very minor feature of the landscape and will only minimally affect the viewer's experience of the water, the bay, and the views to the shoreline.

https://www.nhsec.nh.gov/projects/2015-04/2015-04_application.htm Ex. 142, Attachment C.

The SEC addressed the issues, both aesthetic and environmental concerning the concrete mattresses and concluded:  "[c]onsidering that both aesthetics experts testified that the Project will not have an unreasonable adverse effect on aesthetics and after independently reviewing reports and the testimony submitted, subject to the identified mitigation measures, the Subcommittee finds that the Project will not have an unreasonable adverse effect on aesthetics," or on the natural environment of Little Bay.  SEC Order at 117, 207-210.

**Conclusion**

CLF cannot succeed on the merits because it has shown nothing to undermine the conclusion that the Corps took a hard look at all of the legitimate issues, correctly decided that the record indicated all impacts were too insignificant to require an EIS, and eliminated various possible alternatives, based on record evidence showing their impracticability, to arrive at its decision to select the Middle Route, installed by the jet plow method, as the least environmentally damaging practicable alternative.  Likewise, CLF cannot prove irreparable harm because the jet plow trial confirmed the predictive modeling presented by Eversource at the SEC, and confirmed that the jet plow would not cause irreparable harm to Little Bay.  For these reasons, and those set forth in Eversource's prior memoranda, CLF's Motion for Preliminary Injunction should be denied.

Respectfully submitted,

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE
d/b/a EVERSOURCE ENERGY

By its attorneys,

McLANE, GRAF, RAULERSON & MIDDLETON,
   PROFESSIONAL ASSOCIATION

Dated:  October 6, 2019            By:____/s/ Wilbur A. Glahn, III_____

              Wilbur A. Glahn, III, NH Bar No. 937
              bill.glahn@mclane.com
              Barry Needleman, NH Bar No. 9446
              barry.needleman@mclane.com
              900 Elm Street, P.O. Box 326
              Manchester, New Hampshire 03105
              Telephone (603) 625-6464

              James T. Banks  (admitted pro hac vice)
              james.banks@hoganlovells.com
              HOGAN LOVELLS US LLP
              555 Thirteenth Street, NW
              Washington, DC 20004-1109
              (202) 637-5600

**Certificate of Service**

I hereby certify that on October 6, 2019, I served the foregoing Supplemental
Memorandum electronically through ECF upon all counsel of record.

              /s/ Wilbur A. Glahn, III
              Wilbur A. Glahn, III