**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19-cv-00868-JL |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL BRIEF**

## I.    INTRODUCTION

This Court found after the September 6th hearing that Plaintiff had not carried its burden of demonstrating that preliminary injunctive relief is necessary, and nothing has changed in light of Plaintiff's Supplemental Memorandum. *See* Pl.'s Supp. Mem. In Support of Mot. for TRO & Prelim. Inj., ECF No. 44 ("Pl.'s Supp. Br."). The record demonstrates that the Corps considered the appropriate factors and articulated its decision in issuing a permit to dredge and fill approximately fourteen acres of wetlands in connection with the Seacoast Reliability Project.

The entire Project has been thoroughly studied by both the Corps and the relevant New Hampshire state agencies. The Project will have only 0.22 acres of permanent impacts, for which Eversource has provided mitigation in the form of payment of nearly $350,000 to the State of New Hampshire Aquatic Resource Mitigation Fund. Plaintiff has not demonstrated a likelihood of success on the merits, or irreparable harm, much less that the public interest and balance of harms favors issuing an injunction.

Federal Defendants incorporate the entirety of their Opposition to Plaintiff's Motion for a Temporary Restraining Order, ECF No. 24. This brief addresses those issues raised by Plaintiff

in its Supplemental Memorandum, as well as issues related to the concrete mattresses, which

Federal Defendants did not previously address.

## II.       ARGUMENT

Plaintiff has not carried its heavy burden of showing that the extraordinary relief of a

preliminary injunction is necessary.  The Corps is likely to succeed on the merits of the case

because it, along with other agencies including the New Hampshire Site Evaluation Committee

and ISO-New England, have studied the Project, found it to be necessary, and determined it

would have minimal impacts.

### A.       Plaintiff has not shown a likelihood of success on the merits.

Likelihood of success on the merits is the "critical" element of the test for injunctive

relief, and it "cannot be woven from the gossamer threads of speculation and surmise."

*Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991).  Indeed, "[t]he sine qua non

of [the] four-part inquiry is likelihood of success on the merits: if the moving party cannot

demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle

curiosity."  *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (internal

quotation marks and citation omitted); *accord ANSYS, Inc. v. Computational Dynamics N. Am.,

Ltd.*, 595 F.3d 75, 78 (1st Cir. 2010) ("The first factor, likelihood of success, is usually given

particularly heavy weight.").

In addition to Plaintiff's heavy burden of showing that extraordinary equitable relief is

justified, on the likelihood of success on the merits, Plaintiff must also show that the Corps acted

arbitrarily, capriciously, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

"Because the APA standard affords great deference to agency decisionmaking and because the

[agency's] action is presumed valid, judicial review, even at the summary judgment stage, is

narrow."  *Assoc. Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (citing

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16 (1971); *Sierra Club v. Marsh (Sierra Club I),* 976 F.2d 763, 769 (1st Cir. 1992)).  A court may not substitute its judgment for that of the agency.  *Overton Park*, 401 U.S. at 416.  Instead, agency action must be upheld if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014) (*quoting N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 601 (4th Cir. 2012) (alteration in original)).  Review is particularly deferential where, as here, "resolution of th[e] dispute involves primarily issues of fact" that "implicate substantial agency expertise," *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376–77 (1989), "and the agency is tasked with balancing often-competing interests."  *Tidwell*, 770 F.3d at 1115.

Moreover, the Court's review of the merits of the Corps' action must be based on the administrative record.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  The "focal point for judicial review [of an agency decision] should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).[1]

Plaintiff has not met its burden of showing that it is likely to succeed on the merits.  The Corps' analysis was thorough and comported with the relevant law.

### 1.     The Corps reasonably considered alternatives.

Plaintiff's brief focuses almost entirely on the proposition that the record must contain specific and detailed information about the costs and potential impacts of alternatives — the

---

[1] The October 7, 2019, deposition of Sarah Allen included extensive testimony regarding Ms. Allen's understanding of the content of the administrative record underlying the Corps' permitting decision.  The Corps notes that such evidentiary testimony regarding the content of the record should not be considered by the Court in evaluating the merits of the Corps' action.

Northern Route and the Southern Route — that were considered but rejected.  But no legal

authority supports the proposition that the Corps must develop and evaluate detailed data for

rejected alternatives.  The Corps reasonably relied upon information provided by Eversource and

explained the reasons for rejecting nonpracticable alternatives.  In so doing, it more than met

NEPA's requirements, particularly because the Corps reasonably determined the Project would

not have significant impacts.

> ### a.     The Corps complied with NEPA by explaining why other alternatives were rejected.

For an Environmental Assessment (EA), NEPA requires that agencies examine

"reasonable" alternatives, "[b]ased on practical considerations and the 'purpose and need' for the

proposed action."  *Lovgren v. Locke*, 701 F.3d 5, 37 (1st Cir. 2012) (citing *Theodore Roosevelt*

*Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011)).  An EA, which the Corps

prepared here, is "a concise public document" that shall include a "brief discussion[] . . . of

alternatives."  40 C.F.R. § 1508.9; *Nw. Bypass Grp. v. U.S. Army Corps of Engineers*, 470 F.

Supp. 2d 30, 62 (D.N.H. 2007).

Plaintiff frequently cites the standards for alternatives analyses in Environmental Impact

Statements (EISs), which are more stringent than the standards for EAs.  *See, e.g.*, Pl.'s Supp. Br.

at 8–9 (citing *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1291 (1st Cir. 1996), which

involved an Environmental Impact Statement).  As this Court has explained, "[h]owever, 'an

agency's obligation to consider alternatives under an EA is a lesser one than under an EIS.'"

*Nw. Bypass Grp.*, 470 F. Supp. 2d at 62 (quoting *Native Ecosystems Council v. United States*

*Forest Serv.,* 428 F.3d 1233, 1246 (9th Cir. 2005) and citing *Mt. Lookout—Mt. Nebo Prop.*

*Protection Ass'n v. FERC,* 143 F.3d 165, 172 (4th Cir. 1998) ("The rigor with which an agency

must consider alternatives is greater when the agency determines that an EIS is required for a

particular federal action."); *Friends of Ompompanoosuc v. FERC,* 968 F.2d 1549, 1558 (2d Cir.

1992)) ("Indeed, the range of alternatives an agency must consider is narrower when, as here, the

agency has found that a project will not have a significant environmental impact.")); *see also*

*Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1323 (D.C. Cir. 2015) (noting

that "the relevant regulations provide that the consideration of alternatives in an Environmental

Assessment need not be as rigorous as the consideration of alternatives in an EIS").

The Corps met NEPA's standards here because the Corps' EA explains why the other

alternatives were rejected.  The Corps explained in the EA "that the Northern Route was not

available because it presented significant constructability, permitting, land rights, and cost

issues."  AR21331.  Specifically, 11.5 miles of the existing transmission lines within the existing

corridor would have had to be relocated and rebuilt to accommodate the new line, requiring

approximately 24 miles of transmission lines to be constructed.  *Id.*  The Corps noted that such

relocation and rebuild would increase cost, add at least a year to the Project timeframe, and

"potentially jeopardize the stability of the electric system in the region during construction

because the existing transmission lines would have been removed from service for extended

periods of time."  *Id.*  In addition, the Northern Route would have required an additional 11.8

miles of rights of way.  *Id.*; *see also* AR 23137.  This route also had two significant water

crossings over the Piscataqua River, which added to the complexity and costs of the Project, and

crosses into Maine, which would have required coordination and approval from that state, as

well.  *Id.*; AR24159 (map of three routes).

The Corps also noted in the EA that the Southern Route was rejected because "it would

likely create more voltage and reliability issues than it would solve."  AR21331.  This route is

almost twice the length of the other alternatives, "which would result in greater 'line-loss' and

inefficiency."  *Id.*  The Corps also noted that the alternative was rejected because of increased

costs due to increased line length and because the route would require construction of an

additional capacitor bank.  *Id.*  This route would also have required additional land rights, and

"greater environmental impacts to wetlands and State-designated prime wetlands in the southern

sections of the State."  AR21332.

Plaintiff argues that the record must contain specific data regarding the rejected

alternatives, arguing that the Corps must verify projected costs, set forth data and metrics for line

loss and inefficiency associated with a route that is twice as long as the proposed route, and

quantify the environmental impacts.  Pl.'s Supp. Br. at 13–14.  But Plaintiff cites no legal

authority requiring such data.  Plaintiff cites 33 C.F.R. Pt. 325, Appendix B for the general

proposition that the Corps should "exercise independent judgment in defining the purpose and

need for the project."  Pl.'s Supp. Br. at 15.  First, the Corps demonstrated in its initial brief that

its determination of the purpose and need was reasonable, *see* ECF No. 24 at 9–11, and Plaintiff

makes no new argument here regarding purpose and need.  But, second, Plaintiff has made no

showing that the Corps failed to exercise independent judgment.  The EA explained the obvious

conclusion that a route that requires a significant rebuilding of transmission lines, gathering

rights of way, and river crossings would have both increased impacts and costs over a route that

utilizes an existing utility corridor.  A much longer route is more likely to have inefficiencies and

greater costs.  The Corps' conclusions were in no way arbitrary or capricious.  Plaintiff fails to

show any legal authority requiring either the Corps or Eversource to quantify all costs or impacts

before an alternative can be rejected.

In fact, NEPA does not require such specific or detailed analysis of rejected alternatives.

*See Tongass Conservation Soc'y v. Cheney*, 924 F.2d 1137, 1140–41 (D.C. Cir. 1991) (noting

that "an agency need only 'briefly discuss the reasons' why rejected possibilities were not reasonable alternatives); 40 C.F.R. § 1508.9 (stating that an environmental assessment is "a concise public document" that shall include a "brief discussion[] . . . of alternatives").  In a similar case, a court rejected the plaintiffs' assertion that that the agency should have developed models and more thoroughly evaluated costs associated with habitat restoration, finding that the agency's brief discussion was reasonable.  *See Center for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 148 (D.D.C. 2012).  Similarly, the Tenth Circuit has held that "the Corps did not act arbitrarily and capriciously by failing to take additional steps to verify [the applicant's] claim that sites more than 30 miles from the Argentine Yard were infeasible."  *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1170 (10th Cir. 2012).

### b.    The Corps properly relied on information Eversource provided.

Plaintiff takes issue with the Corps' reliance on Eversource's information, but such reliance is proper.  "The Corps' regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an EA."  *Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986); *see also Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1170 (10th Cir. 2012); *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1152–52 (D.C. Cir. 2011); *River Road Alliance, Inc. v. Army Corps of Eng'rs,* 764 F.2d 445, 453 (7th Cir. 1985); *Save the Bay, Inc. v. U.S. Army Corps of Eng'rs,* 610 F.2d 322, 325 (5th Cir. 1980).  Here, Eversource's permit application gave a thorough explanation of the Northern and Southern Routes, and explained why those routes were not feasible.  AR23136–38.  The Corps evaluated that explanation in the EA and found that the Northern and Southern Routes were not practicable.  AR21329–31; AR21334–35.

Multiple courts have recognized that "the Corps is not a business consulting firm" and "is in no position to conduct a feasibility study of alternative sites" for permit applicants.  *See, e.g.,*

7

*Hintz*, 800 F.2d at 835–36; *River Road All.*, 764 F.2d at 453; *Hillsdale*, 702 F.3d at 1171.  "For us to require the Corps to do such independent studies rather than reasonably relying on extensive studies given to them by applicants 'would place unreasonable and unsuitable responsibilities on the Corps,' which receives thousands of permit applications per year." *Crutchfield v. Cty. of Hanover, Virginia*, 325 F.3d 211, 223–24 (4th Cir. 2003) (quoting *Hintz*, 800 F.2d at 835–36).  Here, in particular, the Corps is not an expert in public utilities siting and is not required to evaluate Eversource's business needs or second-guess the assessments of ISO-NE and the SEC, agencies with relevant expertise.

> **c.    The Corps' obligation to examine other alternatives is narrow because the Project will not have a significant impact on the environment.**

Further, given that the proposed Project was determined not to have a significant impact, the need to identify and study further alternatives narrows.  *See Friends of the Ompompanoosuc*, 968 F.2d at 1558 (holding that "where, as here, the agency determines that the proposed action will not have a significant impact, the need to identify alternatives narrows").  "When, as here, an agency makes an informed decision that the environmental impact will be small, a view which we are required to accord deference, a 'less extensive' search [for alternatives] is required." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 960 (7th Cir. 2003) (citing *River Road All.*, 764 F.2d at 452); *see also City of Dallas, Tex. v. Hall*, 562 F.3d 712, 718 (5th Cir. 2009) ("[T]he range of alternatives that the [agency] must consider decreases as the environmental impact of the proposed action becomes less and less substantial." (quoting *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994)).  "Although an EA must still reflect 'consideration of some range of alternatives,' 'it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined . . . will have no significant environmental effects anyway." *Delaware Audubon Soc. v. Salazar*, 829 F. Supp. 2d

273, 281–82 (D. Del. 2011) (quoting *Sierra Club,* 38 F.3d at 803).  The Corps' analysis here was more than sufficient, particularly given that the Project will have very few impacts and even fewer permanent impacts.

Moreover, NEPA is a procedural statute.  It does not require that an agency select the most environmentally-friendly alternative, or elevate environmental concerns over other appropriate considerations.  *See, e.g.*, *Stryker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227 (1975) (finding that NEPA did not require the Department of Housing and Urban Development to select the most environmentally friendly alternative); *Citizens' Comm. to Save Our Canyons v. Krueger,* 513 F.3d 1169, 1178 (10th Cir. 2008) ("NEPA does not, however, require agencies to elevate environmental concerns over other appropriate considerations; it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action.").  "On the contrary, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences . . . ."  *Stryker's Bay*, 444 U.S. at 228.

Plaintiff cites a number of cases where it asserts that the agencies were enjoined "on far better evidence than the Corps based its decision on in this case."  Pl.'s Supp. Br. at 15.  Those cases are inapposite.  First, none of the cases involve the agency's alternatives analysis, so they are of questionable relevance at all for Plaintiff's argument.  In any event, however, *National Audubon Society v. Department of Navy*, 422 F.3d 174, 181 (4th Cir. 2005), involved an EIS, which has higher standards for evaluation of impacts.  There, the court found the Navy failed to take a hard look at the impacts of the project on migratory birds near a National Wildlife Refuge. Here, the Project has gone through numerous levels of review and the record is replete with

information about the Project and its potential impacts.  Plaintiff has pointed to no aspect of the

Project that the Corps failed to adequately consider.  The two cases simply are not analogous.

Similarly, in *O'Reilly v. United States Army Corps of Engineers*, 477 F.3d 225, 233 (5th

Cir. 2007), the Corps failed to adequately study or assess mitigation measures before concluding

that they would appropriately compensate for the Project's adverse impacts.  While the Corps

similarly required mitigation here — Eversource paid nearly $350,000 to the State of New

Hampshire Aquatic Resource Mitigation Fund — Plaintiff has not alleged that this mitigation

fails to adequately compensate for the Project's impacts.  The case, therefore, provides no

support for Plaintiff here.

Plaintiff's reliance on *Klamath-Siskiyou Wildlands Center v. Bureau of Land

Management*, 387 F.3d 989, 994 (9th Cir. 2004), similarly fails.  There, the court found that the

agency was required to objectively quantify the cumulative impacts of a timber sale with three

other timber sales.  *Id.*  The Ninth Circuit has held that "[a] proper consideration of the

cumulative impacts of a project requires some quantified or detailed information," not just

"general statements about possible effects and some risk."  *Id.* (quoting *Ocean Advocates v. U.S.

Army Corps of Eng'rs*, 361 F.3d 1108, 1128 (9th Cir. 2004)).  Here, the Corps has objectively

quantified the Project's impacts:  14 acres of temporary impacts and 0.22 acres of permanent

impacts.  AR21348.  It examines *Klamath-Siskiyou* does not stand for the proposition that the

Corps must require quantification of impacts of a rejected alternative, particularly when the

reasons for not selecting that alternative are obvious and were explained thoroughly in the EA.

> **d.    The Corps properly determined that there are no practicable
>         alternatives.**

In addition, Plaintiff inappropriately conflates the distinct concepts of practicability and

possibility.  Specifically, the CWA Section 404(b)(1) Guidelines provide that an alternative is

"practicable" not if it is merely possible to carry out, but rather if it is "available and capable of being done *after taking into consideration cost, existing technology, and logistics in light of overall project purposes*."  40 C.F.R. § 230.10(a)(2) (emphasis added).  An alternative is practicable only if "it is capable of attainment with relevant, existing constraints."  *Nat'l Wildlife Fed'n v. Adams*, 629 F.2d 587, 591-92 (9th Cir. 1980).

The Corps may not issue a permit under Section 404 of the CWA "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a).  The CWA Section 404(b)(1) Guidelines require the Corps to presume that practicable alternatives to non-water dependent projects that do not involve wetlands are available, and that practicable alternatives that do not involve wetlands have a less adverse impact on the aquatic environment.  *Id.* § 230.10(a)(3).   Both of those presumptions are rebuttable, however, if an applicant clearly demonstrates that less damaging, practicable alternatives do not exist.  *Id.; see also La. Wildlife Fed'n, Inc. v. York*, 603 F. Supp. 518, 527 (W.D. La. 1984).  Rebutting the presumptions "does not require a specific level of detail . . . but only record evidence the agency took a hard look at the proposals and reached a meaningful conclusion based on the evidence."  *Hillsdale*, 702 F.3d at 1168.

The Corps reasonably concluded that the considered alternatives were impracticable.  As described in the EA, the Corps evaluated the alternatives "based on practicability including technical and logistical feasibility, costs, impacts to [waters of the United States] and whether it achieves the overall project purpose."  *See supra* at 5.  The Corps had no reason to second-guess the issues identified by Eversource with respect to constructability, permitting, land rights, cost, and reliability associated with the alternatives.  Additionally, in response to comments from

Plaintiff and others, Eversource provided further information to address alternatives.  AR21144–49.  The Corps considered Eversource's response and determined that further evaluation was unnecessary.  AR21327.  And as discussed above, the Corps was entitled to rely on a permit applicant's submissions in evaluating alternatives.  *See supra* at 7–8, ECF No. 24 at 17–18; *see also Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013); *Hillsdale*, 702 F.3d at 1170–71; *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1271 (10th Cir. 2004); *Hintz*, 800 F.2d at 834.

Plaintiff does not identify alternatives that the Corps failed to consider, but rather faults the adequacy of the Corps' evaluation of the alternatives identified in the EA.  But once the Corps determined that the identified alternatives were not practicable, it was not required to consider them further.  As EPA expressly recognized in the preamble to the Section 404(b)(1) Guidelines, the Corps is not obligated to analyze project alternatives that would not be practicable.  Guidelines for Specification of Disposal Sites for Dredged Fill Material, 45 Fed. Reg. 85,336, 85,339 (Dec. 24, 1980) (codified at 40 C.F.R. pt. 230).

Furthermore, Plaintiff's characterization of the record ignores the multi-year, state-level evaluative process that preceded the Corps' permitting decision, to which the Corps had access in reviewing Eversource's application, and through which Eversource had already addressed extensive comments.  The inclusion of the SEC docket materials in the Corps' administrative record reflects the Corps' consideration of those materials.  The Corps was actively engaged in the SEC process, including by receipt of submissions as they were filed and by participation in at least one deliberative meeting.  At the federal level, the Corps also consulted with EPA, which did not express concerns with the Project.  AR21043.  The Corps' reliance on these findings was permissible.  As the Seventh Circuit has noted:

> Although the Corps has an independent responsibility to enforce the Clean Water
> Act and so cannot just rubberstamp another agency's assurances concerning
> practicability and environmental harm, it isn't required to reinvent the wheel.  If
> another agency has conducted a responsible analysis the Corps can rely on it in
> making its own decision.  After all, it is permitted to rely (though not uncritically)
> on submissions by private permit applicants and on consultants . . . and it
> necessarily relies heavily on them—so why not on federal agencies that have
> relevant responsibilities and experience?

*Hoosier Envtl. Council*, 722 F.3d at 1061.  Here, the record establishes that the Corps evaluated

the information developed by Eversource, ISO-NE, and the SEC.  Neither NEPA nor the CWA

requires the Corps to "reinvent the wheel" by duplicating the efforts undertaken by those entities.

Finally, the Corps' alternatives analysis was appropriate in light of the Project's

anticipated environmental impacts.  As discussed in greater detail below, the impacts of the

Project consist of a temporary increase in turbidity from the operation of the jet plow, and the

installation of 8,681 square feet of concrete mattresses.  The Section 404(b) Guidelines recognize

that "different levels of effort . . . should be associated with varying degrees of impact," and

instruct the Corps to "require or prepare commensurate documentation."  40 C.F.R. § 230.6(b).

The Guidelines further provide that "[t]he level of documentation should reflect the significance

and complexity of the discharge activity."  *Id.*  "Though the Corps must always identify the

LEDPA, 'the compliance evaluation procedures will vary to reflect the seriousness of the

potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material

discharge activities.'"  *Audubon Soc'y of Greater Denver v. U.S. Army Corps of Eng'rs*, 908

F.3d 593, 608–09 (10th Cir. 2018) (quoting *Greater Yellowstone Coal.*, 359 F.3d at 1271).  That

the Project's environmental impacts will be relatively limited in duration and scope further

underscores that the level of analysis undertaken by the Corps was reasonable.

2.     **The Corps acted reasonably in completing an EA instead of an EIS because the Project will not have significant environment impacts.**

Plaintiff also argues that the Corps should have completed an EIS instead of an EA because it did not sufficiently analyze the Northern and Southern Routes.  As an initial matter, Plaintiff confuses several concepts with this argument.  It conflates CWA terms (practicable alternatives and special aquatic sites) with NEPA concepts (EAs and EISs).  Any legal assumptions about practicable alternatives would not require the Corps to complete an EIS.  In any event, as discussed above, the Corps found that there were no practicable alternatives, so Plaintiff's argument is irrelevant.

An EIS is only necessary when a project is expected to have significant environmental impacts.  Here, the Corps reasonably concluded that an EIS was not necessary given that the Project is not expected to have a significant impact on the environment.  The Corps found that the entire Project would have only 0.22 acres of permanent impacts, and required mitigation for any impacts.  The Corps' decision to prepare an EA is entitled to deference from this Court.  *See Marsh,* 490 U.S. at 376–77.  "An agency's decision to issue a FONSI rather than prepare an EIS 'is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review.'"  *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (quoting *Comm. to Preserve Boomer Lake Park v. Dep't of Transp.,* 4 F.3d 1543, 1555 (10th Cir. 1993)).

Plaintiff relies heavily on the *Sierra Club v. Marsh* cases.  *Sierra Club* has not been officially overruled, but it is outdated and has been superseded in several ways.  For example, Plaintiff relies on *Sierra Club* to argue that the length of the EA justifies an EIS, but this proposition has been rejected by other courts.  *See, e.g.*, *TOMAC v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006) (holding that "the length of an EA has no bearing on the necessity of an EIS");

*Heartwood, Inc. v. U.S. Forest Serv.,* 380 F.3d 428, 434 (8th Cir. 2004) ("A rule requiring an EIS whenever an EA is longer than 15 pages would encourage agencies to produce bare-bones EA's."). "What ultimately determines whether an EIS rather than an EA is required is the scope of the project itself, not the length of the agency's report.'" *Heartwood,* 380 F.3d at 434.

Similarly, *Sierra Club* uses the wrong standard for reviewing an agency's decision not to prepare an EIS. The Supreme Court has clarified that an agency's decision not to prepare an EIS once that agency has prepared an EA is reviewed for abuse of discretion, and will be set aside only if it is arbitrary and capricious. *Marsh*, 490 U.S. at 376–77.

In any event, however, *Sierra Club* is not particularly instructive here. The *Sierra Club* court found that the agencies did not take into account the project's likely impacts, including "considerable secondary development," and ignored information in the record. *Sierra Club*, 769 F.2d at 881; *see also Sierra Club v. Marsh (Sierra Club II,* 872 F.2d 497, 498 (1st Cir. 1989). No such allegations regarding indirect impacts or secondary development being ignored have been made here. *See Nat'l Parks Conversation Assoc. v. United States*, 177 F. Supp. 3d 1, 32 (D.D.C. 2016) (holding that "[t]he absence of any certain, or near certain, plans for future development . . . distinguishes this case from *Marsh* . . ."). This case also does not involve a federal action setting a precedent for other actions; each permit is different and nothing in this case is unique or precedent-setting. *See* Pl.'s Br. at 21.

To the extent Plaintiff relies upon *Sierra Club I* to argue that the statements about the Northern Route and Southern Route are simply conclusory statements without support in the record, that argument fails. The statements themselves explain why the conclusions were drawn. For example, instead of simply stating that the Northern Route would have increased costs, the Corps explained that the route would require construction of approximately twenty-four miles of

transmission lines.  *Sierra Club I* does not stand for the proposition that the Corps needed to quantify the costs of relocating and rebuilding the transmission lines before it could make a determination that the Northern Route was not a practicable alternative.

Plaintiff appears to rely on *Sierra Club II* for the proposition that "the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation," and the idea that a "bureaucratic steam roller," once started, is difficult to stop. Pl.'s Supp. Br. at 22; *Sierra Club II*, 872 F.2d at 504.  The record demonstrates that this case is not one with a risk of inadequate foresight and deliberation.  The Project has been developed over the course of years.  The Corps prepared a thorough analysis, and the Project has also been analyzed by the state.  There has been ample opportunity for public comment, the public did comment, and the agency considered those comments.  This simply is not a case of an unstoppable bureaucratic steamroller.

Plaintiff has not shown a likelihood of success on the merits.  Instead, the record demonstrates careful evaluation of the Project, and reliance on materials submitted from the applicant and other agencies consistent with relevant statutes and regulations.  This Court should deny Plaintiff's motion for a preliminary injunction.

**B.      Plaintiff has not shown irreparable harm.**

Plaintiff also has not shown that irreparable harm is likely to occur absent an injunction. While the Corps relies in large part on Eversource's demonstration that the Project is not likely to result in irreparable harm, a few points, however, merit discussion here.

First, the EA demonstrated that any impacts from the jet plow will be limited in distance and duration.  AR21336–40.  The Corps found that the sediment plume "will normally be limited to the immediate vicinity of the disturbance and should dissipate shortly after each phase of the construction activity."  AR21336–37.  In fact, the EA notes that a model estimates that the

sediments resettle within 24 to 48 hours.  AR21338.  The "jet plow technology has been shown to minimize impacts to marine habitat caused by excessive dispersion of bottom sediments."  *Id.* The results of the jet plow trial support these conclusions.  Given the minimal disturbance and the short-term impact of the sediments, Plaintiff has failed to demonstrate irreparable harm from the jet plow.

Plaintiff's argument that the concrete mattresses will irreparably harm the environment is also contrary to the administrative record.  The mattresses will be limited to an estimated 8,681 square feet.  While some loss of habitat will result, the concrete blocks will also provide habitat for macroalgae and crustaceans.  AR21340–41.  When the mattresses are colonized with algae, they will provide refuge for minnows and juvenile fish species and an additional forage base for many fish species in the bay.  AR21341.  Eelgrass has not been in the Project vicinity for many years; should it "recolonize the area in the future, only the small areas with concrete mattresses will be unavailable for colonization, and these areas represent a very small percentage (0.04%) of the potential eelgrass habitat in Little Bay."  *Id.*  Even then, portions of the concrete mattresses could become potential eelgrass habitat.  *Id.*

In addition, any impacts have been compensated through payment into the New Hampshire Aquatic Resource Mitigation Program.  AR21320; 21353.  And to the extent Plaintiff argues that the threatened Atlantic sturgeon will be effected by the Project, the Corps consulted with the National Marine Fisheries Service about the sturgeon and the Service agreed that the Project was not likely to adversely affect the sturgeon.  AR21338; AR21356.

In addition, the Corps found permanent impacts would result only from the mattresses, not the jet plow.  If the Court ultimately found in Plaintiff's favor, the concrete mattresses could

be removed and there would be no permanent impact.  Thus, Plaintiff has not demonstrated irreparable injury.

Federal Defendants' opening brief also addressed the idea that a procedural injury can support issuance of an injunction.  ECF No. 24 at 23.  As the Court found in *Northwest Bypass Group*, here, there is no likely NEPA violation, as discussed above.  *Nw. Bypass Grp.,* 470 F. Supp. 2d at 65.  The record shows that the Corps conducted a thorough analysis, including public comment, and also considered the state agency's evaluation of the Project.  Accordingly, there is no risk here that "governmental decision makers [made] up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment."

Further, even if Plaintiff demonstrated a likely NEPA violation, an injunction should not issue.  *See id.* (citing *Conservation Law Found. v. Busey*, 79 F.3d 1250, 1271–72 (1st Cir. 1996)) (noting that a likely NEPA violation does not automatically call for an injunction); *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013).  As another district court explained,

> Although Plaintiffs are correct that an *established* NEPA violation might rise to the level of irreparable harm when coupled with sufficient evidence of environmental injury, *see, e.g., Fund For Animals v. Norton,* 281 F.Supp.2d 209, 220 (D.D.C. 2003); *Sierra Club v. Marsh,* 872 F.2d 497, 500 (1st Cir. 1989), Plaintiffs have thus far failed to demonstrate that they are likely to succeed with their arguments that the Federal Agencies have violated any duty to conduct an environmental review under NEPA, as discussed above.  Surely, after having missed the mark with respect to that prerequisite, Plaintiffs cannot expect that the alleged but unproven procedural violation will carry the day on the issue of irreparable harm.

In light of the negligible physical impacts of the Project, the mitigation for remaining impacts, the public need for the Project, and the extensive process and scrutiny the Project has undergone,

Plaintiff has not shown a NEPA or CWA violation of such immediate and irreparable harm that an injunction is necessary.

**C.      This Court should deny Plaintiff's motion because Plaintiff has not demonstrated that all four preliminary injunction factors weigh in its favor.**

Federal Defendants' opening brief demonstrated that the public interest and balance of harms favor not enjoining the Corps' permit. We do not restate those arguments here, but note that it is Plaintiff's burden to demonstrate that all four factors weigh in its favor. Plaintiff has not carried its heavy burden of justifying this extraordinary relief. The Court should therefore deny Plaintiff's motion.

## III.      CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted this 7th day of October, 2019.

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment & Natural Resources Division

*s/ Devon Lehman McCune*
DEVON LEHMAN McCUNE
Senior Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1487
Fax: (303) 844-1350
devon.mccune@usdoj.gov

KATE R. BOWERS
Senior Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section

P.O. Box 7611
Washington, D.C.  20044
(202) 307-0930
kate.bowers@usdoj.gov


OF COUNSEL
Julie A. Byars
Assistant District Counsel
New England District
U.S. Army Corps of Engineers

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2019, a copy of the foregoing Federal Defendants'

Response to Plaintiff's Supplemental Brief was filed through the Court's CM/ECF management

system and electronically served on counsel of record.

> */s/  Devon Lehman McCune*
> Devon Lehman McCune
> Senior Attorney